# EXHIBIT 4

(redacted deposition transcript of
Plaintiff's corporate representative)

# In The Matter Of:

*MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ v.*
*THE LOCAL BRAND, INC.,*

---

*Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash*

## April 10, 2023

---



(850) 737-9071
info@precisionreportingandvideo.com

BAY COUNTY
4408 Delwood Lane, Suite 20
Panama City, Florida 32408

WALTON COUNTY
12889 Emerald Coast Pkwy, Suite 107A
Miramar Beach, Florida 32550

*Original File CorpRep041023MC3InvestmentsREDACTED.txt*
*Min-U-Script® with Word Index*

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 3 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ vs.   Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                        April 10, 2023

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                 PANAMA CITY DIVISION

 3  MC3 INVESTMENTS LLC
    d/b/a THE LOCAL CAFÉ,
 4
          Plaintiff,
 5
 6  vs.                      Case No. 5:22-cv-00260
 7  THE LOCAL BRAND, INC.,
 8          Defendant.
    _____/
 9
    THE LOCAL BRAND, INC.,
10
          Counter-Plaintiff,
11  vs.
12  MC3 INVESTMENTS LLC
    d/b/a THE LOCAL CAFÉ,
13
          Counter-Defendant.
14  _____/
15
16    (PAGE 125, LINE 7 to PAGE 130, LINE 14 REDACTED AS
17         CONFIDENTIAL ATTORNEY EYES ONLY)
18  _____
19  DEPONENT:              MC3 INVESTMENTS LLC
                           (Gregory Cash)
20
21  DATE:                  April 10, 2023
22  TIME:                  9:28 a.m. to 1:33 p.m. CST
23  LOCATION:              4408 Delwood Lane
                           Suite 24
24                         Panama City, Florida
25  REPORTED BY:     AMBER L. RODRIGUEZ, RPR, CSR, FPR-C
                     Stenographic Court Reporter
```

**Page 2**

```
 1                   APPEARANCES
 2  FOR THE PLAINTIFF:    H. JARED DOSTER, ESQUIRE
                          DOSTER LAW PLLC
 3                        97 West Oak Avenue
                          Suite 300
 4                        Panama City, Florida 32401
                          (850) 319-4248
 5                        jared@doster.law
                          support@doster.law
 6
 7  FOR THE DEFENDANT:    JEFFREY S. CARTER, ESQUIRE
    (Via Zoom)            Jeff Carter, P.A.
 8                        PO Box 228
                          Panama City, Florida 32402
 9                        (850) 387-0787
                          jeff@jeffcarterpa.com
10
11  FOR THE DEFENDANT:    Harold Clayton McGurk
    (Via Zoom)            The Law Office of Clay McGurk
12                        PO Box 1488
                          Orange, California 92856
13                        (949) 395-3942
                          claymcgurk@gmail.com
14
15
16
17  _____
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF PROCEEDINGS
 2  GREGORY CASH                                PAGE
 3    Direct Examination By Mr. McGurk:            5
 4    Cross-Examination By Mr. Doster:           123
 5  CONFIDENTIAL PORTION EXCEREPTED              125
 6  CERTIFICATE OF OATH                          132
 7  CERTIFICATE OF REPORTER                      133
 8  ERRATA SHEET                                 134
```

**Page 4**

```
 1              INDEX OF EXHIBITS
 2  Exhibit 1    Documents from Sunbiz.org         9
 3  Exhibit 2    Documents from Sunbiz.org        11
 4  Exhibit 3    Wallsign Replacement Face        28
 5  Exhibit 4    Wallsign Replacement Face Storefront  28
 6  Exhibit 5    Pylon Replacement Face           30
 7  Exhibit 6    Pylon Replacement Face           30
 8  Exhibit 7    E-mail Correspondence, Oct 28, 2022  48
 9  Exhibit 8    Google Search                    54
10  Exhibit 9    Text Messages                    64
11  Exhibit 10   Text Message                     81
12  Exhibit 11   Wallsign Replacement Face        83
13  Exhibit 12   Wallsign Replacement Face        95
14  Exhibit 13   Pylon Replacement Face           95
15  Exhibit 14   Pylon Replacement Face           95
16  Exhibit 15   Door Vinyl                       95
17  Exhibit 16   Photograph                       95
18  Exhibit 17   Webpage                         101
19  Exhibit 18   Text Messages                   118
20  Confidential Exhibit A                       125
21
22
23
24
25
```

Page 5

1          P R O C E E D I N G S
2          COURT REPORTER: Please raise your right
3    hand.
4          Do you swear or affirm to tell the truth, the
5    whole truth, and nothing but the truth so help you
6    God?
7          THE WITNESS: I do.
8               GREGORY SCOTT CASH
9    was called as a witness, and after having been first
10   duly sworn was deposed and testified as follows:
11              DIRECT EXAMINATION
12   BY MR. McGURK:
13   Q    Good morning, Mr. Cash. I am Clay McGurk
14   with Jeff Carter. We represent The Local Brand, Inc. in
15   Florida. This is a deposition, and I will ask you a
16   series of questions. You must answer them truthfully
17   unless your attorney tells you clearly and directly not
18   to answer. There is no judge present. This is a legal
19   proceeding, though, and just like testifying in court,
20   you're under the same obligation under oath to tell the
21   truth.
22        Do you understand this?
23   A    Yes, I do.
24   Q    Are you prepared to answer the questions
25   today?

Page 6

1    A    Yes, I am.
2    Q    Okay. Is this your first deposition?
3    A    Yes.
4    Q    Also, if you need a break, you know, what
5    normally happens I think is that we -- you answer a
6    question, and then we'll take a break then. Okay?
7    A    Uh-huh.
8    Q    Unless somebody has another way they want to
9    do it. But, you know, if you need a break, just let us
10   know.
11   A    No problem.
12   Q    Okay. So what is your full name?
13   A    Gregory Scott Cash.
14   Q    Where do you live?
15   A    Panama City, Florida.
16   Q    How long have you lived there?
17   A    Well, I'm born and raised here, but I've
18   lived at this house for five years.
19   Q    Okay.
20   A    I'm from --
21   Q    Where did you live previously?
22   A    -- Panama City.
23        Panama City.
24   Q    Oh. Have you always lived in Bay County,
25   then?

Page 7

1    A    No. In college, I lived in Georgia. And
2    mainly, was born here, went to Georgia for college and
3    then been back here since.
4    Q    Oh. How long were you in Georgia?
5    A    Three years.
6    Q    Okay. Well, was that, like, when you were
7    getting your degree?
8    A    Yes.
9    Q    Okay. Do you live alone?
10   A    No. I'm married with three children.
11   Q    Oh, okay. What is your wife's name?
12   A    Megan Cash.
13   Q    And your children's name?
14   A    Arianna, Carol Marie and Tessa.
15        MR. DOSTER: Can I interject something,
16   Mr. McGurk? Greg Cash is here to testify as the
17   corporate representative for MC3 Investments. So I
18   don't mind there being some individual questions,
19   but MC3 is the deponent for today.
20        MR. McGURK: Thank you. And I -- that was
21   actually it for that.
22        MR. DOSTER: Okay.
23   BY MR. McGURK:
24   Q    Other than a few other small questions. Do
25   you have any other real estate that you own?

Page 8

1    A    No, sir.
2    Q    What is your phone number?
3    A    (850) 258-9289.
4    Q    And your e-mail address?
5    A    GCash21@hotmail.com.
6    Q    Okay. So you had said that you were born in
7    Florida?
8    A    Yes, sir.
9    Q    In Bay County?
10   A    Yes, sir. On Tyndall Air Force Base, 1969.
11   Q    Okay. And what college degrees do you have?
12   A    I have an AA from Gulf Coast Community
13   College, which is now Gulf Coast State College.
14   Q    And that's in Georgia, you said?
15   A    That's in Bay County.
16   Q    Oh, it's in Bay County?
17   A    Yes. Panama City. I went two years and then
18   went to Georgia. Actually, thought I was going to
19   continue my college degree but found out the
20   out-of-state tuition was quite high. But that was my
21   motive and came back here in '93. But yeah, I have a
22   two-year AA degree.
23   Q    Before opening the café, did you run any
24   other businesses?
25   A    Gulf Coast Telecom is my primary company,

Page 9

1 business.
2    Q    Okay.  I'm going to share something.  Let's
3 see.  There it is.
4        (Exhibit 1 was marked for identification.)
5 BY MR. MCGURK:
6    Q    Can you see this document that I'm sharing
7 right now?
8    A    Yes, I do.
9    Q    Is -- this is from Sunbiz.
10   A    Uh-huh.
11   Q    And this -- is this the company that you were
12 just talking about?
13   A    Yes, sir.  Gulf Coast Telecom, LLC.
14   Q    Okay.  And it shows here that -- what date
15 was it started around?
16   A    I'm not really sure.  I'm not sure.
17   Q    It shows 2011.  Is that about right from your
18 recollection?
19   A    It's possible.  It says Date Filed.  Probably
20 around then, yeah.  That's July 18.  I'm not really sure
21 of the exact date.
22   Q    Actually, it is July 18th.  Exactly right.
23   A    No.  I mean, I'm reading it.  Sorry.
24   Q    Okay.  I notice that there's two people
25 listed.  And the first is -- is Megan Cash, your wife?

Page 10

1    A    That is my wife.
2    Q    Okay.  And then also you.  Is that you, Greg
3 Cash?
4    A    Yes.
5    Q    Who's also a manager?
6    A    Uh-huh.
7    Q    Okay.  What role do you play in Gulf Coast
8 Telecom?
9    A    I'm 90 percent owner.  My wife is 10 percent.
10       MR. DOSTER: I would like to object at this
11   time. I don't see how Gulf Coast Telecom relates
12   to MC3 Investments or the matters related to the
13   corporate representative deposition.  So could you
14   enlighten me, Mr. McGurk, as to where this is
15   going?
16       MR. MCGURK: Just trying to figure out his
17   background as it relates to a previous -- before a
18   café.  That's all.
19       MR. DOSTER: Well, this isn't an individual
20   deposition.  This is a corporate representative
21   deposition.  So I'm going to object and ask that
22   the questions be limited to the matters.  There are
23   13 topics listed in the corporate rep deposition
24   notice, and I'm going to ask that the questions now
25   be limited to those topics.

Page 11

1 BY MR. McGURK:
2    Q    Okay.  Is MC3 related at all to Gulf Coast
3 Telecom?
4    A    No, sir.
5    Q    Okay.  I also have the Sunbiz for MC3
6 Investments.
7        (Exhibit 2 was marked for identification)
8 BY MR. MCGURK:
9    Q    What is the name of your café?
10   A    The Local Café.
11   Q    Okay.  Did you file a trademark application
12 at the USPTO for The Local Café?
13   A    I don't think so.  Did I file a trademark --
14 I don't believe so.
15   Q    What trademark applications have you filed?
16   A    I don't believe I have filed any yet.
17   Q    Did you file any trademark applications at
18 the State of Florida -- with the State of Florida?
19   A    Not that I recall.
20   Q    Where is your café located?
21   A    401 East 23rd Street, Unit I, Panama City,
22 Florida 32405.
23   Q    So MC3 Investments, LLC, is that the owner of
24 the café?
25   A    Yes.

Page 12

1    Q    And this is again this.  So the address that
2 appears at Sunbiz, 401 East 23rd Street -- I think
3 that's Suite I, as you said, Panama City, Florida, that
4 is the address of the café?
5    A    Yes, it is.
6    Q    Okay.
7    A    Excuse me.
8    Q    What does "MC3" mean?
9    A    Megan Cash.  3 means my three daughters.
10   Q    Okay.  What does "Investments" mean?
11   A    Just a terminology for a name of an
12 investment group or whatever, if anything, I guess.
13 It's just a name.
14   Q    Okay.  Did you reserve the name of MC3
15 Investments before it was formed?
16   A    No.  No, sir.
17   Q    You didn't.
18       What made you choose an LLC or the
19 corporation?
20   A    Not a lot of knowledge with that.  I just
21 assumed LLC, based on my previous experiences, was kind
22 of the normal thing to do.  I don't really know a lot of
23 details.
24   Q    What other names did you consider before you
25 filed for MC3 Investments?

Page 13

1    A    That was it.  Trying to leave something for
2  my family, and this is the reason why I pursued this --
3  what is the word I'm trying to -- it's -- the reason why
4  I pursued this was something for my family.  And
5  immediately I came up with MC, which is the letters of
6  my wife, and 3, representing my three daughters.
7    Q    Did you file the paperwork to form the LLC?
8    A    My office did.  My office.
9    Q    Who is your -- your -- which office?
10   A    My -- I've got -- my corporate office is
11  there at the café.  In the back, I have an office there.
12   Q    Oh.
13   A    Yeah.  It controls -- it's kind of my
14  corporate office, per se, I created.  And Gulf Coast
15  Telecom and MC3 Investments, I work out of that office.
16  So that's where I filed it from my computer in my
17  office.
18   Q    So you have an office inside the café in the
19  back?
20   A    Yes, sir.
21   Q    That's what you just said, right?
22   A    Yes, sir.
23   Q    Okay.
24   A    And I filed it through there.  I didn't go
25  like to a business or through an attorney or anything

Page 14

1  like that.  I just filed from my office.
2    Q    That was my next question.  Did you file it
3  yourself, or did you file with an attorney?
4    A    Myself.
5    Q    Yourself.  Okay.
6         Did you file it online?
7    A    Yes, sir.
8    Q    Okay.  Are you the sole member of MC3?
9    A    Yes, sir.
10   Q    When did you think about opening the café?
11   A    I don't know the exact date, but it was
12  early, earlier in the year.  I opened November 8th, so
13  it was -- I don't know, maybe February.  I don't know.
14  I'm not sure exactly what date.  I'm always looking for
15  ways to create some type of a -- you know, investment
16  opportunities to help my family.  And it was just an
17  idea, thought that I came up with.  I don't know the
18  exact date and time that I created that.  It's just...
19   Q    What made you want to open a café?
20   A    Like I said, I wanted to leave something -- I
21  wanted something for my family, my wife and children.
22  Something for a future for them.
23   Q    But in particular, for a café versus
24  something else, you know, why a café versus, you know,
25  like a clothing store or something else, a tire store?

Page 15

1    A    Yeah.  Well, growing up at a young age, I
2  started out as busboy and then worked into a waiter
3  through the years and then to a restaurant manager
4  through the years.  So I have a food background.  I
5  enjoy food.  I enjoy people.  I enjoy the hospitality
6  aspect of having a restaurant and a café.
7         You know, I like having something good and
8  presenting it and watching people enjoy it and being
9  part of that.  I had Gulf Coast Telecom.  Obviously,
10  that's a technical field that I've become successful in.
11  But when I saw an opportunity to invest in something,
12  you know, it seemed kind of simple for me.  I guess I'm
13  kind of a foodie in a way, at that.
14         And my mother was a very good cook, a great
15  woman and a great mother.  And she inspired me with some
16  of her recipes and ideas from that.  And over the years,
17  I've thought about that since she passed, in '09 with
18  cancer at 63.  I've always thought about her and her
19  food.  And some of the few items that's on my menu that
20  stand out the most are her direct recipes.  So, you
21  know, all that together kind of drove me to be where I'm
22  at today.
23   Q    So you -- let me just clarify.  Have you
24  owned a café or restaurant or bar before?
25   A    No, I haven't.

Page 16

1    Q    Okay.  But -- and did you operate or manage a
2  café, restaurant or bar before?
3    A    I have.
4    Q    Oh.  You -- which one?
5    A    My good friend Dee Brown, he owns Dee's
6  Hangout.  I worked in restaurants with him at the
7  Lighthouse Restaurant, which is now the Grand Marlin.
8  And before that, it was the Boatyard.  We opened up the
9  Lighthouse Restaurant, and I want to say it was maybe
10  around 1994, 1995.  And I was the daytime restaurant
11  manager for him when we opened it.  And then -- for a
12  short time.  But that's the management experience that I
13  have was with the Lighthouse Restaurant.  And it's
14  not -- not open there anymore.
15   Q    That's what I was just going to ask you.  Is
16  it still open?
17   A    No.
18   Q    Did it close because of the hurricane?
19   A    No, no.  This was back in '94.  So there's
20  been several restaurants that I've been a part of with
21  Dee Brown, who is a local chef.
22   Q    Oh.
23   A    And he has a restaurant that I've worked with
24  over the years that have come and gone.  Not from not
25  being successful.  It's just, I think restaurant

Page 17

1  businesses, you know, some of them have been here 50
2  years. Some of them are successful for, I don't know, a
3  short period of time from my experience.
4          MR. DOSTER: I'm going to object at this
5  point because these questions don't seem to be
6  related to MC3 Investments. They seem to be more
7  related to an individual deposition.
8          MR. MCGURK: No, it's related to the café.
9          MR. DOSTER: How is it related to the café?
10         MR. McGURK: Understanding his background is
11  important.
12         MR. DOSTER: The deponent is MC3 Investments,
13  and MC3 Investments doesn't seem to be related to
14  those previous restaurants.
15         MR. MCGURK: I'm just asking his background
16  in restaurants, but I'm not going to be arguing
17  points. Objection noted, right, and we move on.
18  BY MR. MCGURK:
19    Q    Do you have any culinary training?
20    A    No. All on the job.
21    Q    How many places did you visit before you
22  settled on the current location of the café?
23    A    None.
24    Q    None. Okay.
25    A    Well, I mean, this café was an opportunity of

Page 18

1  location on 23rd Street that opened up available for
2  rent. And it used to be a pizza place, and before that
3  it used to be my best friend's kitchen. So it appeared
4  to be a great location for a café. So I pursued it.
5    Q    Did you use a real estate agent?
6    A    No, I did not use a real estate agent. But
7  obviously to rent it there was one that represented the
8  owner of the place. So no, I didn't use an agent. No,
9  sir.
10    Q    Okay. So clarify, what made you select the
11  current location of the café?
12    A    23rd Street is one of the busiest locations
13  in Bay County as far as business and restaurants go.
14  And this location kind of already had a kitchen in it.
15  It already had a cooler and a freezer. And for most --
16  for the most part was ready to go, and that was
17  appealing as well. So, you know, having a restaurant
18  set up already ready and the location. Right next to
19  Home Depot.
20    Q    Okay. Did you purchase or lease the
21  property?
22    A    Lease.
23    Q    Was there a down payment for the
24  purchase/lease?
25    A    Yes.

Page 19

1    Q    What is the term of the lease?
2    A    I think that it's five years with another
3  five-year option after that.
4    Q    Oh, okay.
5    A    I think so.
6    Q    When was the starting date for the lease?
7    A    Trying to remember here. Let's see. I
8  opened in November. I think September -- I don't know
9  the exact date -- is when I signed it. And I was given
10  a month buildout. And I had to pay $8,900 up front
11  for -- I can't remember exactly. The first and last and
12  the deposit, I had to pay almost $9,000 on that day of
13  September. And I had a month buildout, October, and
14  then opened November 8th.
15    Q    Okay. November 8th was your opening date?
16    A    Yes, sir.
17    Q    Okay. So the end of the lease is, let's just
18  say, September 2028?
19    A    I guess.
20    Q    You said about five years, right?
21    A    I think so, yes, sir.
22    Q    Okay. How much were your startup costs?
23    A    I don't really have those figures in front of
24  me right now. It was a considerable amount. I had to
25  remodel the inside. I had to purchase some equipment.

Page 20

1  It was quite substantial, I would say, to get it open
2  for November 8th, but I don't know the exact numbers.
3    Q    You think it was like over a hundred
4  thousand?
5    A    No. No.
6    Q    It was under that? Okay. Because I was just
7  wondering, you know, with tables, chairs, counters, you
8  know, getting everything, the plates, you know, the
9  decorations, I was just wondering.
10         Do you think it was over 25, then, before 25
11  and 50, somewhere?
12    A    I'm sure it was over 25.
13    Q    Okay.
14    A    Yeah.
15    Q    All right. So are you the sole owner?
16    A    Yes, I am.
17    Q    Okay. Are there any other directors than
18  you?
19    A    No.
20    Q    No. Any officers or executives other than
21  you?
22    A    Just me.
23    Q    No. Does anyone else have an interest, right
24  or lien in the café?
25    A    No. Believe it or not, all my friends, no

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 8 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFE and   Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                                       April 10, 2023

**Page 21**

1 one wanted to be involved.
2 Q   Oh.
3 A   But I proved them wrong, which kind of drove
4 me.  They wished they were with us.
5 Q   Sorry with the cold, and I apologize I have
6 that cough.
7 A   It's okay.
8 Q   Is your café a restaurant?
9 A   I would call it that, yes.  "Café" is just a
10 word, just a word to name it.  I mean the local
11 restaurant, The Local Café, whatever, it's just
12 terminology. It's small.
13 Q   How many employees work at your café?
14 A   Seven to ten.
15 Q   Do you have a general manager?
16 A   I am the general manager.
17 Q   Oh, okay.  Is there an operating manager or
18 somebody that, you know, runs day-to-day other than you?
19 A   Yes.  Crystal Pitts.
20 Q   How long has Crystal been with you?
21 A   She's been with MC3 Investments since, let's
22 say, August or September, you know, when we signed the
23 lease and formed this company.
24 Q   Okay.  So she's an employee of MC3?
25 A   Yes.

**Page 22**

1 Q   Okay.  Do you work at the café?
2 A   I do in like an owner's capacity.  I don't
3 really do, you know -- I help when I can, when needed.
4 Q   Do you cook at the café?
5 A   No.
6 Q   No, you don't?
7 A   Huh-uh.
8 Q   How many cooks do you have at the café?
9 A   Two, two to three cooks and a dishwasher.
10 Q   What culinary schools did they attend, do you
11 remember?
12 A   I don't know what school one of them went
13 to -- I've got two of them that have culinary education
14 degrees or schooling and one that's not.  But I'm not
15 sure the name of them.  One of them is from Georgia, and
16 the other one is, I think, from around this area.
17 Q   What is your typical profit margin for each
18 of the meals you serve?
19 A   I'm not sure.  I think typical is like maybe
20 20 percent.  I don't know.  I think what they say that
21 they want you to be is 20 or 30 percent.  But I'm not
22 sure if that's what I have or if that's what it is.  I'm
23 not really sure, to be honest with you.
24 Q   Do you think about the property margin based
25 on the meals per day or per week; not per, then, how

**Page 23**

1 much it is per meal, or do you?
2 A   I don't know per meal, and I don't really --
3 what I've been paying attention to is my daily sales, my
4 weekly sales, and they fluctuate.  It fluctuates as far
5 as -- I look at basically my sales for the day, daily,
6 weekly.
7 Q   How many people have to attend or eat at your
8 café in order for you to clear a profit every day, or
9 what did you estimate it to be?
10 A   I'm not -- I'm not sure.  I know what I've
11 been told that I should have, a hundred, but I haven't
12 had close to that, really.  I'm not really sure.
13 Q   How many attend your café, eat at your café
14 right now about every day, average?
15 A   I could be honest and say I have no clue, but
16 I can guess.  I mean, I saw one the other day that said
17 45 people.  I really don't know.  Sorry.
18 Q   Okay.  It's okay.
19 Do you have any health citations by the City?
20 A   Any what?
21 Q   Health citations?
22 A   Oh, no, sir.  No, sir.
23 Q   How did you decide on your menu?
24 A   Like I said, my mother's recipes inspired me,
25 and then we added to that, you know, other simple stuff,

**Page 24**

1 like green beans and stuff and potatoes.  But I just
2 wanted to have a local home-cooked Southern-style menu,
3 which is what we have.  Kind of what we call here, meat
4 and three.  Have you ever heard of that?
5 Q   Yes, I have.
6 A   Yeah.
7 Q   That makes more sense now.
8 So how did you decide which food to serve on
9 each day with the meat and three?
10 A   We just came up with a menu of something
11 different every day.  I mean, we have fried chicken
12 every day.  And we, you know, together with my kitchen,
13 came up with a menu that had some of my mother's recipes
14 and some other ideas from some of my cooks in the
15 kitchen, like meatloaf and chicken pot pie, some of the
16 stuff they've created and -- themselves.  And we all
17 together have pretty much designed the food and feel of
18 the place.
19 Q   So you said it's a Southern style.  So I'm
20 just curious, does Bay County have a well-known flavor
21 of food?
22 A   Yes.
23 Q   And what is that?
24 A   Well --
25 Q   Is it Southern style like that?

Page 25

1    A    Most -- well, you have Panama City Beach,
2  which is ten minutes, and it's mostly seafood and
3  steaks, and that's driven heavily on the beach.  In
4  town, you kind of have more of a local community feel of
5  restaurants.  And there's several others in town in the
6  area that do kind of serve similar type food.  So yeah,
7  it is kind of known here in the area.
8    Q    Do you have any special ingredients that you
9  use in your food?
10   A    Nothing special.
11   Q    Okay.  What would your reaction be if someone
12 opened a café a few miles down the road, used The Local
13 Café as their name and offered the exact same menu?
14        MR. DOSTER: Objection.  How does that relate
15    to the topics set forth in the Notice of
16    Deposition?
17        MR. McGURK: Exactly on point.
18        MR. DOSTER: Which topic?
19 BY MR. McGURK:
20   Q    Please answer the question.
21        MR. DOSTER: I'm going to instruct the
22    witness not to answer until you state which topic
23    from the deposition notice that question relates
24    to.
25        MR. MCGURK: It is about the café.

Page 26

1        MR. DOSTER: Do you have a copy of the
2    corporate representative deposition notice that was
3    served on MC3 Investments?
4        MR. McGURK: Not in front of me right now.
5        MR. DOSTER: Well, I have a copy in front of
6    me, and it would probably be worthwhile if you had
7    a copy in front of you during your deposition.
8        MR. MCGURK: He actually has to answer the
9    question.
10       MR. DOSTER: I'm instructing him not to
11    answer that question.
12       MR. MCGURK: Okay.  So I would have to do a
13    Motion to Compel.  Okay.  That's what you're
14    asking, Jared?
15       MR. DOSTER: I've stated my objection.
16 BY MR. MCGURK:
17   Q    When did you decide on using Crow Signs?
18   A    It's one of the local -- it's one of the
19 local companies in town that does signs, and they do a
20 good job.  I mean, I don't know.  I've never owned a
21 restaurant before or needed a sign before so...
22   Q    Who did you speak to at Crow Signs?
23   A    The owner's name is Steve Crow.
24   Q    So have you done business with him in the
25 past?

Page 27

1    A    No, I haven't.  He's a personal friend of
2  mine.
3    Q    Is Mr. Crow the owner of Crow Signs, do you
4  think?
5    A    Yes, he is.
6    Q    Okay.  Did you ever deal with anyone else
7  from Crow Signs?
8    A    I didn't, but there's -- he has an office
9  there that works on -- I don't know how he runs his
10 office, but I don't recall talking to anyone directly.
11 I think he handled that within himself.
12   Q    Does he install the signs too?
13   A    Yes.
14   Q    What did Crow Signs promise to do?
15   A    Promised to create a sign for me, a logo and
16 a sign.
17   Q    Did you get competing bids from any other
18 sign place?
19   A    No.
20   Q    Was there a payment plan?
21   A    No.
22   Q    How much money was required up front?
23   A    There was nothing up front.
24   Q    Was the money -- when was the payments due,
25 then?

Page 28

1    A    When the sign was completed, I got an
2  invoice, and then I paid it timely.  Yeah.
3    Q    Did you pay by check, credit card or cash?
4    A    I can't remember.
5    Q    Do you have any payment receipts for any of
6  the payments made?
7    A    I'm sure I do somewhere.  It was one payment.
8    Q    Okay.  Let me -- let's see.  Where is it?
9  There it is.
10        (Exhibit 3 was marked for identification.)
11 BY MR. MCGURK:
12   Q    This is what I got.  Can you see this first
13 page?
14   A    Uh-huh.
15   Q    Was this -- this one and -- let me scroll
16 slowly.  And then I think it is with this page because
17 they both say "Wallsign Replacement."
18        And then Exhibit 4 is, I guess, showing it on
19 the front of the building.
20        (Exhibit 4 was marked for identification.)
21 BY MR. MCGURK:
22   Q    So this one, was this order prepared by Crow
23 Signs?
24   A    Yes.
25   Q    What is this for?

---

Page 29

1    A    It's for the logo and signage for the café.
2    Q    Can you -- is this date accurate, the
3 September 1st, '22?
4    A    If that's what it says, yes.  I'm looking at
5 it.  6 -- is that 6/1/22?
6    Q    I -- let me increase it.
7    A    Yeah.
8    Q    I see 9/1.
9    A    That's 9/1.  Sorry.  I thought you said 6.
10 So 9/1/22 does sound quite familiar because,
11 like I said, we signed a lease in September and had a
12 month buildout, October, and opened November.  So yeah,
13 9/1/22.
14    Q    How much did this cost?
15    A    I don't know off the top of my head.  I want
16 to say --
17    Q    Can you approximate?
18    A    -- 3 to 5,000.
19    Q    3 to 5.  Okay.
20    A    Yeah.
21    Q    Who assigned or approved each of the orders?
22    A    Who approved it?  I did.
23    Q    Okay.  Do you have any payment receipts for
24 this one?
25    A    I mean, I've got them somewhere.  I don't --

---

Page 30

1 I do have them, yes.
2    Q    When was this sign installed at the café?
3    A    I'm not sure of the exact time.  I would have
4 to look it up.  Somewhere between -- somewhere between
5 September 1st and October 1st, I'm sure.  I'm not
6 sure.  Excuse me.
7    Q    Were there any problems in the installation
8 of the sign?
9    A    Not that I'm aware of.
10    Q    Okay.  Then on Exhibits 5 and 6, there's
11 something called "Pylon Replacement," and this is, I
12 guess, where it was going to go.  This is what I got
13 from you guys.
14        (Exhibit 5 was marked for identification.)
15        (Exhibit 6 was marked for identification.)
16 BY MR. MCGURK:
17    Q    On this, same type of questions.  Was this
18 order prepared by Crow Signs?
19    A    Yes.
20    Q    What was this for?
21    A    It was for the signage for the café.
22    Q    Okay.  In what area, where was it going to
23 appear?
24    A    Well, as you can see on the pictures you've
25 shown, it was the front of the café, the door.

---

Page 31

1    Q    Or on this one, it was --
2    A    Out by the road.
3    Q    Out by the road.  Okay.
4    A    Uh-huh.  We're part of The Home Depot
5 shopping center.  There's multiple areas there.
6    Q    Okay.  Because the pylon replacement means
7 that big sign, right, out in front by Home Depot?
8    A    Yes.  If you can see the picture example he's
9 given, it was previous a pizza place, and now it's going
10 to be The Local Café.
11    Q    Okay.
12    A    They replaced it.  He wanted to show, Hey,
13 this is what it was when I showed up; this is the way it
14 is when I left.
15    Q    Is the date 9/1/22 accurate?
16    A    I believe so.  It's what it says.
17    Q    Okay.
18    A    That's all I would know.
19    Q    And Crow Signs prepared this?
20    A    Yes.
21    Q    How much did this one cost?
22    A    It was all together.  It was down by the
23 road, the door and the signage above the restaurant, 3-
24 to $5,000.
25    Q    Oh, so all three signs were three to five?

---

Page 32

1    A    Yes.
2    Q    Okay.
3    A    I believe it was a package -- I believe it
4 was a package deal.
5    Q    Okay.
6    A    One didn't come after the other.  It was part
7 of the whole.
8    Q    Do you -- did Crow Signs make the vinyl sign
9 for the door?
10    A    Yes.
11    Q    Where is the order for the vinyl sign?  I
12 didn't get it.
13    A    I'm not sure.  I would -- like I said, I
14 would like to think that -- it may have been -- I'm not
15 sure.  It may have been, Hey, I also put it on the door.
16 I don't know.  I just know it all came from the same
17 invoice.  It was all paid the same.  It may have been
18 something he included, Hey, I'll put this on the door as
19 well, or Hey -- I'm not really definitely sure how that
20 transpired back then.
21    Q    When was the pylon sign installed?
22    A    I don't know.
23    Q    When was the door vinyl sign installed?
24    A    I'm not sure.  I don't know.
25    Q    Okay.  You --

---

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 11 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ vs.   Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                                   April 10, 2023

Page 33

1    A    I mean, to tell you the exact date, I really
2 don't know.  Probably could leave here today and go
3 research it and look and see when or what, but I don't
4 really have that information in front of me of when.  It
5 was before I opened, November 8th.  I know that.
6    Q    Okay.  Who decided to use "The Local Café"
7 for the name of your café?
8    A    I did.
9    Q    Did anybody else have a say in the name of
10 the café?
11    A    No.
12    Q    Did anybody else recommend another name other
13 than that?
14    A    No.
15    Q    What other names beside The Local Café did
16 you think about using?
17    A    Mimi's Café, after my mother.
18    Q    What made you not choose that one?
19    A    There's -- I don't know.  I just thought,
20 well, I wanted to -- I had an idea -- I'd like to say I
21 have a business mind -- creating a brand for myself with
22 a local feel, and which is what drove me to have the
23 name and the café and the atmosphere.  It's just, I
24 wanted to have a local place.
25         I mean, I just came up with that, you know,

Page 34

1 the name, and changed it from Mimi.  I mean, Mimi's was
2 after my mother, but I just kind of took it off the
3 personal aspect of it as far as branding it, per se.
4    Q    What searches did you do to see if anybody
5 else had a café called The Local Café in Bay County or
6 Florida?
7    A    I didn't look at any.
8    Q    You didn't do any searching of any name of a
9 café before on The Local Café in Bay County?
10    A    The only example of searching, whether it's
11 Gulf Coast Telecom or The Local Café or anything as far
12 as a business or name, from my experiences is whenever
13 you go to register with the State of Florida and you
14 type in the name.  And as long as there's not one there,
15 then you go forward.
16         That's the only search or confirmation of
17 creating this, where it came from.  From my experience,
18 that's how you kind of do it from my angle.  I go to
19 register -- I think it's called a "fictitious name" with
20 the State of Florida, and that's when you find out if
21 it's available or not.
22    Q    But a fictitious name -- you did the
23 fictitious business name for the café?
24    A    I think I did.  Because usually you have to
25 have a fictitious name before you can open your company

Page 35

1 as an LLC.  Well, MC3 Investments was an LLC.  But then
2 to open The Local Café as an entity and get an FEIN
3 number, you know, you have to follow that pattern.
4         I'm not 100 percent sure of the exact steps
5 of that pattern, but that's when I find out or search,
6 if I want to open a company in the state of Florida, if
7 the name is going to be matched or good or not is when
8 you go to register, per se.
9    Q    So you didn't search any -- you didn't do any
10 Google searching at all?
11    A    No, sir.
12    Q    Did you search Yelp?
13    A    No, sir.
14    Q    Did you search any other platforms?
15    A    No, sir.
16    Q    Did you consult a service that has a list of
17 every restaurant in the U.S.?
18    A    No, sir.
19    Q    How many restaurants in Florida use the word
20 "Local" in their name?
21    A    Not really sure.
22    Q    Does it bother you that there are at least
23 three other restaurants in Florida that have the word
24 "Local" in their name?
25    A    It does not bother me.  I will say that I'm

Page 36

1 aware of around the country, and whenever I was doing my
2 own restaurant and something would pop up it, it would
3 be like somewhere up in Tennessee or something, you
4 know, when you use the word "The Local" or "Local" in
5 that aspect, it's usually -- it was something that was
6 not even nowhere near here, much less Florida.  But no,
7 I didn't -- I didn't know that.  I'm not aware.
8    Q    What is the meaning, then, of "Local" in your
9 logo?
10         MR. DOSTER: Objection, form.
11 BY MR. McGURK:
12    Q    What is the meaning of the word "Local" in
13 your logo, in this logo, the one that's shown, Local
14 Café?
15    A    What is the meaning of "local"?
16    Q    Uh-huh.
17    A    Oh.  Well, from -- in this area growing up,
18 you -- the word "local" has been derived from being from
19 this area.  You get local discounts if you're a local.
20 There's different meanings of the word "local."  And for
21 me, I wanted to have a café with a local feel where
22 people come in from the community.  You know each other.
23 And that's basically what it's turned into be is a local
24 feel.  And I wanted to have a café that --
25    Q    Okay.  So is your meat, vegetables and fruits

Page 37

1  locally grown in Bay County?
2      A    I have no idea.
3      Q    So it doesn't refer to locally sourced food?
4      A    No.
5      Q    It just means local in Bay County.  Okay.
6           Who designed the artwork of your logo that
7  was used by Crow Signs, this one right here in front of
8  us?
9      A    I don't know.  It was Crow Signs.
10     Q    Crow Signs designed it?
11     A    Yes.
12     Q    Was there an agreement between you and Crow
13  Signs for them to design your logo?
14     A    Yes.  Well, it wasn't like some contract
15  signed for, no, I mean, if that's what you're asking.
16  But there was an agreement that I needed a logo and a
17  sign, and I asked if he could help me with it.  And they
18  pretty much took it from there.
19     Q    So was this a situation where you told Crow
20  Signs you wanted The Local Café and they designed your
21  artwork for your logo?
22     A    Yes, sir.
23     Q    What requirements did you give Crow Signs?
24     A    I just wanted a -- open a café with The Local
25  Café was the name of it and asked if I could get a

Page 38

1  design or some kind of logo.  Same thing I did with Gulf
2  Coast Telecom and various other, you know, entities of
3  business, you go to someone to try to help you create a
4  logo.
5      Q    Was this a situation where you gave Crow
6  Signs the artwork and they spec'd out the dimensions for
7  your wall sign and the pylon and told you about the
8  price and installation?
9      A    No.
10     Q    Did you tell Crow Signs to use the Local
11  portion, or did Crow Signs propose the use of the Local
12  portion?
13          MR. DOSTER: Objection, form.
14  BY MR. MCGURK:
15     Q    Please answer the question.
16     A    What was it again, the question?
17     Q    Did you tell Crow Signs to use the Local
18  portion of what you see in front of you, or did Crow
19  Signs propose the use of the Local portion?
20          MR. DOSTER: Objection, form.
21  BY MR. MCGURK:
22     Q    Please answer the question.
23          THE WITNESS: What does "objection, form"
24     mean?
25          MR. DOSTER: It means I stated an objection

Page 39

1  that's written in the record and then you are
2  allowed to answer the question.
3          THE WITNESS: Oh.
4          MR. DOSTER: To the best that you're able to
5  answer.
6          THE WITNESS: I'm not sure if I understand
7  what he's asking me.
8          MR. DOSTER: You're free to ask him to ask
9     the question again.
10     A    Can you ask the question again?
11  BY MR. MCGURK:
12     Q    Who provided the Local portion in this sign
13  to Crow Signs?
14     A    I did not design it, no, sir.
15     Q    I'm not asking about design.  Did you
16  provide --
17     A    Oh.
18     Q    -- the Local --
19     A    Any information I did not provide.
20     Q    Any information you did not provide.  Please
21  explain what you mean.
22     A    I didn't provide any information.
23          MR. DOSTER: Wait.  Don't answer until he
24     asks you a question.
25          THE WITNESS: Oh, sorry.  Sorry about that.

Page 40

1      A    Go ahead.
2  BY MR. McGURK:
3      Q    How many different variations of the artwork
4  did Crow Signs provide to you?
5      A    Just one.
6      Q    Just one?
7      A    I mean, one that I can remember.  I mean, I
8  don't -- there may have been several.  I don't really
9  know.  I don't remember.  I mean, I just know we have
10  this one here, and that's what -- when he presented it
11  to me, I decided on this logo.  I mean, there's
12  really --
13     Q    How long did it take before you actually
14  approved the design?
15          MR. DOSTER: I'm going to object.  He was
16     still answering the question.
17          MR. MCGURK: Oh, I'm sorry.  I thought he was
18     done.
19          MR. DOSTER: Please proceed.
20  BY MR. McGURK:
21     Q    Are you done?
22     A    I'm not sure what I was going to say now.
23  Sorry.
24     Q    How long did it take for you to approve of
25  the design?

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 13 of 50
MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ and   Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                              April 10, 2023

Page 41

1   A   I don't recall.

2   Q   When did you first get the design from Crow

3  Signs?

4   A   I don't recall.

5   Q   This is dated September 1st, 2022.  You

6  must have had some communication -- when did you --

7   A   I don't know the exact date.

8        MR. DOSTER: Wait until there's a question.

9        THE WITNESS: Okay.  Sorry.

10 BY MR. McGURK:

11   Q   How much did it cost for Crow Signs to design

12 the logo?

13   A   I'm not sure.  I think it was all in the same

14 invoice.

15   Q   Do you have any agreement at all for them

16 designing?

17   A   No, sir.

18   Q   How did you pay Crow Signs for the design of

19 the logo?

20   A   I believe it was part of the whole package

21 with the sign.

22   Q   How did Crow Signs send you the artwork for

23 the logo?

24   A   Through the e-mail that you have there that

25 I've provided.

Page 42

1   Q   This -- you're referring to the exhibit?

2   A   Yes.

3   Q   Let's see.

4   A   It was the prints too.

5   Q   Exhibit 3?

6   A   Yes.

7   Q   So this is what they provide to you the first

8 time?

9   A   As far as I can remember.  I mean, I'm not

10 sure.  I'm not...

11   Q   What fonts did you tell them to use in your

12 logo?

13   A   I didn't tell them any specific fonts

14 whatsoever.

15   Q   So do you know what the font is for the "The"

16 in your logo?

17   A   No.

18   Q   What other fonts would you have considered

19 for the "The"?

20   A   I didn't consider any fonts.

21   Q   Who decided on the size of the word "The" in

22 the logo?

23   A   Crow Signs.

24   Q   You gave complete design authority to Crow

25 Signs?

Page 43

1   A   Well, I knew what I wanted it to say, The

2 Local Café.  But as far as the font style or type, no, I

3 did not.

4   Q   Who decided on the placement of the word

5 "The" in the logo?

6   A   Crow Signs.  Well, let me back --

7   Q   You just basically accepted what they gave

8 you on the first try?

9   A   Well, let me back up.

10   Q   There were no other variations at all?

11   A   Let me answer that question again.  So I did

12 say I wanted it to start with -- you know, we have The

13 Local Café.  We also have a sign in the restaurant.

14 It's a neon sign that's cursive.  It says the same

15 thing.  It's in cursive.  That has nothing to do with

16 this logo.  It was just the name, The Local Café, is all

17 I have.  I didn't have a font or how I wanted it to be

18 placed or designed.  I just knew The Local Café is what

19 I wanted to name it.

20   Q   So you accepted the first version of the sign

21 that Crow Signs gave you?

22   A   I can't remember if or what -- if there were

23 other versions or not.  I just know that this was the

24 one that I liked and this is the one that was presented

25 to me to put the sign together.  It wasn't a real hard

Page 44

1 thing to do.

2   Q   You -- did you provide us any of the other

3 variations that you got?

4   A   I don't know if there was or not or how many.

5 I can't remember is what I'm saying.

6   Q   What color or what font was used for the word

7 "Café"?

8   A   I have no idea.

9   Q   What other fonts did you consider?

10   A   I didn't have any.

11   Q   Who decided on the size of the word "Café" in

12 the logo?

13   A   Like I said, the design was totally done by

14 Crow Signs.  I didn't have any font or any size ideas

15 whatsoever.

16   Q   Who decided on the placement of the word

17 "Café" in the logo?

18   A   Crow Signs.

19   Q   What font was used for the "o-c-a-l" in the

20 logo?

21   A   I have no idea.

22   Q   What other fonts did you consider?

23   A   I didn't have any fonts.

24   Q   Who decided on the spacing of the letters

25 "o-c-a-l" in the logo?

MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ and   Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                                   April 10, 2023

---

Page 45

1    A    The sign company.
2    Q    Where did you get the graphical
3 representation of Florida?
4    A    I didn't get a representation of Florida.
5 That came from Crow Signs.
6    Q    What purpose does the graphical
7 representation of Florida serve in your logo?
8    A    Obviously, I live in Florida and kind of
9 represents the area where I'm at.
10   Q    How does it represent the area that you're
11 at?
12   A    Because that's the state of Florida, and
13 that's where we're at, Florida.
14   Q    Who decided to turn it upside down?
15   A    I have no idea.  Crow Signs presented it for
16 me.
17   Q    What made you want to use a graphical
18 representation of Florida upside down in your logo with
19 the letters "o-c-a-l"?
20   A    I did not design the logo.  Crow Signs
21 designed it.
22   Q    I am not asking about design.  You adopted
23 this as the -- the logo of your café.  What made you
24 want to use that graphical representation of Florida in
25 your logo with the letters "o-c-a-l"?

Page 46

1    A    Because it best represented the café.
2    Q    Who decided on the length of the Panhandle in
3 Florida?
4    A    I have no idea.  Crow Signs.
5    Q    What made you decide to make "Local" much
6 larger than the words "The" and "Café"?
7    A    Crow Signs.
8    Q    Did you consider using Local Café without the
9 word "The"?
10   A    No.  I knew I wanted the name "The Local
11 Café," but once it was presented to Crow Signs, he
12 created the logo for me, that font for me and the design
13 for me.
14   Q    Isn't the upside-down graphical
15 representation of Florida unique, right?
16        MR. DOSTER: Objection, form.
17   A    I have no idea.  I had no idea at the time
18 until you contacted me.
19 BY MR. McGURK:
20   Q    Wouldn't you consider the upside-down
21 graphical representation of Florida distinctive, right?
22 You adopted it in your sign.
23        MR. DOSTER: Objection, form.
24   A    Ask the question again.
25

Page 47

1 BY MR. McGURK:
2    Q    Wouldn't you consider that the upside-down
3 graphical representation of Florida that you adopted in
4 your sign is distinctive?
5        MR. DOSTER: Objection, form.
6    A    I wouldn't say.  I mean, I wouldn't.
7 BY MR. MCGURK:
8    Q    You are adopting a sign for your café.  You
9 do not think that's distinctive?
10        MR. DOSTER: Wait for a question.
11        I don't believe there's a question pending.
12   A    Is there a question?
13 BY MR. McGURK:
14   Q    Yes.  The question was -- is:  If you're
15 adopting a sign why would you not -- for what purpose
16 would you not think that your sign was distinctive?
17        MR. DOSTER: Objection, form.
18   A    I have no idea.  I mean, I -- wasn't much
19 thought put into it, to be honest with you.  Just like I
20 didn't search for The Local Café before I came up with a
21 name.
22 BY MR. McGURK:
23   Q    When you adopted to use the logo, you must
24 have been happy how "Local" appeared in your logo,
25 right?

Page 48

1    A    As far as asking to create a design for me, I
2 thought they did a good job.
3    Q    So you were happy with how this looks.
4        MR. DOSTER: Wait for a question.
5        THE WITNESS: Okay.
6    A    Is there --
7 BY MR. MCGURK:
8    Q    With how your sign looked.
9    A    Was I happy with the way it looked?  Yes,
10 sir.
11   Q    When you adopted the logo as the name of your
12 café, you thought your name was not widely used, right?
13   A    I didn't think about it or have any knowledge
14 of it, no.
15   Q    I am now going to Exhibit 7.
16        (Exhibit 7 was marked for identification.)
17 BY MR. MCGURK:
18   Q    Do you recognize this e-mail?
19   A    Yes, I do.
20   Q    Did you send this e-mail?
21   A    Yes, I did.
22   Q    Who did you send this to?
23   A    That was in October 28th.  So I thought we
24 were at the point of opening.  And when I opened the
25 company, a lot has transpired from September to

---

Page 49

1  October 28th.  So if we're going to jump to
2  October 28th, then obviously there's difference
3  between September 1st, when there's an exhibit from
4  the sign company, and October 28th.  So between that
5  time, yes.
6      Q     In this e-mail, you mentioned that you
7  performed a Google search, right?
8      A     I believe -- I'm not sure if I -- can I ask a
9  question?  Is this before or after you sent me the
10 letter of cease and desist, to notify me of the
11 trademark?  Because that would matter if I said this
12 after I was told about the trademark and informed of my
13 logo.  So do you have that e-mail, the date and time
14 from the e-mail, telling me to please refrain from the
15 sign?
16     Q     According to my timeline, I think this is
17 after.
18     A     Okay.  So after you informed me that my logo
19 was trademarked and after you informed me cease and
20 desist, then that's when at some point I started
21 searching and seeing, you know, really?  And that's
22 where I believe this e-mail came from and was about
23 trying to discuss.
24     Q     So you had mentioned that -- let me just
25 confirm that you had performed no Google search up until

Page 50

1  this point, up until October 28th.
2      A     I wouldn't say October 28th, but somewhere
3  between, you know, the information you provided and this
4  date, I would say, obviously.
5      Q     You mentioned that in this, "I googled Logo
6  Florida Upside down."  You see that?
7      A     Uh-huh.
8      Q     It's like the third sentence down.
9      A     And "WOW."
10     Q     "And WOW.  There were 10000"...
11     A     Thousands is what I meant.  Sorry.
12     Q     Thousands.  "And none of them I saw was
13 yours."  Right?  That's what is said there, right?
14     A     Yes.
15     Q     What is meant by "Logo Florida Upside down"?
16     A     Logo Florida upside down, what is meant by
17 that is you sent me information concerning my logo and
18 saying it was representative of what your trademark was.
19 And like the e-mail says, I started searching after that
20 to find out the validity of it.  And like the e-mail
21 says, when I explained to Matthew, he said there were so
22 many companies using the logo upside-down Florida, we
23 just don't go after all of them, which is accurate.
24         I don't know exactly what all of them were.
25 I don't know exactly which ones were what.  But there

Page 51

1  was a lot of different variances that I had searched
2  after I was informed of your concern.  And once I
3  addressed that with Matthew, as you can see in the
4  e-mail, you know, basically stated that they don't
5  really pursue all of them because there's so many.  Why
6  he chose me, I don't know.  But I was trying to --
7      Q     Okay.  Well, sure -- let's continue.
8          MR. DOSTER: I'm going to object.  He was
9      still answering the question.  I'm going to allow
10     my client to continue answering.
11     A     And my e-mail, like this one here in
12 corresponding with Matthew, was trying to explain the
13 difference between the two of us and with what I'm doing
14 versus what he's got, referring to clothing, hats and
15 shirts, which is basically what the trademark
16 represents.  And that's in this e-mail that you have
17 presented here.
18 BY MR. McGURK:
19     Q     Uh-huh.
20     A     And me trying to work with him and saying, "I
21 have no issue working with you regarding any concerns,
22 and I have no correlation with your brand.  I just want
23 to run my family's café in peace, and I'm not bothering
24 anyone.  I'm not selling anything from my logo.  My
25 attorney will be reviewing your request, and I'll give

Page 52

1  you my final decision within 10 days."
2          And I think this was after the cease and
3  desist letter, or I'm not sure.  Maybe Matt said that --
4  that he talked to his partner and doesn't really want to
5  agree or work with me on this once it was determined.
6      Q     In your e-mail, when you referred to "Logo
7  Florida Upside down," did you mean Local Brand's
8  registered Local trademark?
9      A     No, just the basic logo Florida upside down.
10 I'm not sure the terminology.  Like again, once you
11 presented it to me, your concern, I guess in generality
12 was just me looking, in my mind, what that represented,
13 which is obvious.  Based on your concerns that were
14 addressed to me, you know, it was representing any Local
15 Florida upside down.
16     Q     So are you referring to the word o-c -- or
17 "Local" with the graphical representation of Florida?
18     A     "Logo Florida Upside down."
19     Q     You're referring to --
20     A     Actually any logo --
21     Q     What it looks like in Exhibit 4, which was
22 the -- or even Exhibit 3, this one.  That Local portion,
23 right?
24     A     That has nothing to do with that.  That was
25 in September.  The e-mail that you're asking me about is

Page 53

1 in October 28th. That's after Crow Signs has created
2 that logo for me and design. And once it was addressed,
3 a concern from your side, that's when we started having
4 conversations and started having searches and trying to
5 validate your concern and your reasons.
6  Q    What was your exact search terms that you
7 used?
8  A    I don't -- I don't recall the exact search
9 terms.
10  Q    How long did you spend on the Google search?
11  A    Not long. It was just here and there.
12  Q    How many entries did you look at?
13  A    I'm not sure.
14  Q    How many pages did you look at of Google
15 searching?
16  A    I'm not sure. I mean, you know...
17  Q    Why wasn't the Google search provided to us?
18  A    I don't know. I mean...
19  Q    How did you arrive at the 10,000 other
20 companies that were using The Local Brand's registered
21 trademark?
22  A    How did I come up with that? Oh. Like I
23 said, it wasn't 10,000. It was just a matter of
24 speaking, you know, Oh, I've seen thousands of these.
25  Q    So you found thousands of them? Oh, sorry.

Page 54

1  A    No. It with was a terminology. I didn't see
2 actually thousands or 10,000. It was just a terminology
3 of explanation, I've seen thousands of them. Not an
4 actual record of --
5  Q    So -- sorry.
6  A    -- of a number, per se.
7  Q    You did not find 10,000 occurrences of logo
8 Florida upside down, did you?
9  A    10,000s, no.
10  Q    So this was a complete fabrication, right?
11    MR. DOSTER: Objection.
12  A    No. It wasn't a fabrication. It was a
13 terminology I was using to explain that there was many,
14 many, many, many examples of different variations of it.
15 And that was just the best way that I could say it. It
16 wasn't a measurement, per se, to determine whether it
17 was 4 or 10,000.
18 BY MR. McGURK:
19  Q    Exhibit 8, there is a Google search with the
20 words "Logo florida upside down."
21    (Exhibit 8 was marked for identification.)
22 BY MR. McGURK:
23  Q    And I'm not sure without showing the -- it
24 didn't show the images.
25    MR. DOSTER: Objection. Has this Exhibit 8

Page 55

1 been produced in discovery?
2    MR. MCGURK: No. But we will.
3    MR. DOSTER: So it has not been produced as
4 of yet?
5    MR. McGURK: Correct.
6    MR. DOSTER: Okay. I don't have a copy of it
7 in front of me, either, so I'm not able to review
8 it.
9    MR. McGURK: We'll provide it to you after.
10 BY MR. MCGURK:
11  Q    Does this -- does this search look anything
12 like the search that you did?
13  A    And again, when I say the word "Logo florida
14 upside down," that's just a terminology that I'm using,
15 just like the thousands, not 10,000s of searches. It
16 was just the way of me explaining that I looked -- was
17 searching and looking for any different way of a -- of a
18 Florida upside down, any kind of logo whatsoever.
19    So it's not like it's an exact terminology of
20 what I plugged in, just that alone, and produced what I
21 saw. So that wouldn't really be accurate to say that I
22 typed that in and this is what I saw.
23 BY MR. McGURK:
24  Q    If a thousand companies or even 10,000 were
25 using "Local" as it appears in your logo, it would have

Page 56

1 been foolish to adopt a logo that was so widely used,
2 right?
3  A    I think when they created it, they had an
4 idea that worked, but I'm sure over the years it's
5 obvious that people, in different ways, thought that it
6 was a good idea as well. So you couldn't really measure
7 that on when your representatives decided to come up
8 with a logo, create it and trademark it versus over the
9 many years up to this day where other people have maybe
10 thought or saw that it might be good as well.
11  Q    So you fabricated the number of occurrences
12 that you could -- so that you could state The Local
13 Brand had selective enforcement, right?
14    MR. DOSTER: Objection, form.
15  A    No. Like I said, it was just a terminology,
16 I've seen thousands. It wasn't a determining number of
17 I saw thousands. It wasn't a fabrication or a make-up
18 scenario. It was a terminology.
19 BY MR. McGURK:
20  Q    Why would you adopt, then, a logo, before
21 your café opened, if you saw thousands of the same
22 thing?
23  A    Like I said, I never developed the logo
24 before I opened up. Crow Signs developed the logo, and
25 I didn't look it up and search it until you brought it

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 17 of 50
MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ v.   Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                        April 10, 2023

Page 57

1 to my attention that it could be possibly part of a
2 trademark. That's --
3    Q    Crow Signs provided the -- the logo and
4 artwork --
5    A    Yes, sir.
6    Q    -- in September.
7    A    Yes, sir.
8    Q    You approved --
9    A    Uh-huh.
10   Q    -- that.
11       MR. DOSTER: Wait for a question.
12 BY MR. McGURK:
13   Q    You received a cease and desist letter from
14 The Local Brand.
15   A    After that.
16   Q    Correct?
17   A    Uh-huh.
18   Q    And then this e-mail came from you that said
19 you seen 10,000s of them. And you're saying, Oh, it's
20 just a figure of speech.
21       You have not opened your café yet. Now you
22 know that supposedly there's thousands of people using
23 the exact same thing. Why would you use that?
24       MR. DOSTER: Objection, form. It's a
25    compound question.

Page 58

1    A    Yeah. Like I said, it's a terminology. It's
2 not a measurement of actual, you know -- it's a way
3 of -- I don't know about -- it's a way of -- it's, I've
4 seen thousands and thousands. It's just a terminology,
5 sir. It wasn't like there was thousands listed here and
6 I just decided -- you know. It's just a terminology.
7 BY MR. McGURK:
8    Q    So basically, you fabricated this number
9 because you were upset The Local Brand caught you using
10 their trademark before you opened your café, right?
11       MR. DOSTER: Objection.
12   A    No, absolutely not.
13       MR. DOSTER: Wait until I finish. Objection,
14    asked and answered. Now you can answer.
15   A    Absolutely not.
16 BY MR. McGURK:
17   Q    You thought The Local Brand singled you out
18 from 10,000 other infringers, right?
19       MR. DOSTER: Objection, form.
20   A    No, not necessarily. No.
21       MR. McGURK: What is the objection?
22       MR. DOSTER: Form.
23 BY MR. McGURK:
24   Q    Please answer the question.
25   A    No.

Page 59

1    Q    But you now know The Local Brand did not
2 single you out because they enforce their marks against
3 anyone that comes to their attention, right?
4       MR. DOSTER: Objection, form.
5    A    All I could go by is what Matt told me, and
6 that is that the logo has been used by many different
7 companies, and so many of them that they can't just go
8 after all of them. How do you want to measure that?
9 You can. But that's all I remembered, and that's why I
10 stated it as such.
11       MR. McGURK: Okay. Does anybody need a break
12    right now?
13       MR. DOSTER: I was going to ask the same
14    thing. We've been going about an hour. Would you
15    like a break?
16       THE WITNESS: Sure.
17       MR. McGURK: How do we -- you want to
18 continue?
19       MR. DOSTER: Let's take a break.
20       MR. McGURK: Oh, take a break?
21       MR. DOSTER: Uh-huh.
22       MR. McGURK: How about a 15-minute break?
23    And I see it's about -- how about returning around
24    9? Is that okay with everybody?
25       MR. DOSTER: Yes.

Page 60

1       (Recess from 10:42 to 11:00 a.m.)
2 BY MR. McGURK:
3    Q    Are you ready, Mr. Cash?
4    A    Yes, sir.
5    Q    What is the size of the word "The" compared
6 to "Local" in your logo?
7    A    I have no idea.
8    Q    Would you say that it's much larger than the
9 word "The"?
10       MR. DOSTER: Objection, form.
11       MR. McGURK: Objection to what?
12       MR. DOSTER: The question on a transcript, I
13    think, would appear ambiguous. I objected to form.
14       MR. McGURK: Oh, okay.
15 BY MR. McGURK:
16   Q    Okay. Would the size of the "The"
17 compared -- let me just move on. That's nothing. Okay.
18       What is the largest portion of your logo?
19   A    The word "Local."
20   Q    The word "The," the word "Café" or the word
21 "Local"?
22   A    The largest word in the logo is the word
23 "Local."
24   Q    Isn't "Local" what people see when they see
25 your signs?

---

Page 61

1    A    That's the largest part that you would see,
2 so I would assume so, yes.  The font is larger.
3    Q    Sorry.  Will you use the name of your café to
4 sell clothing?
5    A    I'm not sure.  A lot of that depends on what
6 we're having to deal with now.  It's not my design or
7 idea, but I don't really have anything in the works or
8 any kind of designs or any kind of creativity in that
9 manner as of yet, no, sir.
10    Q    Will you use the name of your café to sell
11 cakes?
12    A    I sell everything in my café, so cakes, yes.
13    Q    Okay.  Will you use the name of your café to
14 sell hamburgers?
15    A    Well, I mean, I currently don't sell
16 hamburgers, so that's not part of my menu.  I can't -- I
17 can't sit here and list certain things that I possibly
18 might cook or not cook on my menu or any kind of
19 specials.  Sorry.
20    Q    Will you use the name of your café to sell
21 rum?
22    A    No.
23    Q    Will you use the name of your café to sell
24 beer?
25    A    No.

---

Page 62

1    Q    Did you know that The Local Brand was going
2 to open a grill before COVID hit?
3    A    I, again, had no recollection or knowledge or
4 any kind of idea of anything with that company down in
5 West Palm Beach, Florida until you notified me with an
6 e-mail.  I have -- don't know any knowledge of it.
7    Q    Okay.
8    Q    Or, respectfully, care.  Sorry.
9    Q    For takeout, what is printed on the bags or
10 your packaging?
11    A    Nothing.
12    Q    So it's blank?
13    A    Yeah, exactly.  Black.  Plastic.
14    Q    When did Crow Signs -- and I'm not sure if we
15 answered this.  When did Crow Signs install the signs on
16 your café?
17    A    I'm not sure.  I stated earlier that, based
18 on the print that you saw, 9/1, and I opened
19 November 8th, sometime between then, and before your
20 acknowledgement that I had signs and a logo, per se, I
21 guess.  I don't know the timeline.  Maybe sometime in
22 October.  I'm not sure.
23    Q    After the signs were installed, how long was
24 it before Matt, Matthew Lilly contacted you?
25    A    I don't recall.

---

Page 63

1    Q    Do you -- do you have any idea whether it
2 was -- was it a day, a week, a month?
3    A    I have no idea.  I don't remember that far
4 back.
5    Q    Did Matt Lilly contact you before your café
6 opened?
7    A    I believe it is on record.  Your cease and
8 desist letter was before the café opened,
9 October 28th.  I opened November 8th.  So sometime
10 in that timeline.
11    Q    Did Matt contact you via phone or e-mail?
12    A    He's never called me unless it was a text
13 message or an e-mail or Facebook message.  That's --
14 that's how we communicated.
15    Q    Okay.  What was your reaction when you first
16 heard from Matt?
17    A    When I first had a conversation with Matt, I
18 pretty much -- I -- I tried to be understanding.  Kind
19 of come in by trying to be fair and understanding
20 between what maybe his concerns are versus what I'm
21 doing.  And I don't have any concerns of what he does or
22 is doing.
23        So I guess the concerns mainly have come from
24 his side.  And anything or the reaction regarding that
25 was to try to be -- present a fairness or an

---

Page 64

1 understanding of, Hey, let's work together on this.  Is
2 there something we can do to be fair with each other
3 where it doesn't really conflict each other.  Just a bit
4 of --
5    Q    Did you send a -- did you send an e-mail as
6 such?
7    A    Like I said, we communicated through text
8 message, e-mail and Facebook message.  I'm sure between
9 one of those three that we did have those conversations
10 with each other, which you should have documentation of.
11    Q    In exhibit -- this is Exhibit 9.
12    A    Uh-huh.
13        (Exhibit 9 was marked for identification.)
14 BY MR. MCGURK:
15    Q    I think I have this too big.  Hold on.  Does
16 this look like a text message that you would have sent
17 Matt?
18    A    Who's Gary?
19    Q    I think that's what he put you as first.
20 You're, I guess -- says GC.  How about what it says
21 there?
22    A    Do you have a date?  Is that a question?  Do
23 you have a date on that?
24    Q    Let's see.  Yesterday...
25    A    I don't see a date.  I see Wednesday.

---

Page 65

1    Q    Yeah, I don't see it either.
2    A    Well, what was your question?
3    Q    Do you recognize this as something you would
4  have sent via text to Matt?
5    A    Let me see.
6    Q    I can scroll through.
7    A    No.  It's okay.  You can leave it there and
8  then we'll scroll.  See, I'm not selling anything from
9  my logo like coffee mugs, shirts or hats.  I don't feel
10  like monetarily nobody is affected.  My logo doesn't
11  sell my concept or food.  My logo doesn't create any
12  revenue for me whatsoever.  I'm local to my town, and
13  Florida born was the only reason I wanted to call my
14  cafe The Local cafe.  Not Local Fl, yours.
15          I received your letter from your attorney,
16  and I responded well accurately.  I have a camera
17  system, and I will be researching it to find out who's
18  taken pictures -- which basically, coming on my property
19  or around the restaurant -- and you can let them know
20  that they will be visited.  My attorney is aware.
21  Visited as in trespassed.  Also, their picture from my
22  camera system will be blasted all over social media.
23          If someone is trespassing on my property and
24  my café taking pictures and creating a problem, per se,
25  or -- that's what that was directed from.

Page 66

1    Q    Do you think your reaction was typical?
2          MR. MCGURK: Objection, form.
3    A    I think there was no anger there.  I think
4  anyone would be frustrated a little bit with -- with the
5  act of -- of my reasoning and why I'm doing what I'm
6  doing and somebody stirring up some things.  But
7  probably a little minor frustration.  I think anyone
8  would be, on both sides.  But most of my communication
9  was basically trying to be amicable and work something
10  in a way that's fair for each other.  That's my main
11  goal always.
12    Q    Did you apologize to Matt about the use of
13  the logo, of the registered logo trademark in your mark?
14    A    I don't recall.  I don't recall anything with
15  those exact statements or words.
16    Q    Do you have any regrets in using The Local
17  Brand registered logo trademark in your logo?
18    A    I did not use the logo or trademark.  It was
19  presented to me by Crow Signs.  I had an idea of the
20  café and the name.  And so I don't -- you know.  Once I
21  was shown in the e-mails and conversations with them,
22  once it was presented to me, your concerns and how
23  delicate it was, I was willing to try to work something
24  out with the new knowledge of the trademark and what
25  that meant to your client, which is why I have presented

Page 67

1  a new logo.
2          Once I -- that was determined, I made steps
3  to try to correct that or change that logo, which I
4  presented to y'all as well, to kind of offset the
5  trademark or any kind of infringement in my idea.  So
6  I've made steps to try to work on the concerns from your
7  client.
8    Q    What type of steps have you taken?
9    A    Well, we submitted a new logo to you guys.
10  You know, the original logo is still there.  And it has
11  been explained to your client and yourself that it costs
12  money to do the signs.  And we knew that we were going
13  to change the logo and present it to you for acceptance,
14  which you haven't.
15          And then, now, since we have filed these
16  proceedings or filed these -- this case in regards to
17  the new logo and with your concerns, and until this
18  could be determined, you know, I don't have $5,000 just
19  to go change everything.
20          Nothing has been changed.  Nothing has been
21  put back.  Nothing has been changed.  It's just stayed
22  the same ever since from the beginning until we can get
23  this resolved.  So basically -- a new logo has been
24  presented.
25    Q    In your e-mail, how did you come to the

Page 68

1  conclusion that, as it says, "I don't feel like
2  monetarily nobody is affected"?
3    A    What was the question again?  Sorry.
4    Q    How did you come to the conclusion that in
5  your e-mail you say, "I don't feel like monetarily
6  nobody is affected"?
7    A    Because your trademark clearly states it
8  represents clothing, hats.  I'm not exactly sure of the
9  terminology.  It was in one of my other -- coffee mugs,
10  shirts, hats.  And I don't sell coffee mugs, shirts or
11  hats.  I sell food.  I'm a café.  And there's a
12  separation there, you know.  So I feel like there's a
13  difference there between that.
14          If you were a trademark logo for a restaurant
15  where you served food, then maybe that would make me
16  feel like there's a valid concern, once you presented it
17  to me.
18    Q    What is trademark goodwill?
19          MR. DOSTER: Objection, form.
20    A    I don't know what that is.  What is what?
21  BY MR. MCGURK:
22    Q    Trademark goodwill?
23    A    I don't know what that means.  I don't know
24  what that is.
25    Q    Goodwill -- have you ever heard the word

Page 69

1  "goodwill" for a trademark?
2     A   No.
3     Q   So you don't know where the goodwill of a
4  trademark involves the length of how long a mark has
5  been in use?
6     A   I don't have any idea.
7     Q   You do not understand, then, the concept that
8  trademark goodwill is affected by the quality of the
9  goods and services that are sold under it?
10        MR. DOSTER: Objection, form.
11    A   No.
12 BY MR. McGURK:
13    Q   Do you know that you are interfering with
14 over ten years of valuable and precious goodwill of The
15 Local Brand's registered trademark?
16        MR. DOSTER: Objection, form.
17    A   Absolutely not.  That's why your trademark
18 states it represents coffee mugs, T-shirts, hats and
19 clothing.  Clothing being the main word.  And I don't
20 sell any of those things out of my restaurant.  I sell
21 food.
22    Q   You were trying to profit off the valuable
23 goodwill of The Local Brand's registered trademark,
24 right?
25        MR. DOSTER: Objection, form.

Page 70

1     A   Absolutely not.
2         MR. MCGURK: Jared, why did you object to
3    form, on what basis?
4         MR. DOSTER: It's calling for a legal
5    conclusion.
6  BY MR. McGURK:
7     Q   Okay.  Wouldn't the goodwill of The Local
8  Brand's registered trademark be affected by a business
9  that is subpar?
10        MR. DOSTER: Objection, form.
11    A   Please repeat the question.
12 BY MR. McGURK:
13    Q   Wouldn't the goodwill of The Local Brand's
14 registered trademark be affected by a business that is
15 subpar?
16        MR. DOSTER: Objection, form.
17    A   I have no idea.  Like I stated earlier, I
18 don't know what "goodwill" means.  I don't know what it
19 means in reference to a trademark, and I have no
20 experience or knowledge of what that means in any shape
21 or form.  I've never heard of it.
22 BY MR. McGURK:
23    Q   Is this your first time in using a logo of
24 another company, or have you done this before?
25        MR. DOSTER: Objection, form.

Page 71

1     A   I never have.  I don't know -- I don't have
2  any experience whatsoever, nor any knowledge that this,
3  when it was presented to me, was a logo that was with
4  somebody else.  So I -- I don't have any experience with
5  that, no, sir.
6  BY MR. MCGURK:
7     Q   In your e-mail, what do you mean by "My logo
8  doesn't sell my concept or food"?
9     A   Your concern is the fact that I have this
10 alleged logo that is infringing on your company that
11 sells clothing, hats and so forth.  I don't feel like
12 monetarily anything that I have sold as my food and my
13 café and coffee would have any bearing on your concern
14 when I'm doing one thing, you're doing a separate thing.
15        So monetarily -- excuse me -- your trademark
16 logo doesn't represent anything I do in my café with
17 serving food in my restaurant.  It just represents a
18 name and a feel --
19    Q   Don't you -- I'm sorry.  I thought you were
20 done.  Go ahead.
21    A   It just represents a name and a feeling of
22 the area where I'm at.
23    Q   Don't you want a logo that sells your concept
24 or food?
25    A   Absolutely.

Page 72

1     Q   But you just told me you didn't care, my logo
2  doesn't sell my concept or food.
3         MR. DOSTER: Wait for a question.
4  BY MR. McGURK:
5     Q   Right?
6     A   You have a question?
7     Q   You just said you don't care whether your
8  food or concept -- you -- in your e-mail, it says, "My
9  logo doesn't sell my concept or food."  You agreed with
10 that.  But now you're saying you don't care whether you
11 have a logo that sells your concept or food?
12        MR. DOSTER: Objection, form.  Compound
13   question.
14 BY MR. McGURK:
15    Q   Okay.
16    A   I'm not --
17    Q   Let me ask another question.
18    A   Maybe ask --
19    Q   Don't you want a logo that sells your concept
20 or food?
21    A   Me selling my concept of food has nothing to
22 do with the logo.  It has to do with the food that I
23 make, how we present it, and how we treat the people
24 when they come in, which is service, quality food and
25 atmosphere.

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND  Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                              April 10, 2023

Page 73

1    Q    But don't you want a logo that sells your
2  concept or food?
3         MR. DOSTER: Objection.  Asked and answered.
4         MR. McGURK: No, he hasn't answered it yet.
5    A    Don't --
6  BY MR. McGURK:
7    Q    Please answer the question.
8    A    You're asking me, don't I want a logo that
9  will help me sell my food?
10   Q    Yeah.
11   A    That's not why it's created.  I don't have a
12 logo nor do I have a desire to create a logo to help me
13 serve my food.  It represents the establishment and the
14 place that I work in, where I'm able to serve people and
15 greet people and people eat and -- and have a -- I mean,
16 I don't really know any other way to explain that.  My
17 logo --
18   Q    But the logo is the name of your café, right?
19   A    Yeah.  Let me put it this way.  The logo
20 doesn't bring me sales.  It doesn't create sales for me.
21 It's me selling food and people eating it.  So the logo
22 doesn't create anything for me and doesn't pay my bills,
23 per se.  It's the food that I serve inside that
24 building.
25   Q    Don't you want to create or use a logo that

Page 74

1  creates goodwill for your food?
2         MR. DOSTER: Objection, form.
3    A    I mean, like I said, the logo doesn't do
4  anything to create food for me.  It represents the
5  building and the brand, the café and the local aspect of
6  the community that comes there to eat.
7  BY MR. McGURK:
8    Q    What makes you want to continue to use your
9  logo when it looks identical to The Local Brand's
10 registered Local trademark?
11        MR. DOSTER: Objection, form.
12   A    Like I said, we've presented an alternate
13 logo and...
14 BY MR. McGURK:
15   Q    Okay.  Is that it, all you have?
16   A    Yeah.
17   Q    Okay.  In your e-mail, it says, "I have a
18 camera system," there at the bottom here.  I will use
19 my -- there, right here.  "I have a camera system, and I
20 will be researching it to find out who's taken pictures,
21 and you can let them know that they will be visited."
22   A    Oh.
23   Q    Is that what is written there?
24   A    Oh, we're going back to that?  Okay.  I
25 thought we addressed that earlier.

Page 75

1         Yeah, like I said, "My attorney is aware."
2  And I said, "visited and trespassed." I feel like
3  personally if someone is coming in and out on my
4  property, taking pictures and maybe trying to create a
5  problem or stir up trouble, I could possibly trespass
6  them.  That's what that statement says.
7    Q    Well, that statement I just read, is this a
8  threat?
9    A    No, not at all.
10   Q    Why were you threatening to visit the person
11 who took pictures of your sign on public property?
12   A    I didn't say that I would visit them.  I
13 said, They will be visited --
14   Q    Oh, who?
15   A    -- to be trespassed.
16   Q    Sorry, sorry.
17   A    Yeah, I don't know.  To be trespassed.  I'm
18 not really sure of whatever laws are available to me to
19 refrain them from coming over on my personal property
20 and taking pictures, whether or not there's any validity
21 to the law or anything that's for me.  That's what that
22 means.
23   Q    You just mentioned you wouldn't visit this
24 person.  Who would visit this person?
25   A    Like I said, however they could possibly be

Page 76

1  trespassed or whatever form through the laws that are
2  available to me.  Nowhere on there it says that I will
3  visit them.  It says that they will be visited.
4  Whatever representative that would be, whether it would
5  be a police officer to trespass them, whether it would
6  be -- I'm not sure.
7    Q    Are you a violent person?
8    A    No, I'm not.
9    Q    Have you had any restraining orders issued
10 against you?
11   A    No, I haven't.
12        MR. DOSTER: Objection.  How does this relate
13   to the topics in the Notice of Deposition?
14        MR. McGURK: Exactly the e-mail.  The
15   correspondence.
16 BY MR. MCGURK:
17   Q    Have you been put under arrest for making
18 threats against another person?
19        MR. DOSTER: Objection.  These questions are
20   directed to Mr. Cash --
21        MR. McGURK: This is exactly to the issues
22   involved in this litigation.
23 BY MR. MCGURK:
24   Q    Please answer the question.
25        MR. DOSTER: Mr. McGurk, this is not an

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 22 of 50
MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND    *Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                    April 10, 2023

Page 77

1    individual deposition. MC3 Investments is the
2    deponent here. So you can ask if MC3 Investments
3    has been arrested, if that makes any sense. But
4    whatever criminal record Mr. Cash --
5    BY MR. McGURK:
6       Q    Has MC3 --
7            MR. DOSTER: I'm still speaking.
8    BY MR. McGURK:
9       Q    -- made any arrests or been put under arrest
10   for making threats against another person?
11      A    No.
12      Q    Have any fights occurred in your café?
13      A    No.
14      Q    Down below it states in your e-mail, as a
15   representative of MC3, you stated, "Also, their picture
16   from my camera system will be blasted all over social
17   media," right? It says that?
18      A    That's what it say.
19      Q    Those are your words, right?
20      A    Uh-huh. That's what it says.
21      Q    Was this another threat?
22      A    That's what social media is about.
23           MR. DOSTER: Objection, form.
24   BY MR. McGURK:
25      Q    Have you blasted pictures from your camera

Page 78

1    system all over social media before?
2       A    Somebody stole our grease can, and we put it
3    on Facebook with the cameras, and they found the person
4    that stole the grease can. We have a camera system if
5    somebody dumps illegally. Like someone dumped a bed in
6    our garbage can, and we couldn't get our garage dumped.
7            Yeah, there's ways in social media that you
8    can post things that aren't violent or angry, per se, if
9    there's trouble or problems to expose or to correct
10   something, if needed.
11      Q    When you referred to "grease can," what are
12   you referring to?
13      A    My restaurant. There's a can out back that
14   we use to -- that the grease gets processed from the
15   restaurant. And I had it on camera that someone came
16   in, backed up, looked in the dumpsters, grabbed the can
17   and stole it. So, I mean, you know.
18      Q    When did that occur?
19      A    I don't know. I mean, this is kind of
20   irrelevant of cameras. I mean, it says on there, I
21   would have them --
22      Q    Now, about your grease can, when was that
23   stolen?
24      A    It doesn't matter when it was stolen. I
25   don't know when that was stolen. I don't see where

Page 79

1    that's relevant. You're asking me about cameras and how
2    I utilize them.
3       Q    I'm just asking, when was it taken?
4       A    Like I said, you're asking me how do I use my
5    cameras, utilize them. There's various ways if someone
6    steals something that you can utilize your cameras.
7    Just like if someone is coming by and coming in the back
8    of my restaurant or parked up front and taking pictures
9    and causing a disturbance, I could use that camera
10   system and that footage in a legal way if it's
11   necessary.
12      Q    Why were you so upset and threatening in
13   these e-mails --
14           MR. DOSTER: Objection.
15   BY MR. McGURK:
16      Q    -- or texts?
17           MR. DOSTER: Objection, form.
18      A    Like I said, I wasn't upset.
19   BY MR. McGURK:
20      Q    Why were you so angry and confrontational
21   when The Local Brand was willing to work with you?
22           MR. DOSTER: Objection, form.
23      A    Was never angry or confrontational. I
24   believe my previous e-mails -- and most of them has been
25   pretty fair and acceptable of finding ways to work this

Page 80

1    out with them, not in an angry way or upset way. Those
2    feelings have not been present in any examples of my
3    communication with them.
4    BY MR. McGURK:
5       Q    You know The Local Brand would have been okay
6    with you using Local in any font, size, style or design
7    just without the upside-down graphical representation of
8    Florida, right?
9       A    Well, my new logo that was presented to
10   you -- first of all, your trademark, it states very
11   clearly that the trademark represents and protects the
12   upside-down Florida and the word "ocal," which would
13   spell Local. But nowhere does it state that you can use
14   the word upside-down Florida, which you do not own that
15   right in the spelling of any terminology.
16           So unless it's the beginning of the L in
17   Local, the upside-down Florida is not owned by you or
18   your client in any shape, form, or any way. So I just
19   happened to present you with a new logo that has the
20   state of Florida as the L at the end, which is different
21   from your logo as trademarked. Which is why I was --
22      Q    We will be covering the second logo here in a
23   moment.
24      A    No problem.
25      Q    This is Exhibit 10.

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 23 of 50
MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND   Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                         April 10, 2023

Page 81

1    A    Again, do you have a date on that?
2        (Exhibit 10 was marked for identification.)
3    BY MR. MCGURK:
4    Q    Let's see.  I think this was before the cease
5    and desist letter was sent.  Because this is text
6    messages with you and Matt Lilly.
7    A    You think it was, or do you have the actual
8    date?
9    Q    I know it is.
10   A    Okay.
11   Q    Because it says here, Hi -- he wrote, Matt
12   wrote, "Hi Gary," because he didn't even know your name
13   was Mr. Cash, Gregory.  "Matt with Local.  I am getting
14   more customers e-mailing me about the café.  Is the
15   signage still up?  If so, when do expect to take it
16   down?"  This was before the cease and desist.
17       And this is what you wrote.  "Matt, there is
18   absolutely no confusion between your T-shirts, hats and
19   other clothing.  I really don't see a lot of people,
20   maybe one hater, contacting you about my café."
21       So you mentioned a hater in your
22   correspondence with Matt, right?
23   A    This is before you sent me the cease and
24   desist letter, right?
25   Q    Yes.

Page 82

1    A    Please make record of that.  I will read what
2    I said.  This is before I got the cease and desist
3    letter from you, their attorney.
4        "Matt, there is absolutely no confusion
5    between your T-shirts, hats and other clothing.  I
6    really don't see a lot of people, maybe one hater,
7    contacting you about my café.  My attorney is checking
8    on some things deeply, and I'm not close to opening
9    until later Novemberish."
10       So in that comment, I stated I had an
11   attorney, for the record.  Thank you.  Your question?
12   Q    Did the contact -- did the hater contact you?
13   A    No.  It's just a terminology, Oh, it was just
14   obviously some hater out there.  Not a specific person.
15   Not a specific sit- -- you know, scenario or an example.
16   It's just based on what's being presented to me.  It
17   just seemed like there may be a hater out there because
18   I haven't seen or heard any confusion.  Excuse me.  You
19   kind of --
20   Q    How many people have come into your café and
21   think the café is owned by The Local Brand?
22   A    Nobody.
23   Q    How many people have entered your café
24   wearing Local merchandise?
25   A    Nobody.

Page 83

1    Q    How many people have entered your café
2    expecting to order a beer made by The Local Brand?
3    A    Nobody.
4    Q    So let's move on to Exhibit 11.
5        (Exhibit 11 was marked for identification.)
6    BY MR. MCGURK:
7    Q    This is -- do you recognize this?
8    A    Yes.  That's my new logo.  The big L at the
9    front, ocal, with the Florida at the end, with a star
10   where Panama City is, which is where we're at, Café.
11   Q    In -- so this is a -- according to here, the
12   revision date of November 4th, 2022.
13   A    Uh-huh.
14   Q    Is that what is stated here?
15   A    It is.  It was actually four days before I
16   opened, which was --
17   Q    Okay.
18   A    Yep.
19   Q    Did you receive this from Crow Signs?
20   A    Yes.
21   Q    What is the purpose of this order?
22   A    The purpose of this order was to, once
23   notified by your company -- your office and your client
24   with the concerns with the original logo and the
25   possible trademark infringement of that logo, it was me

Page 84

1    trying to work out an alternative to work something out
2    with you guys on something that represents my café and
3    what I'm trying to do versus your interests and
4    concerns, as presented.
5    Q    Do you use a yellow star in the -- in the
6    current logo that's in this logo?
7        MR. DOSTER:  Objection, form.  It's
8    ambiguous.
9    BY MR. McGURK:
10   Q    Is there a yellow star used in this logo?
11   A    Whether there's a yellow star used or not, I
12   think it shows some examples of no yellow star on it.
13   Whether there's one there on this one, whether there's
14   not one -- actually, like I said, this was presented to
15   replace the old one.
16   Q    I have --
17   A    The original one, per se.  I think the
18   original one, if you show the picture, shows it without
19   the yellow star.  I'm not sure.  I can't remember.  I
20   do --
21   Q    Who decided to use a yellow star?
22   A    I was going to say, you know, I remember
23   Steve saying that it would be great if we had a yellow
24   star on there representing Panama City, where we're at.
25   Makes it kind of cool.

Page 85

1    Q    When did you decide to use a second logo for
2 The Local Café, for the name of your café?
3    A    What is the question again?  I'm sorry.
4    Q    Sorry.  When did you decide to use the second
5 logo?
6    A    After your office and the client shared your
7 concern with the original logo.  And again, I was trying
8 to -- trying to be fair and work with y'all in trying to
9 see if I could do something different that doesn't
10 really -- you know, that doesn't have any problems with
11 what y'all have going on with your logo and your
12 representation.  I believe I said this earlier in an
13 earlier question.
14    Q    So it was around November here, as it
15 shows --
16    A    It was after --
17    Q    -- that you decided to use the -- to move
18 over to the second logo, right?
19    A    It was after your cease and desist letter,
20 and it was after the concerns and the communication from
21 your office and client with the original logo that was
22 created for me.
23    Q    So you decided to use the second logo because
24 the first logo was confusing to The Local Brand's
25 registered trademark, right?

Page 86

1        MR. DOSTER: Objection, form.
2    A    No.  It's not confusing at all whatsoever.
3 It's very evident of what it represents.  And again, the
4 state of Florida upside down is not owned in any
5 placement of the word except for the beginning of the
6 logo by your trademark.  So there was no confusion.
7    Q    What was the reason for changing the name of
8 the café again?
9    A    You served me a cease and desist letter with
10 concerns of infringing on your trademark that you had
11 registered for clothing, hats and coffee mugs.  And I
12 was trying to work with you on that and seeing if there
13 was something we could do to work together on you not
14 feeling it's the same.  That's why it was presented to
15 your office, Hey, do you accept this, before we had to
16 file this case or any case from your end or anybody.
17        It was about communicating and, Hey, we would
18 like to offer this.  Are you okay with this as a change?
19 And your office said they did not accept.  And we have
20 since now filed this case to deal with it.
21    Q    Well, let's go over that.  When did you --
22 when you decided to use the second logo, did you send it
23 to The Local Brand to see if they had any problems with
24 it before you started using it?
25    A    I'm not sure.  I'm not sure exactly how it

Page 87

1 was routed.  I don't think it just went to you.  I'm
2 sure -- I'm not really sure how it was presented, but
3 I'm not sure if it was all of y'all together or how that
4 was presented, but we presented it to your team.
5    Q    Do you think it was sent in an e-mail?
6    A    I'm not sure.  I'm sure that that's -- there
7 wasn't --
8    Q    Who sent the e-mail?
9    A    I'm sorry?
10    Q    Who sent the e-mail?
11    A    I don't know if it was my attorney or not, or
12 I'm not really sure who sent it.
13    Q    Why hasn't that been provided to us, the
14 e-mails?
15    A    I don't...
16        MR. DOSTER: Objection, form.
17    A    I'm not -- I'm not sure.  I'm not sure how to
18 answer that.  I'm sorry.  I am not sure.
19 BY MR. MCGURK:
20    Q    Do you have a copy of the e-mails that were
21 sent to us regarding the second logo?
22    A    I'm not sure how it was presented or sent.
23 I'm not sure how it was presented or sent, but I just
24 know that y'all were communicated with in giving the
25 logo and correspondence with your concern.

Page 88

1    Q    Do you think the e-mail was sent before you
2 approached Crow Signs?
3    A    No.  That's what Crow Signs designed for me
4 before it was sent to you for acceptance.
5    Q    So you think there was an e-mail after
6 November 4th that you sent to us?
7    A    I'm sure.  If that was created and revised on
8 November 4th, then I would assume that after that
9 y'all would have been communicated and -- and given this
10 example.
11    Q    Did you have an attorney at that time?  On
12 November 4th, did you have an attorney?
13    A    Yes.
14    Q    And do you expect that your attorney had sent
15 an e-mail with the second logo to us?
16    A    I don't recall.
17    Q    Did you provide this --
18    A    It may have been me.  I'm not sure.  I don't
19 recall.
20    Q    Did you provide this second logo to your
21 attorney around November 4th?
22    A    I don't recall the exact date.
23        MR. DOSTER: Objection.  Any information
24    related to what he provides his attorney is
25    privileged.  So I'm going to instruct my client not

Page 89

1    to respond on conversations between him, MC3
2    Investments, and an attorney.
3        But you're free to answer if you can avoid
4    mentioning such information.
5    BY MR. McGURK:
6    Q    What was Crow Signs' reaction when you told
7    them that you're going to change to a second logo?
8    A    Not really a reaction. Just, okay. I mean,
9    probably --
10   Q    There was no reaction by Crow Signs when you
11   told them that the first sign was an actual registered
12   trademark?
13       MR. DOSTER: Objection, form.
14   A    I couldn't really -- I can't really pinpoint
15   a reaction, per se. Probably general conversation
16   between businesses. Hey --
17   BY MR. McGURK:
18   Q    Well, what did you tell -- I'm sorry. Sorry.
19   A    I may have to --
20   Q    I apologize.
21   A    I may have to change --
22   Q    I'll let you speak.
23   A    Yeah. I may have to change my sign. I'm not
24   sure. I may have to come up with an alternative. Can
25   you help me with that, come up with an alternative? And

Page 90

1    then that's what he presented for me. A pretty basic
2    conversation. There was no real reaction, per se,
3    except for, Okay, I'll help you.
4    Q    Did Crow Signs --
5    A    I don't think anybody really --
6    Q    -- apologize to you for using a registered
7    trademark in the first logo?
8    A    It's only speculation because I don't know
9    how they were thinking or what they felt. But I don't
10   think that they really even knew.
11   Q    No. Did they offer you an apology? That was
12   the question.
13   A    An apology?
14   Q    Did they apologize to you for using a
15   registered trademark in your first logo?
16       MR. DOSTER: Objection, form.
17   A    No, there was no apology because I don't
18   think anyone knew or represented a trademark
19   infringement or knowledge of it whatsoever. So there
20   wouldn't be an apology. So no.
21   BY MR. McGURK:
22   Q    There was no apology. Okay.
23   A    There was no apology.
24   Q    Did he offer --
25   A    There was no --

Page 91

1    Q    Did they offer you a refund?
2    A    There was no apology or knowledge of any
3    trademark infringement with the logo that was presented.
4        Go ahead with your question.
5    Q    Did they offer you a refund?
6    A    Did not offer me a refund. But when I --
7    when we came up -- you know, whenever this was presented
8    and there was going to be a change, there would be
9    something to replace it with at that time, that they
10   would work something out with me. I'm not sure what
11   that would be.
12   Q    Did they have some type of agreement with you
13   about the second design of this logo?
14   A    No, sir.
15   Q    Who told them to move the L from the front to
16   the back?
17   A    They designed the logo --
18   Q    The upside-down Florida.
19   A    They designed the logo. Once I presented the
20   concern from your office and the possibility of it being
21   a trademark infringement, the design was created from
22   Crow Signs to present a change in a difference in it to
23   see if it would be acceptable. So they designed it, and
24   they created it for me.
25   Q    And then supposedly you gave it over to The

Page 92

1    Local Brand --
2    A    Yeah.
3    Q    -- through your attorney to approve?
4        MR. DOSTER: Objection.
5    BY MR. McGURK:
6    Q    Did you get an e-mail back from The Local
7    Brand that said, We approve?
8    A    No. The Local Brand and the communications
9    in reference to this change and new -- new logo, y'all
10   did not like it and would not accept it, from what I
11   understand.
12   Q    What other configurations or variations other
13   than the second logo that you see before you did you
14   think about using?
15   A    There was -- I didn't think about using
16   anything. I went to Crow Signs and asked them to help
17   me design the logo, and that's what was presented to me.
18   So there was no thinking on my part to decide that.
19   Q    So they again --
20   A    Uh-huh.
21   Q    -- made this sign, and you just accepted it
22   without any changes at all?
23   A    Why would I? It looks great.
24   Q    What was your reaction when you found out The
25   Local Brand did not like the second logo?

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND, etc. vs. Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,
April 10, 2023

Page 93

1    A   I didn't eat for a whole weekend, and I
2  couldn't sleep for three days.  No, I'm just kidding.  I
3  didn't really have a reaction.  I just couldn't
4  understand why they couldn't be a little more
5  understanding because I'm trying to be fair and
6  understanding with them.
7       I had no interest in going to West Palm Beach
8  and selling, hats, clothing, T-shirts.  I have no
9  interest in opening a café in West Palm Beach.  My only
10  interest is, is to stay in my community, provide a fun,
11  happy, family atmosphere in the local aspect of my
12  community.  And that's really all I care about.  So I
13  would really like to --
14    Q   Why didn't you --
15       MR. DOSTER: Go ahead.
16    A   I would really like to be fair and -- and
17  like I've stated, be respectful of their feelings and
18  their concerns but find a way that we can work something
19  out together is what I've always felt.  And that's
20  always my reaction, and that's always my feeling to
21  anything that's different than what I have.
22  BY MR. McGURK:
23    Q   Why didn't you just drop the upside-down
24  graphical representation of Florida since you previously
25  said, My logo doesn't sell my concept or food?

Page 94

1    A   Like I said, I didn't design it.  It looks
2  good.  Based on the concerns that were presented to me
3  from the alleged trademark infringement from the
4  original logo, once it was presented for a change,
5  something that may work out to be different for you guys
6  to accept and not worry about being any kind of
7  infringement of your company and your design, it looks
8  good.  It is different.  There really wouldn't be any
9  reason for me to try to find something different,
10  really.  I think it looks really good.
11    Q   Well, why didn't you come up with something
12  that used Local but without the same font as the first
13  logo?
14       MR. DOSTER: Objection, form.
15    A   Again, I didn't design it or come up with it.
16  It was Crow Signs.  So it wouldn't be anything me
17  personally or MC3 Investments would have derived or
18  changed on our own accord.  That's why I go to a company
19  that does that.  That's their profession, and that's
20  what they're good at.
21  BY MR. McGURK:
22    Q   Well, there's a difference between somebody
23  who designs it and one that adopts what somebody
24  designs.
25    A   Uh-huh.

Page 95

1    Q   You understand that, right?
2    A   Yeah.  Yes, sir.
3    Q   You adopted something that supposedly they
4  designed.
5    A   I adopt --
6    Q   Right?
7    A   I adopted a logo that was to be presented as
8  a change from the original logo that was presented as a
9  concern from your office as something that would work,
10  to be acceptable, hopefully, from your concerns, and
11  still represents the local aspect of my café in the
12  name.
13    Q   Moving on to Exhibit 12.  Or sorry, we
14  covered 12, 13, 14 and 15, which is the door vinyl for
15  the front.  Exhibit 16.
16       (Exhibit 12 was marked for identification.)
17       (Exhibit 13 was marked for identification.)
18       (Exhibit 14 was marked for identification.)
19       (Exhibit 15 was marked for identification.)
20       (Exhibit 16 was marked for identification.)
21  BY MR. MCGURK:
22    Q   Do you recognize this?
23    A   Yes.  That's the inside of my café.
24    Q   Is this neon sign in your café?
25    A   Yes, it is.

Page 96

1    Q   The blue neon sign in the back?
2    A   Uh-huh.
3    Q   Who designed this?
4    A   There's a company online, various companies
5  where you can buy neon signs in different ways, and they
6  create that, and you kind of pick.  They have different
7  styles, colors, fonts, scripts that you can look at for
8  their neon signs.  That's where that came from.
9    Q   So you designed it?
10    A   No.  It's, like I said, they give you the
11  designs and the scripts and the fonts, and you pick it
12  from their website.  So I wouldn't say I designed it.
13  You kind of pick the word -- I mean, the words are
14  already The Local Café.  You pick the color and the
15  script from their website.
16    Q   What is a script?
17    A   I don't know.
18    Q   You just said that you picked the script.
19    A   Yeah, I picked the script.  That doesn't mean
20  I know the name of it.  I picked the font, but that
21  doesn't mean I know the name of the font.  Just like I
22  don't know the name of the font on the original logo
23  that you have concern with, or the size or the font.
24    Q   So you don't know what font was used for your
25  neon sign?

MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFE AND
THE LOCAL BRAND, INC.,

Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
April 10, 2023

Page 97

1    A    No, sir.
2    Q    Who manufactured this?
3    A    I don't -- I don't have the name in front of
4  me.  I would have to look it up.  That's a company on
5  the Internet.  You could Google probably, I don't know,
6  neon sign.  You would probably find a bunch --
7    Q    How much did this -- oh, sorry.
8    A    It's okay.
9    Q    How much did this cost?
10   A    I have no idea.  $300 maybe, or less.
11   Q    Was any of the paperwork provided to us?
12   A    For The Local Café neon sign?
13   Q    Yes.
14   A    You tell me.  If you requested it, then yes.
15 If you didn't request it or have a need for the scripted
16 neon sign inside the restaurant that has no bearing on
17 the Florida upside-down logo from your concerns on
18 infringement of a trademark, then we probably don't have
19 it.
20   Q    When did you place the order for the neon
21 sign?
22   A    I have no idea.  Before we opened.  I opened
23 November 8th so...
24   Q    Was the order placed before the cease and
25 desist order?

Page 98

1    A    I have -- I have no idea of the timeline
2  between October 28th and November 8th, when we
3  opened.  That's, what, a week, 28th?
4    Q    I think --
5    A    Probably a week.
6    Q    -- it was about a week, yes.
7    A    Yeah.
8    Q    But do you think you placed the order
9  before -- for this neon sign, before the cease and
10 desist letter?
11   A    I have no idea.  And again, the cease and
12 desist letter wouldn't have anything to do with the
13 scripted local café sign inside on the wall of the
14 restaurant.  So I wouldn't really know the timeline.
15   Q    Oh, okay.
16   A    Yeah.
17   Q    When was it installed in your café?
18   A    I have no idea.  Before November 8th.  The
19 clock, the signage, the metal walls, the brown wood.
20   Q    Who installed the -- sorry.
21   A    Yeah.
22   Q    Who installed the neon sign?
23   A    I did.  It came in the mail, and I mounted it
24 on the wall and plugged it in.
25   Q    Why aren't you using this as the only logo

Page 99

1  for your café?
2    A    Because it shows a -- I don't know.  Kind of
3  a -- it was just something different that we put on the
4  back wall.
5    Q    Yeah, but it's a really neat one.
6         Why didn't you just use this really cool neon
7  look that you have for the café?
8    A    I don't really know.  I didn't think about it
9  like that.  I didn't think of it as a logo for my café
10 or a sign.  I just looked at it as a nice scripted neon
11 blue light when you come in.  Lights up at night.
12 Nothing really -- not a lot of thought put into it.  It
13 just looks cool.
14   Q    Wouldn't that look nice on the front of your
15 café on the outside?  Wouldn't more people notice this?
16   A    I mean, whether I was to use that or -- I
17 mean, there was no comparison in both of those, like I
18 said, and what they're used for.  They're used for two
19 different purposes.  I'm not using this necessarily
20 to --
21   Q    How much would a large --sorry.
22   A    Go ahead.
23   Q    I thought you were done.
24   A    No, you're all right.
25   Q    How much would a large neon sign like that

Page 100

1  cost if you would put it outside your café,
2  approximately, if that one, you said, cost what?
3    A    3 to 5, probably.
4    Q    How much?
5    A    3 to 5.
6    Q    3 to 5.
7    A    That may be --
8    Q    How much -- how much would a neon sign cost
9  for the outside, would you approximate?
10   A    Maybe 8 to 10,000.
11   Q    Thousand?
12   A    Probably 8 to 10,000.  You have to have
13 electrical ran out there.  You have to have the --
14 probably, I'm guessing, the demolition of the existing
15 sign that's out there.  You probably would have to paint
16 and cover whatever.  That rectangle sign out front has
17 been there and exposed.  And then the actual design of
18 the neon sign and how large it would probably be.
19        More cost probably in electrical and the
20 construction part, I would guess, than the actual sign
21 itself.  I don't know.  Maybe 8 to 10 grand.
22   Q    Is there -- is there enough electrical outlet
23 on the current sign?  Does it light up at night?
24   A    I think it lights up --
25   Q    You understand outside --

---

Page 101

1    A    I think it lights up at night, but I'm not an
2  electrician, nor would I know how the electrical needs
3  or what would be required for an electrical sign but...
4    Q    Do you think The Local Brand would object to
5  your neon sign?
6    A    I don't know.  I kind of feel like, based
7  on -- I don't know if anything would make them happy, as
8  long as the word "Local" was included with it.
9    Q    But I already asked you, that Local would be
10  happy with using anything other than the upside-down
11  Florida in it, that you could use anything like the neon
12  sign, you know, exactly as it appears here.  And they
13  would have been very happy.
14    A    Do you have record of that?
15        MR. DOSTER: There's no questioning pending.
16   He's testifying.
17        THE WITNESS: Oh, okay.
18        MR. DOSTER: Objection to form.
19    A    Do you have a question?
20  BY MR. McGURK:
21    Q    I'm just stating.
22    A    Okay.
23    Q    Exhibit 17.
24        (Exhibit 17 was marked for identification.)
25

---

Page 102

1  BY MR. MCGURK:
2    Q    Do you recognize what this may be?
3    A    That is a generic -- that is a generic --
4  whenever I signed up on Google for -- to represent my
5  company, it had a -- for $12 a month, you can create a
6  website or create -- not create, excuse me, a website.
7  You could create your -- the local -- they give you an
8  option for a -- what's it called?  Website name?
9        I don't know what the exact terminology is,
10  but thelocalcafe.net or thelocalcafe.org or
11  thelocalcafe.com.  It gave you that option.  So I picked
12  thelocalcafe.net.  And boom, that's what they gave me.
13    Q    So is this your website?
14    A    It's the generic generated website from
15  signing up, yes.  I didn't choose this.
16    Q    Who designed the look of the name for your
17  café?
18    A    Who designed the what?  I'm sorry.
19    Q    The look of your name for your café that
20  appears on your website.
21    A    Yeah.  Like I said, I signed up for a website
22  hosting, per se, and it's actually pretty generic.  I
23  haven't done anything with it.  I've kind of left it.  I
24  probably in the future will try to maybe make it look a
25  little nicer.  I don't know.  It's just a generic -- a

---

Page 103

1  generic site that they just pretty much put there.
2        I didn't do The Local Cafe design.  I didn't
3  do the font or size for it.  I didn't do the American
4  Restaurant, Panama City.  Open today until 3 p.m.  If
5  you scroll down.  Can you scroll down?
6        Oh, it doesn't show the picture.  I think you
7  just took --
8    Q    Yeah, it doesn't show it.
9    A    Yeah.  I didn't design any of that.
10    Q    What is this, though, the -- a spacer of some
11  type?
12    A    No.  You would have to Google The Local --
13  you would have to go to thelocalcafe.net.  Can you do
14  that on your Internet real quick?
15    Q    I don't know.
16    A    Is that on the screen, or is that just a
17  picture?
18    Q    This is just a PDF that I did.
19    A    You just screenshot it or did something.  I
20  think you were focusing on The Local Café font, and that
21  instead of the whole website.  But I didn't work on the
22  website.  I didn't design the website.  I didn't
23  communicate with anyone how I wanted the website to
24  look.  It's a basic generic thing that they gave me when
25  I signed up thelocalcafe.net.

---

Page 104

1    Q    So did Google do this for you?
2    A    I think so.  Or -- probably a company
3  within Google.  Again, when you register with Google, it
4  gives you all these advertisements to click here if you
5  want to do ads for Google.  Do you want to -- because
6  I'm a new company, per se, registering with Google, do
7  you need a website?
8        Oh, yeah.  Okay.  Well, pick your -- okay.
9  Thelocalcafe.net.  I'll pick that one.  And then I think
10  it was like $12 a month.  I don't know what company
11  controls it.  I don't know what company designs it.  But
12  it was all through that web base, to present basically a
13  generic, which is what you see.
14        There really is no reason to change it to
15  look like the logo outside or to look like the logo on
16  my neon sign.  It's just a generic form of my website.
17  Nothing really put into it.
18    Q    Why aren't you using this as the only logo
19  for your café?
20    A    Because, like I said, it wasn't designed by
21  me or it wasn't presented to me to be designed by
22  others.  It was just a generic presentation of the
23  website once I ordered my website, thelocalcafe.net.  We
24  go on there and maybe add pictures to it.  But we don't
25  really have any control over -- or at least haven't

---

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 29 of 50
MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFÉ AND   Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                         April 10, 2023

Page 105

1 looked into it on what that should look like.
2       Basically, it's a generic presentation from a
3 company that designed it, if that makes sense.
4    Q    So you're saying that you did not design
5 anything on your web page at all?
6    A    Nothing at all.
7    Q    You did not add any pictures to your website?
8    A    I added pictures.  I -- I added after the
9 fact.  Once that was created, I've added pictures, yes,
10 but that's it.  I don't really know what else -- I am
11 not sure --
12    Q    Thank you.  Have you removed images from your
13 website?
14    A    Pardon me?
15    Q    Have you ever removed images from your
16 website, photos?
17    A    No, not that I can recall.  I think we
18 had some menus.  We used to be closed on Mondays, so we
19 had some pictures of our menus that showed off -- closed
20 on Monday.  So I made sure -- I had to go in and delete
21 that picture and present the menu picture because we're
22 open seven days now.  That's probably the only --
23    Q    Have you changed anything else on your
24 website since the litigation was filed?
25    A    Not that I recall.

Page 106

1    Q    Does your second logo mean the same thing as
2 your first logo?
3    A    The Local Café?
4    Q    Yes.  Does The Local Café in your first
5 logo -- or your second logo mean the same thing as the
6 first logo?
7    A    Well, they're both spelled the same.  It's
8 just the design, I guess, that was created was a little
9 different, not to represent the L and ocal, representing
10 the upside-down Florida, which allegedly is your
11 trademark concern.
12    Q    Well, the question was:  Does your second
13 logo mean the same thing as your first logo?
14    A    They both mean the same -- they both mean The
15 Local Café.  I mean, I don't really know how to answer
16 that question from what you're saying for.  The Local
17 Café.
18    Q    Who decided to move the upside-down graphical
19 representation of Florida from the first L in Local to
20 the last L in Local?
21    A    Once again, I presented the concern to Crow
22 Signs for a new logo, and that's what was presented to
23 me by them.
24    Q    So you adopted the -- what they designed?
25    A    Yes.

Page 107

1    Q    You adopted how the placement and the
2 dimensions of the first L were used -- or the first L,
3 how it looks, in the second logo, you adopted that?
4       MR. DOSTER: Objection.  Asked and answered.
5 BY MR. MCGURK:
6    Q    Please answer.
7       THE WITNESS: Oh, does that mean he's asked
8 it before and I've answered it already, basically?
9       MR. DOSTER: I made an objection, and you're
10 free to answer.
11    A    So ask the question again.  I'm sorry.
12 BY MR. McGURK:
13    Q    You decided to adopt that the -- let me go
14 back.  I want to make sure you understand which one I'm
15 talking about.
16       Okay.
17    Q    In Exhibit 11 here, this is your second logo,
18 right?
19    A    Yes.  Presented by Crow Signs.
20    Q    Okay.  You decided -- you see the first L
21 here?
22    A    Uh-huh.
23    Q    Okay.  You decided to adopt the placement and
24 the dimensions of that first L, right?
25    A    However you want to word that.  It was

Page 108

1 presented to my by Local -- by Crow Signs, and it looks
2 acceptable to me as something that could possibly be a
3 fair adjustment to your concerns.
4    Q    So you decided to adopt this?
5       MR. DOSTER: Objection, form.
6    A    I mean, I accepted it.
7 BY MR. MCGURK:
8    Q    Right?
9       MR. DOSTER: Objection.
10 BY MR. MCGURK:
11    Q    I mean, in here it's shown in the order.  You
12 decided to adopt this L as it looks, the size,
13 dimension, the placement?
14       MR. DOSTER: Objection, form.  Asked and
15 answered.
16    A    Okay.  Again, the original logo has presented
17 a concern from your client had presented.  So with
18 that --
19 BY MR. McGURK:
20    Q    And I -- I -- I'm asking a specific question
21 to this, not to the back.
22    A    Well, I'm going to explain it.
23    Q    I'm not sure if...
24    A    Well, you need to understand that the
25 original -- you're asking -- yeah, this has everything

Page 109

1  to do with what you're asking, because the first logo is
2  the upside-down Florida representing an L.  So this
3  represents a change of fairness of the logo so you
4  wouldn't feel any kind of infringement based on the
5  design that was presented to me.  Not necessarily an
6  acceptance for me but hopefully an acceptance for your
7  client.
8          MR. DOSTER:  We've been going about an hour.
9  Would you like a break?
10         THE WITNESS:  Uh-huh.
11         MR. DOSTER:  My client said he would like a
12  break.
13         THE WITNESS:  I need to go to the bathroom.
14         MR. McGURK:  Okay.
15         THE WITNESS:  These Diet Cokes.
16         MR. MCGURK:  How about 10, 15 minutes?
17         MR. DOSTER:  It doesn't have to be that long.
18  It can just be 5 minutes.
19         MR. McGURK:  Let's do 10.
20         (Recess from 12:05 to 12:17 p.m.)
21  BY MR. McGURK:
22     Q   Have you thought about or are you going to
23  open a second restaurant?
24     A   My -- as discussed with your team, we have
25  interest in our -- in growing our -- like a little

Page 110

1  sports, little oysters and steamed seafood, in another
2  location.  And I believe we have shared with your team
3  the desire of just staying within our area, Bay County,
4  Florida, and that's it.
5          Where it goes from there, I don't really
6  know.  I don't have any specifics.  But we do have a
7  desire of growing within our community, aside from just
8  one location, but within Bay County only.
9      Q   Would you consider this a restaurant or a
10  bar?
11     A   Restaurant.
12     Q   Are you -- where is it going to possibly be?
13     A   Downtown Panama City, Harrison Avenue.
14     Q   I'm unfamiliar with --
15     A   Yeah.
16     Q   -- the location.
17         How far away is it going to be from your
18  current location?
19     A   Probably about five to seven miles.  It's not
20  far.  There's a --
21     Q   Oh, okay.
22     A   There's a local -- local downtown area where
23  a lot of new restaurants are there.  It's growing and
24  developing.  We had a hurricane here that devastated our
25  area.  So there's a lot of growth and development

Page 111

1  reviving the area down there.  And there's a place right
2  next to Trigo on the left.  It's right next to it, and
3  Trigo is like a little San Francisco deli.  Real popular
4  downtown there, in a nice little area.  And I'm looking
5  at a place right next to it.
6      Q   Have you put a down payment for it?
7      A   I'm not buying.  I'm not buying it.
8      Q   Have you put a down payment for the lease
9  or...
10     A   Yes, I have -- no.  No.  No payments have
11  been made, no.  Sorry.
12         I was saying yes, but no, not yet.  I haven't
13  made any payments towards it at all.  No payments
14  whatsoever.
15     Q   Have you signed a lease?
16     A   Yes, I have.
17     Q   When was the lease signed?
18     A   It was signed -- I would have to look.  I
19  don't know the exact time.  But it was somewhere towards
20  the end of last year.  I was trying to get in there
21  before football season because it's going to be sports.
22  And I don't know the exact date.  I would have to look.
23  They had a buildout, four- or five-month buildout
24  associated with it.
25         I truthfully have been so involved with the

Page 112

1  café.  You know, down there, I have partners.  At the
2  café, I have none.  It's just me.  So my partners are
3  kind of handling all that part of it right now, and I'm
4  not too involved with it.  But...
5      Q   As the second location, is it MC3
6  Investments?
7      A   No, it's not.
8      Q   Oh.  What is it -- who owns that?
9      A   I'm not at liberty to say, but it's not MC3
10  Investments, I can tell you that.
11     Q   How many partners are there?
12     A   Again, this is -- I'm here representing MC3
13  Investments.  I don't mind sharing with you the idea of
14  the local aspect of the area and growth, but, I mean,
15  that's a whole other avenue with a whole other company
16  with a whole -- information from other people.  So I
17  don't feel like it's -- I'm at liberty to discuss that
18  in this situation, or this case.
19     Q   Are the partners joining as members in MC3?
20     A   No.
21     Q   So this is a wholly distinct entity that
22  you're opening?
23     A   It has nothing to do with MC3 Investments or
24  The Local Café.  MC3 Investments is solely owned and
25  operated by me, Greg Cash, representing MC3 Investments.

Page 113

1  That's it.
2      Q    What is the proposed name for the second
3  place?
4      A    Like I said, I would rather not discuss that.
5  It doesn't have anything to do with --
6      Q    No.  You have to answer the question
7  truthfully.
8          MR. DOSTER: Objection, form.
9      A    This has nothing to do with MC3 Investments
10 or this case.
11 BY MR. McGURK:
12     Q    No, it does.  It has everything to do with
13 everything.
14         MR. DOSTER: Objection, form.
15     A    Maybe later, but I wouldn't think now, today.
16 If you have concerns later.
17 BY MR. McGURK:
18     Q    No, I have concerns, directly concerns.
19     A    Okay.  Well, like I said, this is regarding
20 MC3 Investments.
21     Q    No, it isn't.  It's also everything that you
22 responded to the first set of interrogatories and our
23 first set of reproduction, and they were asked in there.
24     A    Do I have plans to do other things and me be
25 involved with other things?  Yes.  But in relation to

Page 114

1  The Local Café and MC3 Investments, it has nothing to do
2  with it.
3      Q    Is it also going to be a local café?
4      A    I already said it was oysters and seafood and
5  sports.
6      Q    You're going to sell beer, right?
7      A    I have no idea.
8      Q    Do you have a liquor license that you're
9  looking for?
10     A    No, I do not.
11     Q    Are you obtaining a liquor license?
12     A    I do not have any information on that.  Like
13 I said, I would have to consult with my partners.  I
14 don't -- like I said, I'm not involved with any of that
15 at this time.
16     Q    When did you think about opening a second
17 place?
18     A    Again, it's not open yet.  It's not even
19 built.  And it involves another company with other
20 partners.  And, I mean, I just would rather not discuss
21 it.  I don't see how it has any -- at this present time,
22 any forbearance on your concern with The Local Café and
23 the logo that I presented.
24     Q    Will the specific name of the restaurant or
25 bar be The Local Café?

Page 115

1      A    No.
2      Q    So who is providing capital for the new
3  restaurant?
4          MR. DOSTER: Objection, form.
5      A    Like I said, I'm not at liberty to answer
6  that question in relation to this case.
7  BY MR. MCGURK:
8      Q    I'm going to be putting you on notice that
9  we're going to be doing a Motion to Compel this
10 discovery issue and file with the Court.  Just putting
11 you on notice right now.
12     A    No problem.
13 BY MR. McGURK:
14     Q    So if you say these questions as provided,
15 you're not going to answer, we will probably do a Motion
16 to Compel real soon.
17         So how much capital do you have allocated for
18 the opening of the new restaurant?
19     A    Zero.  And again, let me state, there's
20 partners involved with that that are controlling the
21 bigger aspects of that, which is why I'm not at liberty
22 to say.  I'm not a representative of -- they're not a
23 representative of MC3 Investments, The Local Café.  So
24 when you ask questions about any other location that's
25 not even built yet or open for business, it's kind of

Page 116

1  hard for me to answer or give you any good answers for
2  that.
3      Q    Are you the sole owner, then, of the new
4  place?
5      A    Like I said, there are partners.  I am the
6  sole owner of MC3 Investments and The Local Café.
7      Q    Okay.  How many people do you think are going
8  to be working at the second place?
9      A    I have no idea.
10     Q    In your office at the café, do you conduct
11 work on behalf of your telecom company?
12     A    The work at the café?  Do I what now?
13     Q    Correct.
14     A    What is it again?
15     Q    At your office there --
16     A    Uh-huh.
17     Q    -- do you work on anything related to your
18 telecom business?
19     A    The café has nothing to do with the work of
20 my Gulf Coast Telecom.  I have an office in the back of
21 the building.  I lease the building.  And I have an
22 office in the back that is my corporate office where I
23 work out of.  That's it.
24     Q    Do you do any work there for Gulf Coast
25 Telecom --

Page 117

```
 1   A    No.
 2   Q    -- out of that office?
 3   A    Out of the office?
 4   Q    What is the --
 5   A    Again --
 6   Q    Out of your office?
 7   A    Yeah.  Again, it's my corporate office is
 8   located in the back of the café in an office space.
 9   Q    Your corporate office for what?
10   A    Gulf Coast Telecom and MC3 Investments.
11   Q    Oh, okay.
12   A    Yep.
13   Q    So you actually have an office for Gulf Coast
14   Telecom in the café.
15   A    In the back.
16   Q    Right?
17   A    With a door that locks, yes, sir.  And a
18   computer and printer and -- you know.
19   Q    What are the names of the employees that work
20   for you at the café?
21   A    Crystal, Cheryl, Alex.
22   Q    Full names, please.
23   A    Oh.
24   Q    First and last name.
25   A    Crystal Pitts.  Cheryl Clements.  Alex
```

Page 118

```
 1   Buchanan.  I don't remember Kayla's last name by heart.
 2   And I don't know Jennifer's last name by heart.  Gracie
 3   Awa.  Phillip, I don't know his last name right off the
 4   top of my head.  Sorry.
 5   Q    Will you be able to write us their contact
 6   information after this?
 7        MR. DOSTER: Objection.
 8   A    If it's -- if it's --
 9        MR. MCGURK: Objection for what, Jared?
10        MR. DOSTER: The time to serve discovery
11   requests has already ended.
12        MR. MCGURK: No, that is not correct.
13   Discovery has not ended.
14        MR. DOSTER: The time to serve discovery
15   requests has ended.  Now, if you believe that we
16   have not responded to one of the previous
17   discovery --
18   BY MR. MCGURK:
19   Q    I just want to ask, where do they live, then,
20   each of those people?
21   A    I think they -- we're in Bay County.  They
22   live in Panama City.  They all live right here locally.
23   I don't know their exact addresses.
24   Q    I am going to go to the last exhibit.
25        (Exhibit 18 was marked for identification.)
```

Page 119

```
 1   BY MR. MCGURK:
 2   Q    This is a -- another text.
 3   A    Ahh, Karma Fishing.  Yes.
 4   Q    How did you find out about Karma Fishing?
 5   A    Well, once again, once your office and your
 6   client shared concerns with possible infringement of the
 7   trademark, I started Googling information, and I
 8   stumbled upon this gem.  When you look this up, it pulls
 9   up Karma Fishing.  It pulls up a news report.  It pulls
10   up a recording of you speaking on behalf of your client
11   and concern of this company and the case that was
12   presented from them.
13        And -- and then that was probably that case
14   that you tried to sue them.  I think it was three or
15   four years ago.  I'm not really sure.  Two years.  You
16   may know more than me on that one.  But I do know
17   presently, if you Google it, they're still there and
18   they're still doing their -- their logos.  But I don't
19   have any other information other than it appears that
20   they're doing their business.  So...
21   Q    How did you -- how did you contact Karma
22   Fishing?
23   A    I tried to send them a message on Facebook
24   but never got a response.  I've never had any
25   communication with them.  No one has ever responded.  I
```

Page 120

```
 1   think they're so big that they just don't really have
 2   time.  I don't know.  They just never responded
 3   whatsoever.
 4   Q    So you didn't actually talk to anybody?
 5   A    No, sir.
 6   Q    Even though you said that you talked to
 7   people --
 8   A    Oh.
 9   Q    -- in this e-mail?
10   A    Oh, been talking to this guy.  Well, been
11   talking to this guy means I --
12   Q    Who is this guy that you keep referring to?
13   A    Well, whoever owns Karma Fishing who is on
14   the video, on the news clip that you're a part of when
15   y'all tried to sue this company for infringement on
16   their logo, which was a Florida sideways going across
17   the top of the fish which, you know, it's not --
18   Q    Do you know --
19   A    I'm still answering.  It is not an
20   upside-down Florida in the shape of an L spelling Local
21   so...
22   Q    Do you know that The Local Brand did not sue
23   them, right?
24   A    I don't know anything about the case.
25   Q    But you just said that we just -- The Local
```

---

Page 121

1  Brand sued them.  And I'm telling you, you do not know
2  that The Local Brand did not sue them?
3      A    I may have used the word "sue" -- I'm not an
4  attorney -- improperly.  But I do know that y'all
5  pursued them in a way of shutting them down from using
6  that logo, however you want to use that terminology.
7  Because you were on video on the -- if you Google it,
8  you can see it.  Anybody can see it.
9          It interviewed the guy that owns Karma
10 Fishing, and he's explaining his -- and it was some news
11 channel.  And it had you on a voice recording explaining
12 your concern from your clients on the use of his logo.
13 And anybody can see that on the Internet.  That's all I
14 saw.
15     Q    How many times did you talk to the guy from
16 Karma Fishing?
17     A    I -- like I said, I sent a few messages and
18 never got a response.  I've never actually had a voice
19 conversation or even a response to my e-mail.  I was
20 trying to talk to him.  I tried to reach out to him.  I
21 sent messages to talk to him and never got a response.
22     Q    What were your reasons for contacting them?
23     A    I'm not sure.  Maybe to inquire, you know --
24 I don't know.  It involved you as the attorney who has
25 contacted me, and it involved your client who has

---

Page 122

1  contacted me.  And I'm not exactly sure what I was
2  looking for at that moment, but I'm sure it was probably
3  to inquire on your concerns as you were voicing them to
4  me versus concerns with them.  I don't really know.  I
5  can't remember exactly.
6      Q    Do you have any copies of the e-mails you
7  sent?
8      A    No.  It was -- it wasn't an e-mail.  It was a
9  Facebook -- Facebook message.  And again --
10     Q    Do you have any copies of the Facebook
11 messages you sent to them?
12     A    I'm probably sure I do have a copy of that.
13 Again, like I stated under oath, I have never got a
14 response from the gentleman.  But yeah.
15     Q    Greg, if there's anything else that you want
16 to ask at this time, I am done.
17     A    I'm good.  Thank you.
18     Q    With everything you ask --
19     A    Yes, sir.
20     Q    Or not Greg, sorry.
21         MR. MCGURK: Jeff.  Sorry about that.  Jeff,
22     is there anything else you want to ask, or do we
23     want to take a break and then come back for the
24     final questions?
25         MR. CARTER: Thanks, Clay.  I'm in good

---

Page 123

1  shape.  If we want to turn it over to Jared for any
2  Redirect or cleanup.
3          MR. MCGURK: Okay.  Let's do that, then.
4          MR. DOSTER: You stay right here.
5          THE WITNESS: Okay.
6          MR. DOSTER: Okay.  Mr. McGurk, what exhibit
7      number did you just have up that was Defendant's
8      exhibit, the Karma Fishing one?
9          MR. MCGURK: Hold on.  Let me get to it.
10         THE WITNESS: Can I say something real quick?
11         MR. MCGURK: Exhibit 18.  Exhibit 18.
12         MR. DOSTER: So Defendant's Exhibit 18.
13         All right.  Do me a favor and scroll down on
14     that same page of Defendant's Exhibit 18.  I don't
15     have a copy to show Mr. Cash, so I have to rely on
16     what's on the screen.  That's good.
17              CROSS-EXAMINATION
18 BY MR. DOSTER:
19     Q    Mr. Cash, do you recognize this text message
20 that is in front of you that is Defendant's Exhibit 18
21 that's dated Saturday, November 12 at 8:17 a.m.?
22     A    Yes.
23     Q    What is that text message?
24     A    It's basically showing where I have changed
25 my logo and waiting on money to replace it.  It's over

---

Page 124

1  $5,000.
2      Q    Is this a text message that you sent to
3  Matthew Lilly?
4      A    I believe so.
5      Q    Is this a text message that you sent to The
6  Local Brand?
7      A    Yes.
8      Q    Why did you send him this text message?
9      A    Because they shared a concern of a possible
10 infringement of their logo with my original logo that I
11 have.  And so, therefore, I was trying to see if there
12 was an option to present to them of a change or
13 something different so they wouldn't feel infringed.
14     Q    Now, when we first started, you said there
15 was something else you wanted to say.  Is there a
16 question you would like me to ask you?
17     A    No, it's okay.  It was a general question
18 about -- I should have asked it whenever he said
19 anything else.  I don't have any concerns.  I was just
20 going to state that I appreciate the opportunity for us
21 to talk and to go over this situation.  Hopefully we can
22 handle everything with fairness.  And I appreciate your
23 time.  Thank you.
24     Q    All right.  I have some additional questions,
25 but I would like to go off the record to handle a

---

**Precision Reporting & Video** (850) 737-9071
info@precisionreportingandvideo.com

| | | | |
|---|---|---|---|
| Page 125 | | Page 127 | |

| | |
|---|---|
| 1 | logistics administrative issue about how to do this |
| 2 | Redirect on Zoom, if that's okay with y'all. |
| 3 | MR. CARTER: Absolutely. |
| 4 | MR. DOSTER: All right.  Let's go off the |
| 5 | record. |
| 6 | (Discussion off the record) |
| 7 | (CONFIDENTIAL PORTION REDACTED) |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 127**

| | |
|---|---|
| 1 | (CONFIDENTIAL PORTION REDACTED) |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 126**

| | |
|---|---|
| 1 | (CONFIDENTIAL PORTION REDACTED) |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 128**

| | |
|---|---|
| 1 | (CONFIDENTIAL PORTION REDACTED) |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Case 5:22-cv-00260-MJF    Document 52-4    Filed 05/15/23    Page 35 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND Confidential - Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                                    April 10, 2023

Page 129

1          (CONFIDENTIAL PORTION REDACTED)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 131

1    before.  Mr. Cash indicated that he would like the
2    right to read his deposition transcript.  And I
3    know in the state of Florida, if you don't say
4    anything you automatically get to read.  I don't
5    know if that's true in Federal Courts or not.  So
6    just to do my belt and suspenders, would you mind
7    if we went back on the record to Mr. Cash's
8    corporate rep depo, just for me to state that we
9    request the right to read his transcript -- that he
10    has a right to read his transcript?
11          MR. CARTER:  No problem.
12          MR. DOSTER:  We request the right for
13    Mr. Cash to read his transcript.
14          COURT REPORTER:  Thank you, sir.
15          (Deposition was concluded at 1:33 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 130

1          (CONFIDENTIAL PORTION REDACTED)
2
3
4
5
6
7
8
9
10
11
12
13
14
15          MR. DOSTER:  All right.  And that concludes
16    my Redirect.
17          MR. CARTER:  Nothing from me, Clay.  Thank
18    you, Jared.
19          MR. MCGURK:  Should we move for a lunch break
20    and then start with the next one?
21          MR. DOSTER:  Let's go off the record first.
22          MR. McGURK:  Oh, I thought -- sorry.
23          (Recess.)
24          MR. DOSTER:  Mr. Cash, I should have put this
25    on the record and asked your permission to do it

Page 132

1                    CERTIFICATE OF OATH
2    STATE OF FLORIDA          )
3    COUNTY OF WALTON          )
4
5          In my capacity as a Notary Public of the State of
6    Florida, I certify that on the 10th day of April, 2023,
7    GREGORY CASH, personally appeared before me means and
8    took an oath or affirmation.
9
10
11          WITNESS my hand and official seal this 28th of
12    April, 2023.
13
14
15          AMBER LEE RODRIGUEZ
16          Notary Public - State of Florida
               Commission # HH 050744
17          Expires January 23, 2025
18
19
20
21
22                              Produced ID _X__
                   Type of ID Produced _DL_
23                    Personally Known ____
24
25

Page 133

1           CERTIFICATE OF REPORTER

2   STATE OF FLORIDA        )

3   COUNTY OF WALTON        )

4       I, Amber Lee Rodriguez, FPR, Registered

5   Professional Reporter, certify that I was authorized to

6   and did stenographically report the foregoing

7   deposition; and that the transcript is a true record of

8   the testimony given by the witness; that the witness did

9   not waive reading and signing.

10      I further certify that I am not a relative,

11  employee, attorney, or counsel of any of the parties,

12  nor am I a relative or employee of any of the parties'

13  attorney or counsel connected with the action, nor am I

14  financially interested in this action.

15

16

17

18      _____
        AMBER LEE RODRIGUEZ, FPR
        Registered Professional Reporter

19

20

21

22

23

24

25

Page 134

1   Please attach to the deposition of MC3 INVESTMENTS LLC
    in the case of MC3 Investments LLC vs. The Local Brand,
2   Inc.

3   INSTRUCTIONS:  Please read the transcript of your
    deposition and make note on this page of any changes.
4   Do not mark on the transcript itself.  Please sign and
    date this sheet.
5               ERRATA SHEET

6   PAGE   LINE   ERROR OR AMENDMENT            REASON

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18

19  Under penalties of perjury, I declare that I have read
    my deposition and that it is true and correct subject to
20  any changes in form or substance entered here.

21  _____        _____

22  DATE                           GREGORY CASH

23  Reporter AR

24

25

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,
April 10, 2023

## $

**$12 (2)**
102:5;104:10
**$300 (1)**
97:10
**$5,000 (3)**
31:24;67:18;124:1
**$8,900 (1)**
19:10
**$9,000 (1)**
19:12

## A

**AA (2)**
8:12,22
**able (4)**
39:4;55:7;73:14;
118:5
**above (1)**
31:23
**absolutely (8)**
58:12,15;69:17;70:1;
71:25;81:18;82:4;
125:3
**accept (4)**
86:15,19;92:10;94:6
**acceptable (4)**
79:25;91:23;95:10;
108:2
**acceptance (4)**
67:13;88:4;109:6,6
**accepted (3)**
43:7,20;92:21;108:6
**accord (1)**
94:18
**According (3)**
49:16;83:11
**accurate (4)**
29:2;31:15;50:23;
55:21
**accurately (1)**
65:16
**acknowledgement (1)**
62:20
**across (1)**
120:16
**act (1)**
66:5
**actual (6)**
54:4;58:2;81:7;
89:11;100:17,20
**actually (13)**
7:21;8:18;9:22;26:8;
40:13;52:20;54:2;
83:15;84:14;102:22;
117:13;120:4;121:18
**add (2)**
104:24;105:7
**added (4)**
23:25;105:8,8,9

**additional (1)**
124:24
**address (3)**
8:4;12:1,4
**addressed (4)**
51:3;52:14;53:2;
74:25
**addresses (1)**
118:23
**adjustment (1)**
108:3
**administrative (1)**
125:1
**adopt (7)**
56:1,20;95:5;107:13,
23;108:4,12
**adopted (10)**
45:22;46:22;47:3,23;
48:11;95:3,7;106:24;
107:1,3
**adopting (2)**
47:8,15
**adopts (1)**
94:23
**ads (1)**
104:5
**advertisements (1)**
104:4
**affected (6)**
65:10;68:2,6;69:8;
70:8,14
**affirm (1)**
5:4
**again (31)**
12:1;38:16;39:9,10;
43:11;46:24;52:10;
55:13;62:3;68:3;81:1;
85:3,7;86:3,8;92:19;
94:15;98:11;104:3;
106:21;107:11;108:16;
112:12;114:18;115:19;
116:14;117:5,7;119:5;
122:9,13
**against (4)**
59:2;76:10,18;77:10
**age (1)**
15:1
**agent (3)**
18:5,6,8
**ago (1)**
119:15
**agree (1)**
52:5
**agreed (1)**
72:9
**agreement (4)**
37:12,16;41:15;
91:12
**ahead (5)**
40:1;71:20;91:4;
93:15;99:22
**Ahh (1)**
119:3

**Air (1)**
8:10
**Alex (2)**
117:21,25
**alleged (2)**
71:10;94:3
**allegedly (1)**
106:10
**allocated (1)**
115:17
**allow (1)**
51:9
**allowed (1)**
39:2
**almost (1)**
19:12
**alone (2)**
7:9;55:20
**alternate (1)**
74:12
**alternative (3)**
84:1;89:24,25
**always (7)**
6:24;14:14;15:18;
66:11;93:19,20,20
**ambiguous (2)**
60:13;84:8
**American (1)**
103:3
**amicable (1)**
66:9
**amount (1)**
19:24
**anger (1)**
66:3
**angle (1)**
34:18
**angry (4)**
78:8;79:20,23;80:1
**answered (7)**
58:14;62:15;73:3,4;
107:4,8;108:15
**anymore (1)**
16:14
**apologize (5)**
21:5;66:12;89:20;
90:6,14
**apology (7)**
90:11,13,17,20,22,
23;91:2
**appealing (1)**
18:17
**appear (2)**
30:23;60:13
**appeared (2)**
18:3;47:24
**appears (5)**
12:2;55:25;101:12;
102:20;119:19
**application (1)**
11:11
**applications (2)**
11:15,17

**appreciate (2)**
124:20,22
**approached (1)**
88:2
**approve (3)**
40:24;92:3,7
**approved (4)**
29:21,22;40:14;57:8
**approximate (2)**
29:17;100:9
**approximately (1)**
100:2
**area (15)**
22:16;25:6,7;30:22;
36:17,19;45:9,10;
71:22;110:3,22,25;
111:1,4;112:14
**areas (1)**
31:5
**arguing (1)**
17:16
**Arianna (1)**
7:14
**around (9)**
9:15,20;16:10;22:16;
36:1;59:23;65:19;
85:14;88:21
**arrest (2)**
76:17;77:9
**arrested (1)**
77:3
**arrests (1)**
77:9
**arrive (1)**
53:19
**artwork (6)**
37:6,21;38:6;40:3;
41:22;57:4
**aside (1)**
110:7
**aspect (7)**
15:6;34:3;36:5;74:5;
93:11;95:11;112:14
**aspects (1)**
115:21
**assigned (1)**
29:21
**associated (1)**
111:24
**assume (2)**
61:2;88:8
**assumed (1)**
12:21
**atmosphere (3)**
33:23;72:25;93:11
**attend (3)**
22:10;23:7,13
**attention (3)**
23:3;57:1;59:3
**attorney (20)**
5:17;13:25;14:3;
51:25;65:15,20;75:1;
82:3,7,11;87:11;88:11,

12,14,21,24;89:2;92:3;
121:4,24
**August (1)**
21:22
**authority (1)**
42:24
**automatically (1)**
131:4
**available (4)**
18:1;34:21;75:18;
76:2
**Avenue (2)**
110:13;112:15
**average (1)**
23:14
**avoid (1)**
89:3
**Awa (1)**
118:3
**aware (5)**
30:9;36:1,7;65:20;
75:1
**away (1)**
110:17

## B

**back (25)**
7:3;8:21;13:11,19;
16:19;32:20;43:6,9;
63:4;67:21;74:24;
78:13;79:7;91:16;92:6;
96:1;99:4;107:14;
108:21;116:20,22;
117:8,15;122:23;131:7
**backed (1)**
78:16
**background (4)**
10:17;15:4;17:10,15
**bags (1)**
62:9
**bar (4)**
15:24;16:2;110:10;
114:25
**Base (2)**
8:10;104:12
**based (8)**
12:21;22:24;52:13;
62:17;82:16;94:2;
101:6;109:4
**basic (3)**
52:9;90:1;103:24
**basically (13)**
23:5;36:23;43:7;
51:4,15;58:8;65:18;
66:9;67:23;104:12;
105:2;107:8;123:24
**basis (1)**
70:3
**bathroom (1)**
109:13
**Bay (13)**
6:24;8:9,15,16;

MC3 INVESTMENTS LLC d/b/a THE LOCAL Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC., April 10, 2023

18:13;24:20;34:5,9;
37:1,5;110:3,8;118:21
**Beach (5)**
25:1,3;62:5;93:7,9
**beans (1)**
24:1
**bearing (2)**
71:13;97:16
**become (1)**
15:10
**bed (1)**
78:5
**beer (3)**
61:24;83:2;114:6
**beginning (3)**
67:22;80:16;86:5
**behalf (2)**
116:11;119:10
**below (1)**
77:14
**belt (1)**
131:6
**beside (1)**
33:15
**best (4)**
18:3;39:4;46:1;
54:15
**bids (1)**
27:17
**big (4)**
31:7;64:15;83:8;
120:1
**bigger (1)**
115:21
**bills (1)**
73:22
**bit (2)**
64:3;66:4
**Black (1)**
62:13
**blank (1)**
62:12
**blasted (3)**
65:22;77:16,25
**blue (2)**
96:1;99:11
**Boatyard (1)**
16:8
**boom (1)**
102:12
**born (4)**
6:17;7:2;8:6;65:13
**both (6)**
28:17;66:8;99:17;
106:7,14,14
**bother (2)**
35:22,25
**bothering (1)**
51:23
**bottom (1)**
74:18
**Brand (25)**
5:14;33:21;51:22;

56:13;57:14;58:9,17;
59:1;62:1;66:17;74:5;
79:21;80:5;82:21;83:2;
86:23;92:1,7,8,25;
101:4;120:22;121:1,2;
124:6
**branding (1)**
34:3
**Brand's (8)**
52:7;53:20;69:15,23;
70:8,13;74:9;85:24
**break (12)**
6:4,6,9;59:11,15,19,
20,22;109:9,12;
122:23;130:19
**bring (1)**
73:20
**brought (1)**
56:25
**Brown (3)**
16:5,21;98:19
**Buchanan (1)**
118:1
**building (5)**
28:19;73:24;74:5;
116:21,21
**buildout (5)**
19:10,13;29:12;
111:23,23
**built (2)**
114:19;115:25
**bunch (1)**
97:6
**busboy (1)**
15:2
**busiest (1)**
18:12
**business (12)**
9:1;13:25;18:13;
26:24;33:21;34:12,23;
38:3;70:8,14;115:25;
116:18
**businesses (3)**
8:24;17:1;89:16
**buy (1)**
96:5
**buying (2)**
111:7,7

---

**C**

**cafe (3)**
65:14,14;103:2
**café (146)**
8:23;10:18;11:9,10,
12,20,24;12:4;13:11,
18;14:10,19,23,24;
15:6,24;16:2;17:8,9,22,
25;18:4,11;20:24;21:8,
9,11,13;22:1,4,8;23:8,
13,13,25;12:13,25;
29:1;30:2,21,25;31:10;
33:6,7,10,15,17,23;

34:5,5,9,9,11,23;35:2;
36:14,21,24;37:20,24,
25;43:2,13,16,18;44:7,
11,17;45:23;46:1,6,8,
11;47:8,20;48:12;
51:23;56:21;57:21;
58:10;60:20;61:3,10,
12,13,20,23;62:16;
63:5,8;65:24;66:20;
68:11;71:13,16;73:18;
74:5;77:12;81:14,20;
82:7,20,21,23;83:1,10;
84:2;85:2,2;86:8;93:9;
95:11,23,24;96:14;
97:12;98:13,17;99:1,7,
9,15;100:1;102:17,19;
103:20;104:19;106:3,
4,15,17;112:1,2,24;
114:1,3,22,25;115:23;
116:6,10,12,19;117:8,
14,20
**cakes (2)**
61:11,12
**call (3)**
21:9;24:3;65:13
**called (6)**
5:9;30:11;34:5,19;
63:12;102:8
**calling (1)**
70:4
**came (16)**
8:21;13:5;14:17;
24:10,13;32:16;33:25;
34:17;45:5;47:20;
49:22;57:18;78:15;
91:7;96:8;98:23
**camera (9)**
65:16,22;74:18,19;
77:16,25;78:4,15;79:9
**cameras (5)**
78:3,20;79:1,5,6
**Can (50)**
7:15;9:6;22:3;23:16;
28:12;29:2,17;30:24;
31:8;34:25;39:10;40:7;
42:9;49:8;51:3;58:14;
59:9;64:2;65:6,7,19;
67:22;74:21;77:2;78:2,
4,6,8,11,13,16,22;79:6;
80:13;89:3,24;93:18;
96:5,7;102:5;103:5,13;
105:17;109:18;112:10;
121:8,8,13;123:10;
124:21
**cancer (1)**
15:18
**capacity (1)**
22:2
**capital (2)**
115:2,17
**card (1)**
28:3
**care (5)**

62:8;72:1,7,10;93:12
**Carol (1)**
7:14
**Carter (5)**
5:14;122:25;125:3;
130:17;131:11
**case (10)**
67:16;86:16,16,20;
112:18;113:10;115:6;
119:11,13;120:24
**CASH (19)**
5:8,13;6:13;7:12,16;
9:25;10:3;12:9;28:3;
60:3;76:20;77:4;81:13;
112:25;123:15,19;
130:24;131:1,13
**Cash's (1)**
131:7
**caught (1)**
58:9
**causing (1)**
79:9
**cease (14)**
49:10,19;52:2;57:13;
63:7;81:4,16,23;82:2;
85:19;86:9;97:24;98:9,
11
**center (1)**
31:5
**certain (1)**
61:17
**chairs (1)**
20:7
**change (15)**
67:3,13,19;86:18;
89:7,21,23;91:8,22;
92:9;94:4;95:8;104:14;
109:3;124:12
**changed (6)**
34:1;67:20,21;94:18;
105:23;123:24
**changes (1)**
92:22
**changing (1)**
86:7
**channel (1)**
121:11
**check (1)**
28:3
**checking (1)**
82:7
**chef (1)**
16:21
**Cheryl (2)**
117:21,25
**chicken (2)**
24:11,15
**children (2)**
7:10;14:21
**children's (1)**
7:13
**choose (3)**
12:18;33:18;102:15

**chose (1)**
51:6
**citations (2)**
23:19,21
**City (13)**
6:15,22,23;8:17;
11:21;12:3;23:19;25:1;
83:10;84:24;103:4;
110:13;118:22
**clarify (2)**
15:23;18:10
**Clay (3)**
5:13;122:25;130:17
**cleanup (1)**
123:2
**clear (1)**
23:8
**clearly (3)**
5:17;68:7;80:11
**Clements (1)**
117:25
**click (1)**
104:4
**client (15)**
51:10;66:25;67:7,11;
80:18;83:23;85:6,21;
88:25;108:17;109:7,
11;119:6,10;121:25
**clients (1)**
121:12
**clip (1)**
120:14
**clock (1)**
98:19
**close (3)**
16:18;23:12;82:8
**closed (2)**
105:18,19
**clothing (11)**
14:25;51:14;61:4;
68:8;69:19,19;71:11;
81:19;82:5;86:11;93:8
**clue (1)**
23:15
**Coast (15)**
8:12,13,25;9:13;
10:7,11;11:2;13:14;
15:9;34:11;38:2;
116:20,24;117:10,13
**coffee (6)**
65:9;68:9,10;69:18;
71:13;86:11
**Cokes (1)**
109:15
**cold (1)**
21:5
**college (6)**
7:1,2,8:11,13,13,19
**color (2)**
44:6;96:14
**colors (1)**
96:7
**coming (5)**

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 39 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND, Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                    April 10, 2023

65:18;75:3,19;79:7,7
**comment (1)**
82:10
**communicate (1)**
103:23
**communicated (4)**
63:14;64:7;87:24;
88:9
**communicating (1)**
86:17
**communication (6)**
41:6;66:8,21;80:3;
85:20;119:25
**communications (1)**
92:8
**Community (7)**
8:12;25:4;36:22;
74:6;93:10,12;110:7
**companies (6)**
26:19;50:22;53:20;
55:24;59:7;96:4
**company (27)**
8:25;9:11;21:23;
34:25;35:6;45:1;48:25;
49:4;62:4;70:24;71:10;
83:23;94:7,18;96:4;
97:4;102:5;104:2,6,10,
11;105:3;112:15;
114:19;116:11;119:11;
120:15
**compared (2)**
60:5,17
**comparison (1)**
99:17
**Compel (3)**
26:13;115:9,16
**competing (1)**
27:17
**complete (2)**
42:24;54:10
**completed (1)**
28:1
**compound (2)**
57:25;72:12
**computer (2)**
13:16;117:18
**concept (12)**
65:11;69:7;71:8,23;
72:2,8,9,11,19,21;73:2;
93:25
**concern (19)**
51:2;52:11;53:3,5;
68:16;71:9,13;85:7;
87:25;91:20;95:9;
96:23;106:11,21;
108:17;114:22;119:11;
121:12;124:9
**concerning (1)**
50:17
**concerns (24)**
51:21;52:13;63:20,
21,23;66:22;67:6,17;
83:24;84:4;85:20;

86:10;93:18;94:2;
95:10;97:17;108:3;
113:16,18,18;119:6;
122:3,4;124:19
**concluded (1)**
131:15
**concludes (1)**
130:15
**conclusion (3)**
68:1,4;70:5
**conduct (1)**
116:10
**CONFIDENTIAL (6)**
125:7;126:1;127:1;
128:1;129:1;130:1
**configurations (1)**
92:12
**confirm (1)**
49:25
**confirmation (1)**
34:16
**conflict (1)**
64:3
**confrontational (2)**
79:20,23
**confusing (2)**
85:24;86:2
**confusion (4)**
81:18;82:4,18;86:6
**consider (8)**
12:24;42:20;44:9,22;
46:8,20;47:2;110:9
**considerable (1)**
19:24
**considered (1)**
42:18
**construction (1)**
100:20
**consult (2)**
35:16;114:13
**contact (6)**
63:5,11;82:12,12;
118:5;119:21
**contacted (4)**
46:18;62:24;121:25;
122:1
**contacting (3)**
81:20;82:7;121:22
**continue (5)**
8:19;51:7,10;59:18;
74:8
**contract (1)**
37:14
**control (1)**
104:25
**controlling (1)**
115:20
**controls (2)**
13:13;104:11
**conversation (4)**
63:17;89:15;90:2;
121:19
**conversations (3)**

53:4;64:9;89:1
**cook (4)**
15:14;22:4;61:18,18
**cooks (3)**
22:8,9;24:14
**cool (3)**
84:25;99:6,13
**cooler (1)**
18:15
**copies (2)**
122:6,10
**copy (7)**
26:1,5,7;55:6;87:20;
122:12;123:15
**corporate (11)**
7:17;10:13,20,23;
13:10,14;26:2;116:22;
117:7,9;131:8
**corporation (1)**
12:19
**correlation (1)**
51:22
**correspondence (1)**
76:15;81:22;87:25
**corresponding (1)**
51:12
**cost (8)**
29:14;31:21;41:11;
97:9;100:1,2,8,19
**costs (2)**
19:22;67:11
**cough (1)**
21:6
**counters (1)**
20:7
**country (1)**
36:1
**County (13)**
6:24;8:9,15,16;
18:13;24:20;34:5,9;
37:1,5;110:3,8;118:21
**COURT (4)**
5:2,19;115:10;
131:14
**Courts (1)**
131:5
**cover (1)**
100:16
**covered (1)**
95:14
**covering (1)**
80:22
**COVID (1)**
62:2
**create (17)**
14:15;27:15;38:3;
48:1;56:8;65:11;73:12,
20,22,25;74:4;75:4;
96:6;102:5,6,6,7
**created (13)**
13:14;14:18;24:16;
46:12;53:1;56:3;73:11;
85:22;88:7;91:21,24;

105:9;106:8
**creates (1)**
74:1
**creating (3)**
33:21;34:17;65:24
**creativity (1)**
61:8
**credit (1)**
28:3
**criminal (1)**
77:4
**CROSS-EXAMINATION (1)**
123:17
**Crow (58)**
26:17,22,23;27:3,3,7,
14;28:22;30:18;31:19;
32:8;37:7,9,10,12,19,
23;38:5,10,11,17,18;
39:13;40:4;41:2,11,18,
22;42:23,24;43:6,21;
44:14,18;45:5,15,20;
46:4,7,11;53:1;56:24;
57:3;62:14,15;66:19;
83:19;88:2,3;89:6,10;
90:4;91:22;92:16;
94:16;106:21;107:19;
108:1
**Crystal (4)**
21:19,20;117:21,25
**culinary (3)**
17:19;22:10,13
**curious (1)**
24:20
**current (5)**
17:22;18:11;84:6;
100:23;110:18
**currently (1)**
61:15
**cursive (2)**
43:14,15
**customers (1)**
81:14

**D**

**daily (2)**
23:3,5
**date (23)**
9:14,19,21;14:11,14,
18;19:6,9,15;29:2;
31:15;33:1;41:7;49:13;
50:4;64:22,23,25;81:1,
8;83:12;88:22;111:22
**dated (2)**
41:5;123:21
**daughters (2)**
12:9;13:6
**day (11)**
19:12;22:25;23:5,8,
14,16;24:9,11,12;56:9;
63:2
**days (4)**
52:1;83:15;93:2;

105:22
**daytime (1)**
16:10
**day-to-day (1)**
21:18
**deal (4)**
27:6;32:4;61:6;
86:20
**decide (7)**
23:23;24:8;26:17;
46:5;85:1,4;92:18
**decided (21)**
33:6;40:11;42:21;
43:4;44:11,16,24;
45:14;46:2;56:7;58:6;
84:21;85:17,23;86:22;
106:18;107:13,20,23;
108:4,12
**decision (1)**
52:1
**decorations (1)**
20:9
**Dee (2)**
16:5,21
**deeply (1)**
82:8
**Dee's (1)**
16:5
**Defendant's (4)**
123:7,12,14,20
**definitely (1)**
32:19
**degree (3)**
7:7;8:19,22
**degrees (2)**
8:11;22:14
**delete (1)**
105:20
**deli (1)**
111:3
**delicate (1)**
66:23
**demolition (1)**
100:14
**depends (1)**
61:5
**depo (1)**
131:8
**deponent (3)**
7:19;17:12;77:2
**deposed (1)**
5:10
**deposit (1)**
19:12
**deposition (15)**
5:15;6:2;10:13,20,
21,23;17:7;25:16,23;
26:2,7;76:13;77:1;
131:2,15
**Depot (3)**
18:19;31:4,7
**derived (2)**
36:18;94:17

MC3 INVESTMENTS LLC d/b/a THE LOCAL Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,
April 10, 2023

design (31)
37:13;38:1;39:14,15;
40:14,25;41:2,11,18;
42:24;44:13;45:20,22;
46:12;48:1;53:2;61:6;
80:6;91:13,21;92:17;
94:1,7,15;100:17;
103:2,9,22;105:4;
106:8;109:5

designed (20)
24:17;37:6,10,20;
43:18;45:21;88:3;
91:17,19,23;95:4;96:3,
9,12;102:16,18;104:20,
21;105:3;106:24

designing (1)
41:16

designs (5)
61:8;94:23,24;96:11;
104:11

desire (3)
73:12;110:3,7

desist (14)
49:10,20;52:3;57:13;
63:8;81:5,16,24;82:2;
85:19;86:9;97:25;
98:10,12

details (1)
12:23

determine (1)
54:16

determined (3)
52:5;67:2,18

determining (1)
56:16

devastated (1)
110:24

developed (2)
56:23,24

developing (1)
110:24

development (1)
110:25

Diet (1)
109:15

difference (5)
49:2;51:13;68:13;
91:22;94:22

different (20)
24:11;36:20;40:3;
51:1;54:14;55:17;56:5;
59:6;80:20;85:9;93:21;
94:5,8,9;96:5,6;99:3,
19;106:9;124:13

dimension (1)
108:13

dimensions (3)
38:6;107:2,24

DIRECT (2)
5:11;15:20

directed (2)
65:25;76:20

directly (3)

5:17;27:10;113:18

directors (1)
20:17

discounts (1)
36:19

discovery (6)
55:1;115:10;118:10,
13,14,17

discuss (4)
49:23;112:17;113:4;
114:20

discussed (1)
109:24

Discussion (1)
125:6

dishwasher (1)
22:9

distinct (1)
112:21

distinctive (4)
46:21;47:4,9,16

disturbance (1)
79:9

document (1)
9:6

documentation (1)
64:10

done (9)
26:24;40:18,21;
44:13;70:24;71:20;
99:23;102:23;122:16

door (8)
30:25;31:23;32:9,15,
18,23;95:14;117:17

DOSTER (104)
7:15,22;10:10,19;
17:4,9,12;25:14,18,21;
26:1,5,10,15;36:10;
38:13,20,25;39:4,8,23;
40:15,19;41:8;46:16,
23;47:5,10,17;48:4;
51:8;54:11,25;55:3,6;
56:14;57:11,24;58:11,
13,19,22;59:4,13,19,
21,25;60:10,12;68:19;
69:10,16,25;70:4,10,
16,25;72:3,12;73:3;
74:2,11;76:12,19,25;
77:7,23;79:14,17,22;
84:7;86:1;87:16;88:23;
89:13;90:16;92:4;
93:15;94:14;101:15,
18;107:4,9;108:5,9,14;
109:8,11,17;113:8,14;
115:4;118:7,10,14;
123:4,6,12,18;125:4;
130:15,21,24;131:12

down (29)
18:23;25:12;31:22;
45:14,18;50:6,8,15,16;
52:7,9,15,18;54:8,20;
55:14,18;62:4;77:14;
81:16;86:4;103:5,5;

111:1,6,8;112:1;121:5;
123:13

Downtown (3)
110:13,22;111:4

driven (1)
25:3

drop (1)
93:23

drove (3)
15:21;21:3;33:22

due (1)
27:24

duly (1)
5:10

dumped (2)
78:5,6

dumps (1)
78:5

dumpsters (1)
78:16

during (1)
26:7

E

earlier (6)
14:12;62:17;70:17;
74:25;85:12,13

early (1)
14:12

East (2)
11:21;12:2

eat (5)
23:7,13;73:15;74:6;
93:1

eating (1)
73:21

education (1)
22:13

either (2)
55:7;65:1

electrical (5)
100:13,19,22;101:2,
3

electrician (1)
101:2

else (14)
14:24,25;20:23;27:6;
33:9,12;34:5;71:4;
105:10,23;122:15,22;
124:15,19

e-mail (38)
8:4;41:24;48:18,20;
49:6,13,14,22;50:19,
20;51:4,11,16;52:6,25;
57:18;62:6;63:11,13;
64:5,8;67:25;68:5;
71:7;72:8;74:17;76:14;
77:14;87:5,8,10;88:1,5,
15;92:6;120:9;121:19;
122:8

e-mailing (1)
81:14

e-mails (6)
66:21;79:13,24;
87:14,20;122:6

employee (1)
21:24

employees (2)
21:13;117:19

end (5)
19:17;80:20;83:9;
86:16;111:20

ended (3)
118:11,13,15

enforce (1)
59:2

enforcement (1)
56:13

enjoy (4)
15:5,5,5,8

enlighten (1)
10:14

enough (1)
100:22

entered (2)
82:23;83:1

entities (1)
38:2

entity (2)
35:2;112:21

entries (1)
53:12

equipment (1)
19:25

establishment (1)
73:13

estate (3)
7:25;18:5,6

estimate (1)
23:9

even (9)
36:6;52:22;55:24;
81:12;90:10;114:18;
115:25;120:6;121:19

everybody (1)
59:24

evident (1)
86:3

exact (20)
9:21;14:11,18;19:9;
20:2;25:13;30:3;33:1;
35:4;41:7;53:6,8;
55:19;57:23;66:15;
88:22;102:9;111:19,
22;118:23

Exactly (14)
9:22;14:14;19:11;
25:17;50:24,25;62:13;
68:8;76:14,21;86:25;
101:12;122:1,5

EXAMINATION (1)
5:11

example (4)
31:8;34:10;82:15;
88:10

examples (3)
54:14;80:2;84:12

except (2)
86:5;90:3

Excuse (5)
12:7;30:6;71:15;
82:18;102:6

executives (1)
20:20

Exhibit (43)
9:4;11:7;28:10,18,
20;30:14,15;42:1,5;
48:15,16;49:3;52:21,
22;54:19,21,25;64:11,
11,13;80:25;81:2;83:4,
5;95:13,15,16,17,18,
19,20;101:23,24;
107:17;118:24,25;
123:6,8,11,11,12,14,20

Exhibits (1)
30:10

existing (1)
100:14

expect (2)
81:15;88:14

expecting (1)
83:2

experience (6)
16:12;17:3;34:17;
70:20;71:2,4

experiences (2)
12:21;34:12

explain (5)
39:21;51:12;54:13;
73:16;108:22

explained (2)
50:21;67:11

explaining (3)
55:16;121:10,11

explanation (1)
54:3

expose (1)
78:9

exposed (1)
100:17

F

fabricated (2)
56:11;58:8

fabrication (3)
54:10,12;56:17

Facebook (7)
63:13;64:8;78:3;
119:23;122:9,9,10

fact (2)
71:9;105:9

fair (8)
63:19;64:2;66:10;
79:25;85:8;93:5,16;
108:3

fairness (3)
63:25;109:3;124:22

**familiar (1)**
29:10
**family (1)**
13:2,4;14:16,21;
93:11
**family's (1)**
51:23
**far (10)**
18:13;23:4;34:3,11;
42:9;43:2;48:1;63:3;
110:17,20
**favor (1)**
123:13
**February (1)**
14:13
**Federal (1)**
131:5
**feel (17)**
24:17;25:4;33:22;
36:21,24;65:9;68:1,5,
12,16;71:11,18;75:2;
101:6;109:4;112:17;
124:13
**feeling (3)**
71:21;86:14;93:20
**feelings (2)**
80:2;93:17
**FEIN (1)**
35:2
**felt (2)**
90:9;93:19
**few (4)**
7:24;15:19;25:12;
121:17
**fictitious (4)**
34:19,22,23,25
**field (1)**
15:10
**fights (1)**
77:12
**figure (2)**
10:16;57:20
**figures (1)**
19:23
**file (9)**
11:11,13,17;13:7;
14:2,3,6;86:16;115:10
**Filed (11)**
9:19;11:15,16;12:25;
13:16,24;14:1;67:15,
16;86:20;105:24
**final (2)**
52:1;122:24
**find (10)**
34:20;35:5;50:20;
54:7;65:17;74:20;
93:18;94:9;97:6;119:4
**finding (1)**
79:25
**fine (1)**
119:20
**finish (1)**
58:13

**first (34)**
5:9;6:2;9:25;19:11;
28:12;41:2;42:7;43:8,
20;63:15,17;64:19;
70:23;80:10;85:24;
89:11;90:7,15;94:12;
106:2,4,6,13,19;107:2,
2,20,24;109:1;113:22,
23;117:24;124:14;
130:21
**fish (1)**
120:17
**Fishing (8)**
119:3,4,9,22;120:13;
121:10,16;123:8
**five (5)**
6:18;19:2,20;31:25;
110:19
**five-month (1)**
111:23
**five-year (1)**
19:3
**Fl (1)**
65:14
**flavor (1)**
24:20
**Florida (59)**
5:15;6:15;8:7;11:18,
18,22;12:3;34:6,13,20;
35:6,19,23;36:6;45:3,4,
7,8,12,13,18,24;46:3,
15,21;47:3;50:6,15,16,
22;52:7,9,15,17,18;
54:8,20;55:13,18;62:5;
65:13;80:8,12,14,17,
20;83:9;86:4;91:18;
93:24;97:17;101:11;
106:10,19;109:2;
110:4;120:16,20;131:3
**fluctuate (1)**
23:4
**fluctuates (1)**
23:4
**focusing (1)**
103:20
**follow (1)**
35:3
**follows (1)**
5:10
**font (17)**
42:15;43:2,17;44:6,
14,19;46:12;61:2;80:6;
94:12;96:20,21,22,23,
24;103:3,20
**fonts (9)**
42:11,13,18,20;44:9,
22,23;96:7,11
**food (33)**
15:4,5,19;24:8,17,
21;25:6,9;37:3;65:11;
68:11,15;69:21;71:8,
12,17,24;72:2,8,9,11,
20,21,22,24;73:2,9,13,

21,23;74:1,4;93:25
**foodie (1)**
15:13
**foolish (1)**
56:1
**footage (1)**
79:10
**football (1)**
111:21
**forbearance (1)**
114:22
**Force (1)**
8:10
**form (47)**
13:7;36:10;38:13,20,
23;46:16,23;47:5,17;
56:14;57:24;58:19,22;
59:4;60:10,13;66:2;
68:19;69:10,16,25;
70:3,10,16,21,25;
72:12;74:2,11;76:1;
77:23;79:17,22;80:18;
84:7;86:1;87:16;89:13;
90:16;94:14;101:18;
104:16;108:5,14;
113:8,14;115:4
**formed (2)**
12:15;21:23
**forth (2)**
25:15;71:11
**forward (1)**
34:15
**found (4)**
8:19;53:25;78:3;
92:24
**four (2)**
83:15;119:15
**four- (1)**
111:23
**Francisco (1)**
111:3
**free (3)**
39:8;89:3;107:10
**freezer (1)**
18:15
**fried (1)**
24:11
**friend (2)**
16:5;27:1
**friends (1)**
20:25
**friend's (1)**
18:3
**front (22)**
19:10,23;26:4,5,7;
27:22,23;28:19;30:25;
31:7;33:4;37:7;38:18;
55:7;79:8;83:9;91:15;
95:15;97:3;99:14;
100:16;123:20
**fruits (1)**
36:25
**frustrated (1)**

66:4
**frustration (1)**
66:7
**full (2)**
6:12;117:22
**fun (1)**
93:10
**future (2)**
14:22;102:24

## G

**garage (1)**
78:6
**garbage (1)**
78:6
**Gary (2)**
64:18;81:12
**gave (8)**
38:5;42:24;43:7,21;
91:25;102:11,12;
103:24
**GC (1)**
64:20
**GCash21@hotmailcom (1)**
8:5
**gem (1)**
119:8
**general (4)**
21:15,16;89:15;
124:17
**generality (1)**
52:11
**generated (1)**
102:14
**generic (11)**
102:3,3,14,22,25;
103:1,24;104:13,16,22;
105:2
**gentleman (1)**
122:14
**Georgia (6)**
7:1,2,4;8:14,18;
22:15
**gets (1)**
78:14
**given (3)**
19:9;31:9;88:9
**gives (1)**
104:4
**giving (1)**
87:24
**goal (1)**
66:11
**God (1)**
5:6
**goes (1)**
110:5
**Good (17)**
5:13;15:7,14;16:5;
26:20;35:7;48:2;56:6,
10;94:2,8,10,20;116:1;
122:17,25;123:16

**goods (1)**
69:9
**goodwill (12)**
68:18,22,25;69:1,3,8,
14,23;70:7,13,18;74:1
**Google (17)**
35:10;49:7,25;53:10,
14,17;54:19;97:5;
102:4;103:12;104:1,3,
3,5,6;119:17;121:7
**googled (1)**
50:5
**Googling (1)**
119:7
**grabbed (1)**
78:16
**Gracie (1)**
118:2
**Grand (2)**
16:7;100:21
**graphical (11)**
45:2,6,17,24;46:14,
21;47:3;52:17;80:7;
93:24;106:18
**grease (5)**
78:2,4,11,14,22
**great (5)**
15:14,15;18:4;84:23;
92:23
**green (1)**
24:1
**greet (1)**
73:15
**Greg (5)**
7:16;10:2;112:25;
122:15,20
**GREGORY (3)**
5:8;6:13;81:13
**grill (1)**
62:2
**group (1)**
12:12
**growing (5)**
15:1;36:17;109:25;
110:7,23
**grown (1)**
37:1
**growth (2)**
110:25;112:14
**guess (12)**
12:12;15:12;19:19;
23:16;28:18;30:12;
52:11;62:21;63:23;
64:20;100:20;106:8
**guessing (1)**
100:14
**Gulf (15)**
8:12,13,25;9:13;
10:7,11;11:2;13:14;
15:9;34:11;38:1;
116:20,24;117:10,13
**guy (5)**
120:10,11,12;121:9,

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 42 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                      April 10, 2023

15
**guys (4)**
30:13;67:9;84:2;
94:5

# H

**hamburgers (2)**
61:14,16
**hand (1)**
5:3
**handle (2)**
124:22,25
**handled (1)**
27:11
**handling (1)**
112:3
**Hangout (1)**
16:6
**happened (1)**
80:19
**happens (1)**
6:5
**happy (7)**
47:24;48:3,9;93:11;
101:7,10,13
**hard (2)**
43:25;116:1
**Harrison (1)**
110:13
**hater (6)**
81:20,21;82:6,12,14,
17
**hats (11)**
51:14;65:9;68:8,10,
11;69:18;71:11;81:18;
82:5;86:11;93:8
**head (2)**
29:15;118:4
**health (2)**
23:19,21
**heard (5)**
24:4;63:16;68:25;
70:21;82:18
**heart (2)**
118:1,2
**heavily (1)**
25:3
**help (10)**
5:5;14:16;22:3;
37:17;38:3;73:9,12;
89:25;90:3;92:16
**Hey (8)**
31:12;32:15,18,19;
64:1;86:15,17;89:16
**Hi (2)**
81:11,12
**high (1)**
8:20
**himself (1)**
27:11
**hit (1)**
62:2

**Hold (2)**
64:15;123:9
**Home (3)**
18:19;31:4,7
**home-cooked (1)**
24:2
**honest (3)**
22:23;23:15;47:19
**hopefully (3)**
95:10;109:6;124:21
**hospitality (1)**
15:5
**hosting (1)**
102:22
**hour (2)**
59:14;109:8
**house (1)**
6:18
**Huh-uh (1)**
22:7
**hundred (2)**
20:3;23:11
**hurricane (2)**
16:18;110:24

# I

**idea (29)**
14:17;33:20;37:2;
44:8,21;45:15;46:4,17,
17;47:18;56:4,6;60:7;
61:7;62:4;63:1,3;
66:19;67:5;69:6;70:17;
97:10,22;98:1,11,18;
112:13;114:7;116:9
**ideas (3)**
15:16;24:14;44:14
**identical (1)**
74:9
**identification (18)**
9:4;11:7;28:10,20;
30:14,15;48:16;54:21;
64:13;81:2;83:5;95:16,
17,18,19,20;101:24;
118:25
**illegally (1)**
78:5
**images (3)**
54:24;105:12,15
**immediately (1)**
13:5
**important (1)**
17:11
**improperly (1)**
121:4
**Inc (2)**
5:14
**included (2)**
32:18;101:8
**increase (1)**
29:6
**indicated (1)**
131:1

**individual (4)**
7:18;10:19;17:7;
77:1
**information (13)**
33:4;39:19,20,22;
50:3,17;88:23;89:4;
112:16;114:12;118:6;
119:7,19
**informed (4)**
49:12,18,19;51:2
**infringed (1)**
124:13
**infringement (12)**
67:5;83:25;90:19;
91:3,21;94:3,7;97:18;
109:4;119:6;120:15;
124:10
**infringers (1)**
58:18
**infringing (2)**
71:10;86:10
**ingredients (1)**
25:8
**inquire (2)**
121:23;122:3
**inside (6)**
13:18;19:25;73:23;
95:23;97:16;98:13
**inspired (2)**
15:15;23:24
**install (2)**
27:12;62:15
**installation (2)**
30:7;38:8
**installed (7)**
30:2;32:21,23;62:23;
98:17,20,22
**instead (1)**
103:21
**instruct (2)**
25:21;88:25
**instructing (1)**
26:10
**interest (5)**
20:23;93:7,9,10;
109:25
**interests (1)**
84:3
**interfering (1)**
69:13
**interject (1)**
7:15
**Internet (3)**
97:5;103:14;121:13
**interrogatories (1)**
113:22
**interviewed (1)**
121:9
**into (7)**
15:2;36:23;47:19;
82:20;99:12;104:17;
105:1
**invest (1)**

15:11
**investment (2)**
12:12;14:15
**Investments (30)**
7:17;10:12;11:6,23;
12:10,15,25;13:15;
17:6,12,13;21:21;26:3;
35:1;77:1,2;89:2;
94:17;112:6,10,13,23,
24,25;113:9,20;114:1;
115:23;116:6;117:10
**invoice (3)**
28:2;32:17;41:14
**involved (9)**
21:1;76:22;111:25;
112:4;113:25;114:14;
115:20;121:24,25
**involves (2)**
69:4;114:19
**irrelevant (1)**
78:20
**issue (3)**
51:21;115:10;125:1
**issued (1)**
76:9
**issues (1)**
76:21
**items (1)**
15:19

# J

**Jared (5)**
26:14;70:2;118:9;
123:1;130:18
**Jeff (3)**
5:14;122:21,21
**Jennifer's (1)**
118:2
**job (3)**
17:20;26:20;48:2
**joining (1)**
112:19
**judge (1)**
5:18
**July (2)**
9:20,22
**jump (1)**
49:1

# K

**Karma (8)**
119:3,4,9,21;120:13;
121:9,16;123:8
**Kayla's (1)**
118:1
**keep (1)**
120:12
**kidding (1)**
93:2
**kind (35)**
12:21;13:13;15:12,

13,21;18:14;21:3;24:3;
25:4,6,7;34:2,18;38:1;
45:8;55:18;61:8,8,18;
62:4;63:18;67:4,5;
78:19;82:19;84:25;
94:6;96:6,13;99:2;
101:6;102:23;109:4;
112:3;115:25
**kitchen (4)**
18:3;14;24:12,15
**knew (6)**
43:11,18;46:10;67:12;
90:10,18
**knowledge (9)**
12:20;48:13;62:3,6;
66:24;70:20;71:2;
90:19;91:2
**known (1)**
25:7

# L

**large (3)**
99:21,25;100:18
**larger (3)**
46:6;60:8;61:2
**largest (3)**
60:18,22;61:1
**last (8)**
19:11;106:20;
111:20;117:24;118:1,
2,3,24
**later (3)**
82:9;113:15,16
**law (1)**
75:21
**laws (2)**
75:18;76:1
**lease (11)**
18:20,22;19:1,6,17;
21:23;29:11;111:8,15,
17;116:21
**least (2)**
35:22;104:25
**leave (4)**
13:1;14:20;33:2;
65:7
**left (3)**
31:14;102:23;111:2
**legal (3)**
5:18;70:4;79:10
**length (2)**
46:2;69:4
**less (2)**
36:6;97:10
**letter (12)**
49:10;52:3;57:13;
63:8;65:15;81:5,24;
82:3;85:19;86:9;98:10,
12
**letters (4)**
13:5;44:24;45:19,25
**liberty (4)**

Case 5:22-cv-00260-MJF Document 52-4 Filed 05/15/23 Page 43 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                    April 10, 2023

112:9,17;115:5,21

**license (2)**
114:8,11

**lien (1)**
20:24

**light (2)**
99:11;100:23

**Lighthouse (3)**
16:7,9,13

**Lights (3)**
99:11;100:24;101:1

**liked (1)**
43:24

**Lilly (4)**
62:24;63:5;81:6;
124:3

**limited (2)**
10:22,25

**liquor (2)**
114:8,11

**list (2)**
35:16;61:17

**listed (3)**
9:25;10:23;58:5

**litigation (2)**
76:22;105:24

**little (9)**
66:4;7;93:4;102:25;
106:8;109:25;110:1;
111:3,4

**live (7)**
6:14,21;7:9;45:8;
118:19,22,22

**lived (4)**
6:16,18,24;7:1

**LLC (7)**
9:13;11:23;12:18,21;
13:7;35:1,1

**Local (132)**
5:14;11:10,12;16:21;
21:10,11;24:2;25:4,12;
26:18,19;31:10;33:6,
15,22,24;34:5,9,11;
35:2,20,24;36:4,4,8,12,
13,15,18,19,19,20,21,
23;37:5,20,24;38:10,
11,17,19;39:12,18;
43:2,13,16,18;46:5,8,
10;47:20,24;52:7,8,14,
17,22;53:20;55:25;
56:12;57:14;58:9,17;
59:1;60:6,19,21,23,24;
62:1;65:12,14,14;
66:16;69:15,23;70:7,
13;74:5,9,10;79:21;
80:5,6,13,17;81:13;
82:21,24;83:2;85:2,24;
86:23;92:1,6,8,25;
93:11;94:12;95:11;
96:14;97:12;98:13;
101:4,8,9;102:7;103:2,
12,20;106:3,4,15,16,
19,20;108:1;110:22,

22;112:14,24;114:1,3,
22,25;115:23;116:6;
120:20,22,25;121:2;
124:6

**locally (3)**
37:1,3;118:22

**located (2)**
11:20;117:8

**location (12)**
17:22;18:1,4,11,14,
18;110:2,8,16,18;
112:5;115:24

**locations (1)**
18:12

**locks (1)**
117:17

**logistics (1)**
125:1

**logo (168)**
27:15;29:1;36:9,13,
13;37:6,13,16,21;38:1,
4;40:11;41:12,19,23;
42:12,16,22;43:5,16;
44:12,17,20,25;45:7,
18,20,23,25;46:12;
47:23,24;48:11;49:13,
18;50:5,15,16,17,22;
51:24;52:6,9,18,20;
53:2;54:7,20;55:13,18,
25;56:1,8,20,23,24;
57:3;59:6;60:6,18,22;
62:20;65:9,10,11;
66:13,13,17,17,18;
67:1,3,9,10,13,17,23;
68:14;70:23;71:3,7,10,
16,23;72:1,9,11,19,22;
73:1,8,12,12,17,18,19,
21,25;74:3,9,13;80:9,
19,21,22;83:8,24,25;
84:6,6,10;85:1,5,7,11,
18,21,23,24;86:6,22;
87:21,25;88:15,20;
89:7;90:7,15;91:3,13,
17,19;92:9,13,17,25;
93:25;94:4,13;95:7,8;
96:22;97:17;98:25;
99:9;104:15,15,18;
106:1,2,5,5,6,13,13,22;
107:3,17;108:16;
109:1,3;114:23;
120:16;121:6,12;
123:25;124:10,10

**logos (1)**
119:18

**long (12)**
6:16;7:4;21:20;
34:14;40:13,24;53:10,
11;62:23;69:4;101:8;
109:17

**look (23)**
23:5;30:4;33:3;34:7;
53:12,14;55:11;56:25;
64:16;96:7;97:4;99:7,

14;102:16,19,24;
103:24;104:15,15;
105:1;111:18,22;119:8

**looked (6)**
48:8,9;55:16;78:16;
99:10;105:1

**looking (7)**
14:14;29:4;52:12;
55:17;111:4;114:9;
122:2

**looks (11)**
48:3;52:21;74:9;
92:23;94:1,7,10;99:13;
107:3;108:1,12

**lot (10)**
12:20,22;48:25;51:1;
61:5;81:19;82:6;99:12;
110:23,25

**lunch (1)**
130:19

## M

**mail (1)**
98:23

**main (2)**
66:10;69:19

**mainly (2)**
7:2;63:23

**makes (5)**
24:7;74:8;77:3;
84:25;105:3

**make-up (1)**
56:17

**making (2)**
76:17;77:10

**manage (1)**
16:1

**management (1)**
16:12

**manager (6)**
10:5;15:3;16:11;
21:15,16,17

**manner (1)**
61:9

**manufactured (1)**
97:2

**many (25)**
17:21;21:13;22:8;
23:7,13;35:19;40:3;
44:4;50:22;51:5;53:12,
14;54:13,14,14,14;
56:9;59:6,7;82:20,23;
83:1;112:11;116:7;
121:15

**margin (2)**
22:17,24

**Marie (1)**
7:14

**mark (2)**
66:13;69:4

**marked (18)**
9:4;11:7;28:10,20;

30:14,15;48:16;54:21;
64:13;81:2;83:5;95:16,
17,18,19,20;101:24;
118:25

**marks (1)**
59:2

**Marlin (1)**
16:7

**married (1)**
7:10

**matched (1)**
35:7

**Matt (16)**
52:3;59:5;62:24;
63:5,11,16,17;64:17;
65:4;66:12;81:6,11,13,
17,22;82:4

**matter (3)**
49:11;53:23;78:24

**matters (2)**
10:12,22

**Matthew (5)**
50:21;51:3,12;62:24;
124:3

**may (15)**
32:14,15,17;40:8;
82:17;88:18;89:19,21,
23,24;94:5;100:7;
102:2;119:16;121:3

**maybe (19)**
14:13;16:9;22:19;
52:3;56:9;62:21;63:20;
68:15;72:18;75:4;
81:20;82:6;97:10;
100:10,21;102:24;
104:24;113:15;121:23

**MC (1)**
13:5

**MC3 (37)**
7:17,19;10:12;11:2,
5,23;12:8,14,25;13:15;
14:8;17:6,12,13;21:21,
24;26:3;35:1;77:1,2,6,
15;89:1;94:17;112:5,9,
12,19,23,24,25;113:9,
20;114:1;115:23;
116:6;117:10

**McGURK (124)**
5:12,13;7:16,20,23;
9:5;10:14,16;11:1,8;
17:8,10,15,18;25:17,
19,25;26:4,8,12,16;
28:11,21;30:16;36:11;
38:14,21;39:11;40:2,
17,20;41:10;46:19;
47:1,7,13,22;48:7,17;
51:18;54:18,22;55:2,5,
9,10,23;56:19;57:12;
58:7,16,21,23;59:11,
17,20,22;60:2,11,14,
15;64:14;66:2;68:21;
69:12;70:2,6,12,22;
71:6;72:4,14;73:4,6;

74:7,14;76:14,16,21,
23,25;77:5,8,24;79:15,
19;80:4;81:3;83:6;
84:9;87:19;89:5,17;
90:21;92:5;93:22;
94:21;95:21;101:20;
102:1;107:5,12;108:7,
10,19;109:14,16,19,21;
113:11,17;115:7,13;
118:9,12,18;119:1;
122:21;123:3,6,9,11;
130:19,22

**meal (2)**
23:1,2

**meals (2)**
22:18,25

**mean (49)**
9:23;12:8,10;17:25;
21:10;23:16;24:11;
26:20;29:25;33:1,25;
34:1;37:15;38:24;
39:21;40:7,7,9,11;
42:9;47:6,18;52:7;
53:16,18;61:15;71:7;
73:15;74:3;78:17,19,
20;89:8;96:13,19,21;
99:16,17;106:1,5,13,
14,14,15;107:7;108:6,
11;112:14;114:20

**meaning (3)**
36:8,12,15

**meanings (1)**
36:20

**means (10)**
12:9;31:6;37:5;
38:25;68:23;70:18,19,
20;75:22;120:11

**meant (4)**
50:11,15,16;66:25

**measure (2)**
56:6;59:8

**measurement (2)**
54:16;58:2

**meat (3)**
24:3;9;36:25

**meatloaf (1)**
24:15

**media (5)**
65:22;77:17,22;78:1,
7

**Megan (3)**
7:12;9:25;12:9

**member (1)**
14:8

**members (1)**
112:19

**mentioned (5)**
49:6,24;50:5;75:23;
81:21

**mentioning (1)**
89:4

**menu (9)**
15:19;23:23;24:2,10,

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 44 of 50
MC3 INVESTMENTS LLC d/b/a THE LOCAL Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                            April 10, 2023

13;25:13;61:16,18;
105:21
**menus (2)**
105:18,19
**merchandise (1)**
82:24
**message (12)**
63:13,13;64:8,8,16;
119:23;122:9;123:19,
23;124:2,5,8
**messages (4)**
81:6;121:17,21;
122:11
**metal (1)**
98:19
**might (2)**
56:10;61:18
**miles (2)**
25:12;110:19
**Mimi (1)**
34:1
**Mimi's (2)**
33:17;34:1
**mind (5)**
7:18;33:21;52:12;
112:13;131:6
**mine (1)**
27:2
**minor (1)**
66:7
**minutes (3)**
25:2;109:16,18
**moment (2)**
80:23;122:2
**Monday (1)**
105:20
**Mondays (1)**
105:18
**monetarily (5)**
65:10;68:2,5;71:12,
15
**money (4)**
27:22,24;67:12;
123:25
**month (6)**
19:10,13;29:12;63:2;
102:5;104:10
**more (8)**
17:6;24:7;25:4;
81:14;93:4;99:15;
100:19;119:16
**morning (1)**
5:13
**most (6)**
15:20;18:15,16;25:1;
66:8;79:24
**mostly (1)**
25:2
**mother (4)**
15:14,15;33:17;34:2
**mother's (2)**
23:24;24:13
**Motion (3)**

26:13;115:9,15
**motive (1)**
8:21
**mounted (1)**
98:23
**move (7)**
17:17;60:17;83:4;
85:17;91:15;106:18;
130:19
**Moving (1)**
95:13
**much (22)**
19:22;23:1;24:17;
27:22;29:14;31:21;
36:6;37:18;41:11;46:5;
47:18;60:8;63:18;97:7,
9;99:21,25;100:4,8,8;
103:1;115:17
**mugs (5)**
65:9;68:9,10;69:18;
86:11
**multiple (1)**
31:5
**must (3)**
5:16;41:6;47:23
**Myself (2)**
14:4;33:21

---

**N**

---

**name (59)**
6:12;7:11,13;11:9;
12:11,13,14;21:10;
22:15;25:13;26:23;
33:7,9,12,23;34:1,8,12,
14,19,22,23,25;35:7,
20,24;37:25;43:16,19;
46:10;47:21;48:11,12;
61:3,10,13,20,23;
66:20;71:18,21;73:18;
81:12;85:2;86:7;95:12;
96:20,21,22;97:3;
102:8,16,19;113:2;
114:24;117:24;118:1,
2,3
**names (4)**
12:24;33:15;117:19,
22
**near (1)**
36:6
**neat (1)**
99:5
**necessarily (3)**
58:20;99:19;109:5
**necessary (1)**
79:11
**need (7)**
6:4,9;59:11;97:15;
104:7;108:24;109:13
**needed (4)**
22:3;26:21;37:16;
78:10
**needs (1)**

101:2
**neon (20)**
43:14;95:24;96:1,5,
8,25;97:6,12,16,20;
98:9,22;99:6,10,25;
100:8,18;101:5,11;
104:16
**new (16)**
66:24;67:1,9,17,23;
80:9,19;83:8;92:9,9;
104:6;106:22;110:23;
115:2,18;116:3
**news (3)**
119:9;120:14;121:10
**next (6)**
14:2;18:18;111:2,2,
5;130:20
**nice (3)**
99:10,14;111:4
**nicer (1)**
102:25
**night (3)**
99:11;100:23;101:1
**nobody (6)**
65:10;68:2,6;82:22,
25;83:3
**None (4)**
17:23,24;50:12;
112:2
**nor (3)**
71:2;73:12;101:2
**normal (1)**
12:22
**normally (1)**
6:5
**noted (1)**
17:17
**notice (9)**
9:24;10:24;25:15,23;
26:2;76:13;99:15;
115:8,11
**notified (2)**
62:5;83:23
**notify (1)**
49:10
**November (19)**
14:12;19:8,14,15;
20:2;29:12;33:5;62:19;
63:9;83:12;85:14;88:6,
8,12,21;97:23;98:2,18;
123:21
**Novemberish (1)**
82:9
**nowhere (3)**
36:6;76:2;80:13
**number (7)**
8:2;35:3;54:6;56:11,
16;58:8;123:7
**numbers (1)**
20:2

---

**O**

---

**oath (2)**
5:20;122:13
**object (7)**
10:10,21;17:4;40:15;
51:8;70:2;101:4
**objected (1)**
60:13
**Objection (60)**
17:17;25:14;26:15;
36:10;38:13,20,23,25;
46:16,23;47:5,17;
54:11,25;56:14;57:24;
58:11,13,19,21;59:4;
60:10,11;66:2;68:19;
69:10,16,25;70:10,16,
25;72:12;73:3;74:2,11;
76:12,19;77:23;79:14,
17,22;84:7;86:1;87:16;
88:23;89:13;90:16;
92:4;94:14;101:18;
107:4,9;108:5,9,14;
113:8,14;115:4;118:7,
9
**obligation (1)**
5:20
**obtaining (1)**
114:11
**obvious (1)**
52:13;56:5
**Obviously (6)**
15:9;18:7;45:8;49:2;
50:4;82:14
**o-c (1)**
52:16
**ocal (3)**
52:12;83:9;106:9
**o-c-a-l (4)**
44:19,25;45:19,25
**occur (1)**
78:18
**occurred (1)**
77:12
**occurrences (2)**
54:7;56:11
**October (13)**
19:13;29:12;30:5;
48:23;49:1,2,4;50:1,2;
53:1;62:22;63:9;98:2
**off (9)**
29:15;34:2;69:22;
105:19;118:3;124:25;
125:4,6;130:21
**offer (6)**
86:18;90:11,24;91:1,
5,6
**offered (1)**
25:13
**office (32)**
13:8,8,9,10,11,14,15,
17,18;14:1;27:8,10;
83:23;85:6,21;86:15,
19;91:20;95:9;116:10,
15,20,22,22;117:2,3,6,

7,8,9,13;119:5
**officer (1)**
76:5
**officers (1)**
20:20
**offset (1)**
67:4
**old (1)**
84:15
**once (17)**
46:11;51:2;52:5,10;
53:2;66:20,22;67:2;
68:16;83:22;91:19;
94:4;104:23;105:9;
106:21;119:5,5
**one (52)**
16:4;18:7,12;21:1;
22:12,14,15,16;23:16;
26:18,18;28:7,15,22;
29:24;31:1,21;32:6;
33:18;34:14;36:13;
37:7;40:5,6,7,10;43:24,
24;51:11;52:22;64:9;
68:9;71:14;81:20;82:6;
84:13,13,14,15,17,18;
94:23;99:5;100:2;
104:9;107:14;110:8;
118:16;119:16,25;
123:8;130:20
**ones (1)**
50:25
**online (2)**
14:6;96:4
**only (9)**
34:10,16;65:13;90:8;
93:9;98:25;104:18;
105:22;110:8
**open (14)**
14:19;16:14,16;20:1;
34:25;35:2,6;37:24;
62:2;103:4;105:22;
109:23;114:18;115:25
**opened (22)**
14:12;16:8,11;18:1;
19:8,14;25:12;29:12;
33:5;48:24;56:21,24;
57:21;58:10;62:18;
63:6,8,9;83:16;97:22,
22;98:3
**opening (9)**
8:23;14:10;19:15;
48:24;82:8;93:9;
112:22;114:16;115:18
**operate (1)**
16:1
**operated (1)**
112:25
**operating (1)**
21:17
**opportunities (1)**
14:16
**opportunity (3)**
15:11;17:25;124:20

MC3 INVESTMENTS LLC d/b/a THE LOCAL Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,
April 10, 2023

**option (4)**
19:3;102:8,11;
124:12
**order (12)**
23:8;28:22;30:18;
32:11;83:2,21,22;
97:20,24,25;98:8;
108:11
**ordered (1)**
104:23
**orders (2)**
29:21;76:9
**original (14)**
67:10;83:24;84:17,
18;85:7,21;94:4;95:8;
96:22;108:16,25;
124:10
**others (2)**
25:5;104:22
**out (38)**
8:19;10:16;13:15;
15:2,20;31:2,3,7;
34:20;35:5;38:6;50:20;
58:17;59:2;65:17;
66:24;69:20;74:20;
75:3;78:13;80:1;82:14,
17;84:1,1;91:10;92:24;
93:19;94:5;100:13,15,
16;116:23;117:2,3,6;
119:4;121:20
**outlet (1)**
100:22
**out-of-state (1)**
8:20
**outside (5)**
99:15;100:1,9,25;
104:15
**over (19)**
15:16;16:24;20:3,10,
12;56:4,8;65:22;69:14;
75:19;77:16;78:1;
85:18;86:21;91:25;
104:25;123:1,25;
124:21
**own (4)**
7:25;36:2;80:14;
94:18
**owned (6)**
15:24;26:20;80:17;
82:21;86:4;112:24
**owner (7)**
10:9;11:23;18:8;
20:15;27:3;116:3,6
**owner's (2)**
22:2;26:23
**owns (4)**
16:5;112:8;120:13;
121:9
**oysters (1)**
110:1;114:4

**P**

**package (3)**
32:3,4;41:20
**packaging (1)**
62:10
**page (4)**
28:13,16;105:5;
123:14
**pages (1)**
53:14
**paid (2)**
28:2;32:17
**paint (1)**
100:15
**Palm (3)**
62:5;93:7,9
**Panama (12)**
6:15,22,23;8:17;
11:21;12:3;25:1;83:10;
84:24;103:4;110:13;
118:22
**Panhandle (1)**
46:2
**paperwork (2)**
13:7;97:11
**Pardon (1)**
105:14
**parked (1)**
79:8
**part (13)**
15:9;16:20;18:16;
31:4;32:6;41:20;57:1;
61:1,16;92:18;100:20;
112:3;120:14
**particular (1)**
14:23
**partner (1)**
52:4
**partners (8)**
112:1,2,11,19;
114:13,20;115:20;
116:5
**passed (1)**
15:17
**past (1)**
26:25
**pattern (2)**
35:3,5
**pay (5)**
19:10,12;28:3;41:18;
73:22
**paying (1)**
23:3
**payment (7)**
18:23;27:20;28:5,7;
29:23;111:6,8
**payments (5)**
27:24;28:6;111:10,
13,13
**PDF (1)**
103:18
**peace (1)**
51:23
**pending (2)**

47:11;101:15
**people (25)**
9:24;15:5,8;23:7,17;
36:22;56:5,9;57:22;
60:24;72:23;73:14,15,
15,21;81:19;82:6,20,
23;83:1;99:15;112:16;
116:7;118:20;120:7
**per (19)**
13:14;22:25,25,25;
23:1,2;34:3;35:8;54:6,
16;62:20;65:24;73:23;
78:8;84:17;89:15;90:2;
102:22;104:6
**percent (5)**
10:9,9;22:20,21;35:4
**performed (2)**
49:7,25
**period (1)**
17:3
**permission (1)**
130:25
**person (8)**
75:10,24,24;76:7,18;
77:10;78:3;82:14
**personal (3)**
27:1;34:3;75:19
**personally (2)**
75:3;94:17
**Phillip (1)**
118:3
**phone (2)**
8:2;63:11
**photos (1)**
105:16
**pick (6)**
96:6,11,13,14;104:8,
9
**picked (4)**
96:18,19,20;102:11
**picture (8)**
31:8;65:21;77:15;
84:18;103:6,17;
105:21,21
**pictures (14)**
30:24;65:18,24;
74:20;75:4,11,20;
77:25;79:8;104:24;
105:7,8,9,19
**pie (1)**
24:15
**pinpoint (1)**
89:14
**Pitts (2)**
21:19;117:25
**pizza (2)**
18:2;31:9
**place (14)**
18:2,8;24:18;27:18;
31:9;33:24;73:14;
97:20;111:1,5;113:3;
114:17;116:4,8
**placed (3)**

43:18;97:24;98:8
**placement (6)**
43:4;44:16;86:5;
107:1,23;108:13
**places (1)**
17:21
**plan (1)**
27:20
**plans (1)**
113:24
**Plastic (1)**
62:13
**plates (1)**
20:8
**platforms (1)**
35:14
**play (1)**
10:7
**Please (14)**
5:2;25:20;38:15,22;
39:20;40:19;49:14;
58:24;70:11;73:7;
76:24;82:1;107:6;
117:22
**plugged (2)**
55:20;98:24
**pm (3)**
103:4;109:20;131:15
**point (5)**
17:5;25:17;48:24;
49:20;50:1
**points (1)**
17:17
**police (1)**
76:5
**pop (1)**
36:2
**popular (1)**
111:3
**portion (13)**
38:11,12,18,19;
39:12;52:22;60:18;
125:7;126:1;127:1;
128:1;129:1;130:1
**possibility (1)**
91:20
**possible (4)**
9:19;83:25;119:6;
124:9
**possibly (6)**
57:1;61:17;75:5,25;
108:2;110:12
**post (1)**
78:8
**pot (1)**
24:15
**potatoes (1)**
24:1
**precious (1)**
69:14
**prepared (4)**
5:24;28:22;30:18;
31:19

**present (11)**
5:18;63:25;67:13;
72:23;80:2,19;91:22;
104:12;105:21;114:21;
124:12
**presentation (2)**
104:22;105:2
**presented (43)**
40:10;43:24;45:15;
46:11;51:17;52:11;
66:19,22,25;67:4,24;
68:16;71:3;74:12;80:9;
82:16;84:4,14;86:14;
87:2,4,4,22,23;90:1;
91:3,7,19;92:17;94:2,
4;95:7,8;104:21;
106:21,22;107:19;
108:1,16,17;109:5;
114:23;119:12
**presenting (1)**
15:8
**presently (1)**
119:17
**pretty (7)**
24:17;37:18;63:18;
79:25;90:1;102:22;
103:1
**previous (6)**
10:17;12:21;17:14;
31:9;79:24;118:16
**previously (2)**
6:21;93:24
**price (1)**
38:8
**primary (1)**
8:25
**print (1)**
62:18
**printed (1)**
62:9
**printer (1)**
117:18
**prints (1)**
42:4
**privileged (1)**
88:25
**Probably (24)**
9:19;26:6;33:2;66:7;
89:9,15;97:5,6,18;
98:5;100:3,12,14,15,
18,19;102:24;104:2;
105:22;110:19;115:15;
119:13;122:2,12
**problem (6)**
6:11;65:24;75:5;
80:24;115:12;131:11
**problems (4)**
30:7;78:9;85:10;
86:23
**proceed (1)**
40:19
**proceeding (1)**
5:19

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND, Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,
April 10, 2023

**proceedings (1)**
67:16
**processed (1)**
78:14
**produced (3)**
55:1,3,20
**profession (1)**
94:19
**profit (3)**
22:17;23:8;69:22
**promise (1)**
27:14
**Promised (1)**
27:15
**property (7)**
18:21;22:24;65:18,
23;75:4,11,19
**propose (2)**
38:11,19
**proposed (1)**
113:2
**protects (1)**
80:11
**proved (1)**
21:3
**provide (11)**
39:16,19,20,22;40:4;
42:7;44:2;55:9;88:17,
20;93:10
**provided (8)**
39:12;41:25;50:3;
53:17;57:3;87:13;
97:11;115:14
**provides (1)**
88:24
**providing (1)**
115:2
**public (1)**
75:11
**pulls (3)**
119:8,9,9
**purchase (2)**
18:20;19:25
**purchase/lease (1)**
18:24
**purpose (4)**
45:6;47:15;83:21,22
**purposes (1)**
99:19
**pursue (1)**
51:5
**pursued (4)**
13:2,4;18:4;121:5
**put (18)**
32:15,18;43:25;
47:19;64:19;67:21;
73:19;76:17;77:9;78:2;
99:3,12;100:1;103:1;
104:17;111:6,8;130:24
**putting (2)**
115:8,10
**Pylon (4)**
30:11;31:6;32:21;

38:7

**Q**

**quality (2)**
69:8;72:24
**quick (2)**
103:14;123:10
**quite (3)**
8:20;20:1;29:10

**R**

**raise (1)**
5:2
**raised (1)**
6:17
**ran (1)**
100:13
**rather (2)**
113:4;114:20
**reach (1)**
121:20
**reaction (12)**
25:11;63:15,24;66:1;
89:6,8,10,15;90:2;
92:24;93:3,20
**read (7)**
75:7;82:1;131:2,4,9,
10,13
**reading (1)**
9:23
**ready (3)**
18:16,18;60:3
**real (9)**
7:25;18:5,6;43:25;
90:2;103:14;111:3;
115:16;123:10
**really (6)**
9:16,20;12:22;19:23;
22:3,23;23:2,12,12,17;
32:19;33:1,4;35:21;
40:8,12;49:21;51:5;
52:4;55:21;56:6;61:7;
64:3;73:16;75:18;
81:19;82:6;85:10;87:2,
12;89:8,14,14;90:5,10;
93:3,12,13,16;94:8,10,
10;98:14;99:5,6,8,12;
104:14,17,25;105:10;
106:15;110:5;119:15;
120:1;122:4
**reason (6)**
13:2,3;65:13;86:7;
94:9;104:14
**reasoning (1)**
66:5
**reasons (2)**
53:5;121:22
**recall (13)**
11:19;27:10;41:1,4;
53:8;62:25;66:14,14;
88:16,19,22;105:17,25

**receipts (2)**
28:5;29:23
**receive (1)**
83:19
**received (2)**
57:13;65:15
**Recess (3)**
60:1;109:20;130:23
**recipes (4)**
15:16,20;23:24;
24:13
**recognize (6)**
48:18;65:3;83:7;
95:22;102:2;123:19
**recollection (2)**
9:18;62:3
**recommend (1)**
33:12
**record (13)**
39:1;54:4;63:7;77:4;
82:1,11;101:14;
124:25;125:5,6;
130:21,25;131:7
**recording (2)**
119:10;121:11
**rectangle (1)**
100:16
**REDACTED (6)**
125:7;126:1;127:1;
128:1;129:1;130:1
**Redirect (3)**
123:2;125:2;130:16
**refer (1)**
37:3
**reference (2)**
70:19;92:9
**referred (2)**
52:6;78:11
**referring (6)**
42:1;51:14;52:16,19;
78:12;120:12
**refrain (2)**
49:14;75:19
**refund (3)**
91:1,5,6
**regarding (4)**
51:21;63:24;87:21;
113:19
**regards (1)**
67:16
**register (4)**
34:13,19;35:8;104:3
**registered (14)**
52:8;53:20;66:13,17;
69:15,23;70:8,14;
74:10;85:25;86:11;
89:11;90:6,15
**registering (1)**
104:6
**regrets (1)**
66:16
**relate (2)**
25:14;76:12

**related (9)**
10:12;11:2;17:6,7,8,
9,13;88:24;116:17
**relates (3)**
10:11,17;25:23
**relation (2)**
113:25;115:6
**relevant (1)**
79:1
**rely (1)**
123:15
**remember (14)**
19:7,11;22:11;28:4;
40:7,9;42:9;43:22;
44:5;63:3;84:19,22;
118:1;122:5
**remembered (1)**
59:9
**remodel (1)**
19:25
**removed (2)**
105:12,15
**rent (2)**
18:2,7
**rep (2)**
10:23;131:8
**repeat (1)**
70:11
**replace (3)**
84:15;91:9;123:25
**replaced (1)**
31:12
**Replacement (3)**
28:17;30:11;31:6
**report (1)**
119:9
**REPORTER (2)**
5:2;131:14
**represent (5)**
5:14;45:10;71:16;
102:4;106:9
**representation (13)**
45:3,4,7,18,24;46:15,
21;47:3;52:17;80:7;
85:12;93:24;106:19
**representative (9)**
7:17;10:13,20;26:2;
50:18;76:4;77:15;
115:22,23
**representatives (1)**
56:7
**represented (4)**
18:7;46:1;52:12;
90:18
**representing (7)**
13:6;52:14;84:24;
106:9;109:2;112:12,25
**represents (13)**
45:9;51:16;68:8;
69:18;71:17,21;73:13;
74:4;80:11;84:2;86:3;
95:11;109:3
**reproduction (1)**

113:23
**request (4)**
51:25;97:15;131:9,
12
**requested (1)**
97:14
**requests (2)**
118:11,15
**required (2)**
27:22;101:3
**requirements (1)**
37:23
**research (1)**
33:3
**researching (2)**
65:17;74:20
**reserve (1)**
12:14
**resolved (1)**
67:23
**respectful (1)**
93:17
**respectfully (1)**
62:8
**respond (1)**
89:1
**responded (5)**
65:16;113:22;
118:16;119:25;120:2
**response (5)**
119:24;121:18,19,
21;122:14
**restaurant (34)**
15:3,6,24;16:2,7,9,
10,13,23,25;18:17;
21:8,11;26:21;31:23;
35:17;36:2;43:13;
65:19;68:14;69:20;
71:17;78:13,15;79:8;
97:16;98:14;103:4;
109:23;110:9,11;
114:24;115:3,18
**restaurants (9)**
16:6,20;17:14,16;
18:13;25:5;35:19,23;
110:23
**restraining (1)**
76:9
**returning (1)**
59:23
**revenue (1)**
65:12
**review (1)**
55:7
**reviewing (1)**
51:25
**revised (1)**
88:7
**revision (1)**
83:12
**reviving (1)**
111:1
**right (67)**

5:2;9:7,17,22;13:21;
17:17;18:18;19:20,24;
20:15,23;23:14;26:4;
31:7;37:7;46:15,21;
47:25;48:12;49:7;
50:13,13;52:23;54:10;
56:2,13;58:10,18;59:3,
12;69:24;72:5;73:18;
74:19;77:17,19;80:8,
15;81:22,24;85:18,25;
95:1,6;99:24;107:18,
24;108:8;111:1,2,5;
112:3;114:6;115:11;
117:16;118:3,22;
120:23;123:4,13;
124:24;125:4;130:15;
131:2,9,10,12
**road (4)**
    25:12;31:2,3,23
**role (1)**
    10:7
**routed (1)**
    87:1
**rum (1)**
    61:21
**run (2)**
    8:23;51:23
**runs (2)**
    21:18;27:9

## S

**sales (5)**
    23:3,4,5;73:20,20
**same (20)**
    5:20;25:13;30:17;
    32:16,17;38:1;41:13;
    43:14;56:21;57:23;
    59:13;67:22;86:14;
    94:12;106:1,5,7,13,14;
    123:14
**San (1)**
    111:3
**Saturday (1)**
    123:21
**saw (10)**
    15:11;23:16;50:12;
    55:21,22;56:10,17,21;
    62:18;121:14
**saying (9)**
    44:5;50:18;51:20;
    57:19;72:10;84:23;
    105:4;106:16;111:12
**scenario (2)**
    56:18;82:15
**school (1)**
    22:12
**schooling (1)**
    22:14
**schools (1)**
    22:10
**SCOTT (2)**
    5:8;6:13

**screen (2)**
    103:16;123:16
**screenshot (1)**
    103:19
**script (4)**
    96:15,16,18,19
**scripted (3)**
    97:15;98:13;99:10
**scripts (2)**
    96:7,11
**scroll (6)**
    28:15;65:6,8;103:5,
    5;123:13
**se (14)**
    13:14;34:3;35:8;
    54:6,16;62:20;65:24;
    73:23;78:8;84:17;
    89:15;90:2;102:22;
    104:6
**seafood (3)**
    25:2;110:1;114:4
**search (16)**
    34:16;35:5,9,12,14;
    47:20;49:7,25;53:6,8,
    10,17;54:19;55:11,12;
    56:25
**searched (1)**
    51:1
**searches (3)**
    34:4;53:4;55:15
**searching (7)**
    34:8,10;35:10;49:21;
    50:19;53:15;55:17
**season (1)**
    111:21
**second (23)**
    80:22;85:1,4,18,23;
    86:22;87:21;88:15,20;
    89:7;91:13;92:13,25;
    106:1,5,12;107:3,17;
    109:23;112:5;113:2;
    114:16;116:8
**seeing (2)**
    49:21;86:12
**seem (3)**
    17:5,6,13
**seemed (2)**
    15:12;82:17
**select (1)**
    18:10
**selective (1)**
    56:13
**sell (18)**
    61:4,10,12,14,15,20,
    23;65:11;68:10,11;
    69:20,20;71:8;72:2,9;
    73:9;93:25;114:6
**selling (5)**
    51:24;65:8;72:21;
    73:21;93:8
**sells (5)**
    71:11,23;72:11,19;
    73:1

**send (8)**
    41:22;48:20,22;64:5,
    5;86:22;119:23;124:8
**sense (3)**
    24:7;77:3;105:3
**sent (23)**
    49:9;50:17;64:16;
    65:4;81:5,23;87:5,8,10,
    12,21,22,23;88:1,4,6,
    14;121:17,21;122:7,
    11;124:2,5
**sentence (1)**
    50:8
**separate (1)**
    71:14
**separation (1)**
    68:12
**September (12)**
    19:8,13,18;21:22;
    29:3,11;30:5;41:5;
    48:25;49:3;52:25;57:6
**series (1)**
    5:16
**serve (9)**
    22:18;24:8;25:6;
    45:7;73:13,14,23;
    118:10,14
**served (3)**
    26:3;68:15;86:9
**service (2)**
    35:16;72:24
**services (1)**
    69:9
**serving (1)**
    71:17
**set (4)**
    18:18;25:15;113:22,
    23
**settled (1)**
    17:22
**Seven (3)**
    21:14;105:22;110:19
**several (3)**
    16:20;25:5;40:8
**shape (4)**
    70:20;80:18;120:20;
    123:1
**share (1)**
    9:2
**shared (4)**
    85:6;110:2;119:6;
    124:9
**sharing (2)**
    9:6;112:13
**shirts (4)**
    51:15;65:9;68:10,10
**shopping (1)**
    31:5
**short (2)**
    16:12;17:3
**show (6)**
    31:12;54:24;84:18;
    103:6,8;123:15

**showed (2)**
    31:13;105:19
**showing (3)**
    28:18;54:23;123:24
**shown (4)**
    30:25;36:13;66:21;
    108:11
**shows (6)**
    9:14,17;84:12,18;
    85:15;99:2
**shutting (1)**
    121:5
**side (2)**
    53:3;63:24
**sides (1)**
    66:8
**sideways (1)**
    120:16
**sign (55)**
    26:21;27:15,16,18;
    28:1;30:2,8;31:7;32:8,
    11,21,23;37:17;38:7;
    39:12;41:21;43:13,14,
    20,25;45:1;46:22;47:4,
    8,15,16;48:8;49:4,15;
    75:11;89:11,23;92:21;
    95:24;96:1,25;97:6,12,
    16,21;98:9,13,22;
    99:10,25;100:8,15,16,
    18,20,23;101:3,5,12;
    104:16
**signage (5)**
    29:1;30:21;31:23;
    81:15;98:19
**signed (10)**
    19:9;21:22;29:11;
    37:15;102:4,21;
    103:25;111:15,17,18
**signing (1)**
    102:15
**Signs (65)**
    26:17,19,22;27:3,7,
    12,14;28:23;30:18;
    31:19,25;32:8;37:7,9,
    10,13,20,23;38:6,10,
    11,17,19;39:13;40:4;
    41:3,11,18,22;42:23,
    25;43:6,21;44:14,18;
    45:5,15,20;46:4,7,11;
    53:1;56:24;57:3;60:25;
    62:14,15,15,20,23;
    66:19;67:12;83:19;
    88:2,3;89:10;90:4;
    91:22;92:16;94:16;
    96:5,8;106:22;107:19;
    108:1
**Signs' (1)**
    89:6
**similar (1)**
    25:6
**simple (2)**
    15:12;23:25
**single (1)**

**showed (2)**
**showing (3)**
    59:2
**singled (1)**
    58:17
**sit (1)**
    61:17
**sit- (1)**
    82:15
**site (1)**
    103:1
**situation (4)**
    37:19;38:5;112:18;
    124:21
**size (9)**
    42:21;44:11,14;60:5,
    16;80:6;96:23;103:3;
    108:12
**sleep (1)**
    93:2
**slowly (1)**
    28:16
**small (2)**
    7:24;21:12
**social (5)**
    65:22;77:16,22;78:1,
    7
**sold (2)**
    69:9;71:12
**sole (4)**
    14:8;20:15;116:3,6
**solely (1)**
    112:24
**somebody (8)**
    6:8;21:18;66:6;71:4;
    78:2,5;94:22,23
**someone (8)**
    25:11;38:3;65:23;
    75:3;78:5,15;79:5,7
**sometime (3)**
    62:19,21;63:9
**somewhere (8)**
    20:11;28:7;29:25;
    30:4,4;36:3;50:2;
    111:19
**soon (1)**
    115:16
**Sorry (36)**
    9:23;21:5;23:17;
    29:9;39:25,25;40:17,
    23;41:9;50:11;53:25;
    54:5;61:3,19;62:8;
    68:3;71:19;75:16,16;
    85:3,4;87:9,18;89:18,
    18;95:13;97:7;98:20;
    99:21;102:18;107:11;
    111:11;118:4;122:20,
    21;130:22
**sound (1)**
    29:10
**sourced (1)**
    37:3
**Southern (2)**
    24:19,25
**Southern-style (1)**

Min-U-Script®
Precision Reporting & Video (850) 737-9071
info@precisionreportingandvideo.com
(11) road - Southern-style

Case 5:22-cv-00260-MJF   Document 52-4   Filed 05/15/23   Page 48 of 50

MC3 INVESTMENTS LLC d/b/a THE LOCAL CAFE,    Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,                                                                                                    April 10, 2023

24:2

**space (1)**
117:8

**spacer (1)**
103:10

**spacing (1)**
44:24

**speak (2)**
26:22;89:22

**speaking (3)**
53:24;77:7;119:10

**spec'd (1)**
38:6

**special (2)**
25:8,10

**specials (1)**
61:19

**specific (5)**
42:13;82:14,15;
108:20;114:24

**specifics (1)**
110:6

**speculation (1)**
90:8

**speech (1)**
57:20

**spell (1)**
80:13

**spelled (1)**
106:7

**spelling (2)**
80:15;120:20

**spend (1)**
53:10

**sports (3)**
110:1;111:21;114:5

**stand (1)**
15:20

**star (8)**
83:9;84:5,10,11,12,
19,21,24

**start (2)**
43:12;130:20

**started (9)**
9:15;15:2;49:20;
50:19;53:3,4;86:24;
119:7;124:14

**starting (1)**
19:6

**startup (1)**
19:22

**State (16)**
8:13;11:18,18;25:22;
34:13,20;35:6;45:12;
56:12;80:13,20;86:4;
115:19;124:20;131:3,8

**stated (11)**
26:15;38:25;51:4;
59:10;62:17;70:17;
77:15;82:10;83:14;
93:17;122:13

**statement (2)**
75:6,7

**statements (1)**
66:15

**states (4)**
68:7;69:18;77:14;
80:10

**stating (1)**
101:21

**stay (2)**
93:10;123:4

**stayed (1)**
67:21

**staying (1)**
110:3

**steaks (1)**
25:3

**steals (1)**
79:6

**steamed (1)**
110:1

**steps (4)**
35:4;67:2,6,8

**Steve (2)**
26:23;84:23

**still (10)**
16:16;40:16;51:9;
67:10;77:7;81:15;
95:11;119:17,18;
120:19

**stir (1)**
75:5

**stirring (1)**
66:6

**stole (3)**
78:2,4,17

**stolen (3)**
78:23,24,25

**store (2)**
14:25,25

**Street (4)**
11:21;12:2;18:1,12

**stuff (3)**
23:25;24:1,16

**stumbled (1)**
119:8

**style (4)**
24:19,25;43:2;80:6

**styles (1)**
96:7

**submitted (1)**
67:9

**subpar (2)**
70:9,15

**substantial (1)**
20:1

**successful (3)**
15:10;16:25;17:2

**sue (5)**
119:14;120:15,22;
121:2,3

**sued (1)**
121:1

**Suite (1)**
12:3

**Sunbiz (3)**
9:9;11:5;12:2

**supposedly (3)**
57:22;91:25;95:3

**sure (69)**
9:16,16,20;14:14;
20:12;22:15,19,22,23;
23:10,12;28:7;30:3,5,
6;32:13,15,19,24;35:4,
21;39:6;40:22;41:13;
42:10;49:8;51:7;52:3,
10;53:13,16;54:23;
56:4;59:16;61:5;62:14,
17,22;64:8;68:8;75:18;
76:6;84:19;86:25,25;
87:2,2,3,6,6,12,17,17,
18,22,23;88:7,18;
89:24;91:10;105:11,
20;107:14;108:23;
119:15;121:23;122:1,
2,12

**suspenders (1)**
131:6

**swear (1)**
5:4

**sworn (1)**
5:10

**system (8)**
65:17,22;74:18,19;
77:16;78:1,4;79:10

**T**

**tables (1)**
20:7

**takeout (1)**
62:9

**talk (5)**
120:4;121:15,20,21;
124:21

**talked (2)**
52:4;120:6

**talking (5)**
9:12;27:10;107:15;
120:10,11

**team (3)**
87:4;109:24;110:2

**technical (1)**
15:10

**Telecom (15)**
8:25;9:13;10:8,11;
11:3;13:15;15:9;34:11;
38:2;116:11,18,20,25;
117:10,14

**telling (2)**
49:14;121:1

**tells (1)**
5:17

**ten (3)**
21:14;25:2;69:14

**Tennessee (1)**
36:3

**term (1)**

19:1

**terminology (18)**
12:11;21:12;52:10;
54:1,2,13;55:14,19;
56:15,18;58:1,4,6;
68:9;80:15;82:13;
102:9;121:6

**terms (2)**
53:6,9

**Tessa (1)**
7:14

**testified (1)**
5:10

**testify (1)**
7:16

**testifying (2)**
5:19;101:16

**texts (1)**
79:16

**Thanks (1)**
122:25

**thelocalcafecom (1)**
102:11

**thelocalcafenet (6)**
102:10,12;103:13,
25;104:9,23

**thelocalcafeorg (1)**
102:10

**therefore (1)**
124:11

**thinking (2)**
90:9;92:18

**third (1)**
50:8

**though (3)**
5:19;103:10;120:6

**thought (20)**
8:18;14:17;15:17,18;
29:9;33:19;40:17;
47:19;48:2,12,23;56:5,
10;58:17;71:19;74:25;
99:12,23;109:22;
130:22

**thousand (3)**
20:4;55:24;100:11

**Thousands (14)**
50:11,12;53:24,25;
54:2,3;55:15;56:16,17,
21;57:22;58:4,4,5

**threat (2)**
75:8;77:21

**threatening (2)**
75:10;79:12

**threats (2)**
76:18;77:10

**Three (13)**
7:5,10;12:9;13:6;
22:9;24:4,9;31:25,25;
35:23;64:9;93:2;
119:14

**timeline (2)**
49:16;62:21;63:10;
98:1,14

**timely (1)**
28:2

**times (1)**
121:15

**tire (1)**
14:25

**today (6)**
5:25;7:19;15:22;
33:2;103:4;113:15

**together (9)**
15:21;24:12,17;
31:22;43:25;64:1;
86:13;87:3;93:19

**told (9)**
23:11;37:19;38:7;
49:12;59:5;72:1;89:6,
11;91:15

**took (4)**
34:2;37:18;75:11;
103:7

**top (3)**
29:15;118:4;120:17

**topic (2)**
25:18,22

**topics (4)**
10:23,25;25:15;
76:13

**totally (1)**
44:13

**towards (2)**
111:13,19

**town (4)**
25:4,5;26:19;65:12

**trademark (49)**
11:11,13,15,17;
49:11,12;50:18;51:15;
52:8;53:21;56:8;57:2;
58:10;66:13,17,18,24;
67:5;68:7,14,18,22;
69:1,4,8,15,17,23;70:8,
14,19;71:15;74:10;
80:10,11;83:25;85:25;
86:6,10;89:12;90:7,15,
18;91:3,21;94:3;97:18;
106:11;119:7

**trademarked (2)**
49:19;80:21

**training (1)**
17:19

**transcript (5)**
60:12;131:2,9,10,13

**transpired (1)**
32:20;48:25

**treat (1)**
72:23

**trespass (2)**
75:5;76:5

**trespassed (5)**
65:21;75:2,15,17;
76:1

**trespassing (1)**
65:23

**tried (5)**

63:18;119:14,23;
120:15;121:20
**Trigo (2)**
111:2,3
**trouble (2)**
75:5;78:9
**true (1)**
131:5
**truth (4)**
5:4,5,5,21
**truthfully (3)**
5:16;111:25;113:7
**try (8)**
38:3;43:8;63:25;
66:23;67:3,6;94:9;
102:24
**trying (23)**
10:16;13:1,3;19:7;
49:23;51:6,12,20;53:4;
63:19;66:9;69:22;75:4;
84:1,3;85:7,8,8;86:12;
93:5;111:20;121:20;
124:11
**T-shirts (4)**
69:18;81:18;82:5;
93:8
**tuition (1)**
8:20
**turn (2)**
45:14;123:1
**turned (1)**
36:23
**two (8)**
8:17;9:24;22:9,9,13;
51:13;99:18;119:15
**two-year (1)**
8:22
**Tyndall (1)**
8:10
**type (8)**
14:15;25:6;30:17;
34:14;43:2;67:8;91:12;
103:11
**typed (1)**
55:22
**typical (3)**
22:17,19;66:1

## U

**under (7)**
5:20,20;20:6;69:9;
76:17;77:9;122:13
**unfamiliar (1)**
110:14
**unique (1)**
46:15
**Unit (1)**
11:21
**unless (4)**
5:17;6:8;63:12;
80:16
**up (50)**

13:5;14:17;15:1;
16:8;18:1,18;19:10;
24:10,13;27:22,23;
30:4;31:13;33:25;36:2,
3,17;43:9;47:20;49:25;
50:1;53:22;56:7,9,24,
25;66:6;75:5;78:16;
79:8;81:15;89:24,25;
91:7;94:11,15;97:4;
99:11;100:23,24;
101:1;102:4,15,21;
103:25;119:8,9,9,10;
123:7
**upon (1)**
119:8
**upset (4)**
58:9;79:12,18;80:1
**upside (14)**
45:14,18;50:6,15,16;
52:7,9,15,18;54:8,20;
55:14,18;86:4
**upside-down (16)**
46:14,20;47:2;50:22;
80:7,12,14,17;91:18;
93:23;97:17;101:10;
106:10,18;109:2;
120:20
**use (43)**
18:5,6,8;25:9;33:6;
35:19;36:4;38:10,11,
17,19;42:11;45:17,24;
47:23;57:23;61:3,10,
13,20,23;66:12,18;
69:5;73:25;74:8,18;
78:14;79:4,9;80:13;
84:5,21;85:1,4,17,23;
86:22;99:6,16;101:11;
121:6,12
**used (19)**
18:2,3;25:12;37:7;
44:6,19;48:12;53:7;
56:1;59:6;84:10,11;
94:12;96:24;99:18,18;
105:18;107:2;121:3
**using (23)**
26:17;33:16;46:8;
50:22;53:20;54:13;
55:14,25;57:22;58:9;
66:16;70:23;80:6;
86:24;90:6,14;92:14,
15;98:25;99:19;
101:10;104:18;121:5
**USPTO (1)**
11:12
**usually (2)**
34:24;36:5
**utilize (3)**
79:2,5,6

## V

**valid (1)**
68:16

**validate (1)**
53:5
**validity (2)**
50:20;75:20
**valuable (2)**
69:14,22
**variances (1)**
51:1
**variations (5)**
40:3;43:10;44:3;
54:14;92:12
**various (3)**
38:2;79:5;96:4
**vegetables (1)**
36:25
**version (1)**
43:20
**versions (1)**
43:23
**versus (7)**
14:23,24;51:14;56:8;
63:20;84:3;122:4
**via (2)**
63:11;65:4
**video (2)**
120:14;121:7
**vinyl (4)**
32:8,11,23;95:14
**violent (2)**
76:7;78:8
**visit (6)**
17:21;75:10,12,23,
24;76:3
**visited (6)**
65:20,21;74:21;75:2,
13;76:3
**voice (2)**
121:11,18
**voicing (1)**
122:3

## W

**Wait (7)**
39:23;41:8;47:10;
48:4;57:11;58:13;72:3
**waiter (1)**
15:2
**waiting (1)**
123:25
**wall (4)**
38:7;98:13,24;99:4
**walls (1)**
98:19
**Wallsign (1)**
28:17
**watching (1)**
15:8
**way (18)**
6:8;15:13;31:13;
48:9;54:15;55:16,17;
58:2,3;66:10;73:16,19;
79:10;80:1,1,18;93:18;

121:5
**ways (6)**
14:15;56:5;78:7;
79:5,25;96:5
**wearing (1)**
82:24
**web (2)**
104:12;105:5
**website (21)**
96:12,15;102:6,6,8,
13,14,20,21;103:21,22,
22,23;104:7,16,23,23;
105:7,13,16,24
**Wednesday (1)**
64:25
**week (5)**
22:25;63:2;98:3,5,6
**weekend (1)**
93:1
**weekly (2)**
23:4,6
**well-known (1)**
24:20
**West (3)**
62:5;93:7,9
**what's (3)**
82:16;102:8;123:16
**whatsoever (9)**
42:14;44:15;55:18;
65:12;71:2;86:2;90:19;
111:14;120:3
**whenever (5)**
34:12;36:1;91:7;
102:4;124:18
**whole (8)**
5:5;32:7;41:20;93:1;
103:21;112:15,15,16
**wholly (1)**
112:21
**Who's (4)**
10:5;64:18;65:17;
74:20
**widely (2)**
48:12;56:1
**wife (5)**
9:25;10:1,9;13:6;
14:21
**wife's (1)**
7:11
**willing (2)**
66:23;79:21
**wished (1)**
21:4
**within (6)**
27:11;52:1;104:3;
110:3,7,8
**without (6)**
46:8;54:23;80:7;
84:18;92:22;94:12
**WITNESS (17)**
5:7,9;25:22;38:23;
39:3,6,25;41:9;48:5;
59:16;101:17;107:7;

109:10,13,15;123:5,10
**woman (1)**
15:15
**wondering (2)**
20:7,9
**wood (1)**
98:19
**word (34)**
13:3;21:10,10;35:19,
23;36:4,12,18,20;
42:21;43:4;44:6,11,16;
46:9;52:16;55:13;60:5,
9,19,20,20,20,22,22;
68:25;69:19;80:12,14;
86:5;96:13;101:8;
107:25;121:3
**words (5)**
46:6;54:20;66:15;
77:19;96:13
**work (29)**
13:15;21:13;22:1;
51:20;52:5;64:1;66:9,
23;67:6;73:14;79:21,
25;84:1,1;85:8;86:12,
13;91:10;93:18;94:5;
95:9;103:21;116:11,
12,17,19,23,24;117:19
**worked (4)**
15:2;16:6,23;56:4
**working (2)**
51:21;116:8
**works (2)**
27:9;61:7
**worry (1)**
94:6
**worthwhile (1)**
26:6
**WOW (2)**
50:9,10
**write (1)**
118:5
**written (2)**
39:1;74:23
**wrong (1)**
21:3
**wrote (3)**
81:11,12,17

## Y

**y'all (10)**
67:4;85:8,11;87:3,
24;88:9;92:9;120:15;
124:1;125:2
**year (2)**
14:12;111:20
**years (15)**
6:18;7:5;8:17;15:3,4,
16;16:24;17:2;19:2,20;
56:4,9;69:14;119:15,
15
**yellow (7)**
84:5,10,11,12,19,21,

MC3 INVESTMENTS LLC d/b/a THE LOCAL BRAND, Confidential Atty Only - Deposition of MC3 Investments LLC - Gregory Cash
THE LOCAL BRAND, INC.,
April 10, 2023

23

**Yelp (1)**
    35:12
**Yep (2)**
    83:18;117:12
**Yesterday (1)**
    64:24
**young (1)**
    15:1

**Z**

**Zero (1)**
    115:19
**Zoom (1)**
    125:2

**0**

**09 (1)**
    15:17

**1**

**1 (1)**
    9:4
**1:33 (1)**
    131:15
**10 (7)**
    10:9;52:1;80:25;
    81:2;100:21;109:16,19
**10,000 (9)**
    53:19,23;54:2,7,17;
    55:24;58:18;100:10,12
**10,000s (3)**
    54:9;55:15;57:19
**10:42 (1)**
    60:1
**100 (1)**
    35:4
**10000 (1)**
    50:10
**11 (3)**
    83:4,5;107:17
**11:00 (1)**
    60:1
**12 (4)**
    95:13,14,16;123:21
**12:05 (1)**
    109:20
**12:17 (1)**
    109:20
**13 (3)**
    10:23;95:14,17
**14 (2)**
    95:14,18
**15 (3)**
    95:14,19;109:16
**15-minute (1)**
    59:22
**16 (2)**
    95:15,20
**17 (2)**

    101:23,24
**18 (7)**
    9:20;118:25;123:11,
    11,12,14,20
**18th (1)**
    9:22
**1969 (1)**
    8:10
**1994 (1)**
    16:10
**1995 (1)**
    16:10
**1st (5)**
    29:3;30:5,5;41:5;
    49:3

**2**

**2 (1)**
    11:7
**20 (2)**
    22:20,21
**2011 (1)**
    9:17
**2022 (2)**
    41:5;83:12
**2028 (1)**
    19:18
**22 (1)**
    29:3
**23rd (4)**
    11:21;12:2;18:1,12
**25 (3)**
    20:10,10,12
**258-9289 (1)**
    8:3
**28th (10)**
    48:23;49:1,2,4;50:1,
    2;53:1;63:9;98:2,3

**3**

**3 (11)**
    12:9;13:6;28:10;
    29:18,19;42:5;52:22;
    100:3,5,6;103:4
**3- (1)**
    31:23
**30 (1)**
    22:21
**32405 (1)**
    11:22

**4**

**4 (4)**
    28:18,20;52:21;
    54:17
**401 (2)**
    11:21;12:2
**45 (1)**
    23:17
**4th (5)**

    83:12;88:6,8,12,21

**5**

**5 (7)**
    29:19;30:10,14;
    100:3,5,6;109:18
**5,000 (1)**
    29:18
**50 (2)**
    17:1;20:11

**6**

**6 (4)**
    29:5,9;30:10,15
**6/1/22 (1)**
    29:5
**63 (1)**
    15:18

**7**

**7 (2)**
    48:15,16

**8**

**8 (6)**
    54:19,21,25;100:10,
    12,21
**8:17 (1)**
    123:21
**850 (1)**
    8:3
**8th (10)**
    14:12;19:14,15;20:2;
    33:5;62:19;63:9;97:23;
    98:2,18

**9**

**9 (3)**
    59:24;64:11,13
**9/1 (3)**
    29:8,9;62:18
**9/1/22 (3)**
    29:10,13;31:15
**90 (1)**
    10:9
**93 (1)**
    8:21
**94 (1)**
    16:19